# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

———————————————————————————

JOHN DOE, by and through his Parent,
JANE DOE,

      Plaintiffs,

           v.

EAST LYME BOARD OF EDUCATION
and the CONNECTICUT STATE
DEPARTMENT OF EDUCATION,

      Defendants.

———————————————————————————

CIVIL ACTION
NO. 3:11-cv-00291-JBA

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## Introduction

      John Doe ("John") is currently a sixth grade special needs student who presents with an unusual and a complex combination of disabilities that profoundly affect his ability to relate to other people and to access his educational program. Since at least 2009, the Board of Education (the "Board") of the East Lyme Public Schools ("ELPS") has been violating John's right to receive a free appropriate public education ("FAPE") as required under the Individuals with Disabilities Education Act ("IDEA") and Connecticut state law.

      In September 2010, Jane Doe ("Ms. Doe"), John's mother, sought to remedy the numerous procedural and substantive violations that ELPS has committed by requesting a due process hearing before the Connecticut State Department of Education's Bureau of Special Education. In a decision issued January 10, 2011, the hearing officer, Elisabeth Borrino, compounded the Board's violations of the Does' rights by wrongly denying them all relief. In a decision long on verbiage but short on actual analysis, the hearing officer erred by, *inter alia,*

failing to order any relief for the Board's egregious violations of the Does' substantive and procedural rights, and failing to base her legal and factual conclusions on the weight of the evidence before her.

For the reasons set forth below, the Does request that this Court, after considering the administrative record and the additional evidence that the Does have submitted pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii), enter summary judgment in their favor, including an order requiring the Board to reimburse Ms. Doe for John's educational expenses during the 2009-2010 school year, the 2010-2011 school year (through the date of hearing), and the summers of 2009, 2010, and 2011.

## FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are set forth in the record and in the Does' statement of material facts pursuant to Local Rule 56(a)(1), filed herewith, as well as in the affidavits submitted as additional evidence pursuant to  20 U.S.C. § 1415(i)(2)(C)(ii).  A summary of the factual and procedural background follows.[1]

John, currently twelve years old, has a complicated learning profile.  While he has high average to superior intelligence, he also has significant language-based learning disabilities which include an expressive language impairment; a rare disorder involving impairment in the learning and use of syntax; a disorder of written expression; dysgraphia; and dyslexia.[2]  His dyslexia involves a "double deficit" phonological processing disorder, meaning that his abilities

---

[1] The Administrative Record is cited herein as "R."

[2] "'Dyslexia is a specific learning disability that is neurobiological in origin.  It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge.'" R. at 824.

are significantly depressed in not one but two of the processes underlying literacy skills: phonological awareness and rapid naming.  These deficits place him at especially high risk with regard to the acquisition and development of skills such as reading, writing, and spelling.

John also displays social-pragmatic vulnerabilities[3] and anxiety.  He has previously been diagnosed with autism; pervasive developmental disorder- not otherwise specified [4]; attention deficit hyperactivity disorder, combined type; and a cognitive disorder, not otherwise specified, related to deficits in executive functioning.[5]

There is no dispute that John meets the eligibility criteria for special education pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482 ("IDEA"), and Conn. Gen. Stat. § 10-76a *et seq*.

At all times relevant to this case, John and Ms. Doe have resided in East Lyme, Connecticut.  The Board is the entity responsible for operating and managing the ELPS. Among

---

[3] "Pragmatics" refers to the rules for the social use of language.  It involves communication skills in three major communication areas: using language for varied social purposes (e.g., greeting, demanding, requesting); changing one's language according to the varying needs of different social situations; and following social rules for conversations (e.g., taking turns, staying on topic).  Website of the American Speech-Language-Hearing Association, *available at* http://www.asha.org/public/speech/development/Pragmatics.htm.

[4] "The diagnostic category of pervasive developmental disorders (PDD) refers to a group of disorders characterized by delays in the development of socialization and communication skills. Parents may note symptoms as early as infancy, although the typical age of onset is before 3 years of age. Symptoms may include problems with using and understanding language; difficulty relating to people, objects, and events; unusual play with toys and other objects; difficulty with changes in routine or familiar surroundings; and repetitive body movements or behavior patterns. Autism (a developmental brain disorder characterized by impaired social interaction and communication skills, and a limited range of activities and interests) is the most characteristic and best studied PDD. Other types of PDD include Asperger's Syndrome, Childhood Disintegrative Disorder, and Rett's Syndrome."  Website of the National Institute of Neurological Disorders and Stroke, National Institutes of Health, *available at* http://www.ninds.nih.gov/disorders/pdd/pdd.htm.

[5] Executive function refers to the set of mental processes that people use to perform activities such as "planning, organizing, strategizing, paying attention to and remembering details, and managing time and space."  Website of the National Center for Learning Disabilities, *available at* http://www.ncld.org/ld-basics/ld-aamp-executive-functioning/basic-ef-facts/what-is-executive-function.

the Board's duties is to ensure the provision of FAPE for eligible students with disabilities who reside within East Lyme, including John.

John attended ELPS from preschool through the middle of first grade receiving Individualized Education Plans ("IEPs") from the Board. In December 2006, midway through John's first-grade year, his planning and placement team ("PPT") determined that John's needs were so extensive that they could not be met within the public school setting. The Board, with Ms. Doe's agreement, placed John at Hope Academy, a private special education program in Orange, Connecticut, for the remainder of first grade and for second grade (2007-2008 school year).

At a PPT meeting in June 2008, and in an August 2008 meeting with Stephen Buck, the Board's then-Director of Special Education, Ms. Doe expressed concerns about the Hope Academy program, noting the program's insufficient level of speech and language therapy, John's lack of progress in reading, and the social difficulties that he was encountering. Lacking confidence in Hope Academy's abilities to meet John's needs, Ms. Doe investigated alternative schools and ultimately identified the Solomon Schechter Academy ("SSA") in New London, Connecticut as a possible placement.

In August 2008, the Board (through Mr. Buck) and Ms. Doe agreed that John would begin the 2008-2009 school year at SSA at Ms. Doe's expense on a trial basis.

In October 2008, clinical psycholinguist Robert L. Kemper, Ph.D., CCC-SLP, evaluated John at Ms. Doe's request. Dr. Kemper diagnosed John with dyslexia, a "double deficit" phonological processing disorder, and a specific language impairment, including an expressive language disorder and a rare and serious syntactic disorder, involving impairment in the ability to use word order. Dr. Kemper also identified pragmatic language deficits in John's profile.

At a December 18, 2008 PPT meeting, Ms. Doe and the Board agreed that, for the 2008-2009 school year, John would remain at SSA with Ms. Doe paying for tuition while the Board would provide and fund a total of 9 hours per week of special education and related services[6], including 1:1 reading instruction (5 hours per week) using the Orton-Gillingham program, and 1:1 speech-language therapy (2.5 hours per week).  The Board subsequently developed an IEP to that effect, which Ms. Doe accepted.  In February 2009, the Board, by agreement with Ms. Doe, amended the IEP, increasing the speech-language therapy to 3 hours per week.  Ms. Doe accepted the amended IEP.

In May 2009, Dr. Kemper reevaluated John.  He found that John had made significant progress in reading and spelling over the interval since his previous evaluation, during which time John had been attending SSA plus receiving related services.  Dr. Kemper confirmed his earlier diagnoses and diagnosed John, in addition, with a disorder of written expression consistent with dysgraphia.  Dr. Kemper recognized the uniqueness of John's profile, including the need for a curriculum that challenges him intellectually, the need for remediation of his severe language impairment, and the need for an educational environment where John feels safe and secure (particularly with regard to peer interactions) so that he can be mentally and emotionally "available" for learning. Dr. Kemper recommended that John remain at SSA and continue to receive specialized services, consisting of 2 hours per day (10 hours per week) of 1:1 speech and language services, and 3 hours per week of 1:1 Orton-Gillingham reading instruction.

---

[6]  Under the IDEA, the term "related services" is defined as "transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services… psychological services, physical and occupational therapy… designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling…) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." 20 U.S.C. § 1401(26)(A); 34 C.F.R.§ 300.34.

He further noted that both types of service needed to be provided to John by professionals with training and experience in meeting the needs of children with significant oral and written language deficits.

On June 17, 2009, the PPT convened to review John's program, Dr. Kemper's evaluation, and to develop John's IEP for 2009-2010 (fourth grade). Dr. Corinne Berglund – who at that point had succeeded Mr. Buck as the Director of Special Education – was the only Board representative to attend this meeting. Dr. Berglund announced at the meeting that the Board would not continue funding services for John if he returned to SSA for the 2009-2010 school year. Dr. Berglund did not identify an alternative program for John during the meeting. Ms. Doe asserted John's right to "stay-put" and continue to receive the services specified in the last agreed-upon IEP at the district's expense as provided for under IDEA, 20 U.S.C. § 1415(j), but the Board, through Dr. Berglund, refused to honor that right.

In later meetings (which were not PPT meetings) with Dr. Berglund and two other administrators, Ms. Doe learned that the Board was proposing to return John to ELPS for the 2009-2010 school year where he would be placed in large regular education classes (15-16 students), without any specialized services or supports, for approximately 75% of his time. The related services offered were inappropriate to meet John's needs because, *inter alia*, the amount of speech therapy was insufficient; reading instruction was not offered through an appropriate program (i.e., Orton-Gillingham); and the services offered were not going to be provided on a 1:1 basis as John required. The Board's proposed program, while required by the IDEA to be tailored to meet John's specific needs, was in fact not supported by any of the evaluations available to the PPT or any other information available to the Board. The Board outlined its proposed 2009-2010 ELPS program in an IEP that Ms. Doe received in July 2009.

Ms. Doe rejected the proposed 2009-2010 program, as well as the services that the Board had proposed for summer 2009, because they were plainly inappropriate for John.  By letters dated July 1 and 2, 2009, Ms. Doe notified the Board of her intent to provide John with summer services (4.5 hours per week of 1:1 speech-language therapy and a total of 18 hours of Orton-Gillingham reading instruction, per Dr. Kemper's summer recommendations) and her request for the Board to pay for these services.  By letter dated July 13, 2009, Ms. Doe also requested that the Board place John at SSA for the 2009-2010 school year and provide him with at least 10 hours per week of 1:1 speech-language therapy and 3 hours per week of Orton-Gillingham instruction, as Dr. Kemper had recommended.  She again stated her intent for the Board to provide these services at public expense.

The Board's refusal during the summer of 2009 and the 2009-2010 school year to offer any programming violated the Does' rights by failing to offer FAPE and by failing to recognize that in the event of a dispute over John's educational programming, John had a right under the IDEA to "stay put" at SSA with the district providing related services as it had agreed to do during the 2008-2009 school year.  In light of the Board's violations of John's rights, Ms. Doe was forced to incur all expenses related to John's SSA tuition, his related services, and transportation – including arranging for John to receive speech-language therapy from Geraldine L. Theadore, M.S., CCC-SLP, and Orton-Gillingham instruction from Janet M. Campbell, M.A. Both Ms. Theadore and Ms. Campbell are highly trained and experienced in working with children who have serious language impairments.

John made good progress in the program provided by Ms. Doe, which consisted of attending SSA plus receiving specialized services.  Although not a special education school, SSA met John's unique needs in a number of ways.  SSA, with a total enrollment of 28 in its K-6

program, provided the small classes that John needs in each subject throughout the day.  SSA teachers implemented many of the goals and objectives in his IEP.  SSA developed a written plan to address John's executive functioning deficits, and his teachers made modifications and accommodations in order to address his disabilities (e.g., shortening written assignments, changing grading criteria).  To address his academic strengths, SSA provided him with math instruction at his intellectual level (above his grade level).

Just as important as (and woven into) the ways in which SSA appropriately addressed John's academic needs were the ways in which it met his social and emotional needs.  Due to his unusual presentation, including awkward speech and movement, discourse that is difficult to follow, and lack of knowledge of social rules, John is an easy target for being bullied or humiliated by his peers.  SSA monitored any type of bullying incident closely, and worked with John to help him learn the vocabulary and actions necessary to successfully participate in groups with his classmates.  SSA also works with John to help him cope with his anxiety.  In the small, structured, supportive environment at SSA, John feels confident and comfortable; this, in turn, makes him available to learn both from his SSA classes and from his 1:1 services.

Ms. Doe sent the Board copies of John's progress reports, report cards, and evaluations to the Board as she received them during the 2009-2010 school year.  The Board refused to take any action in response, and continued to assert that it had no obligation to provide John with an educational program until John was actually enrolled in ELPS, notwithstanding his continued residency in East Lyme.

In April 2010, Dr. Kemper re-evaluated John.  He found that John had made progress in a number of areas, including spontaneous discourse, pragmatic language skills, reading rate, and reading fluency over the period of nearly a year since his previous evaluation, during which John

had received SSA plus the specialized services.  Dr. Kemper recommended that John continue to be educated within a small setting where he felt comfortable participating across a variety of communicative contexts.  Dr. Kemper recommended that John continue to receive specialized services.  Due to his progress, Dr. Kemper reduced the amount of recommended 1:1 speech-language therapy to 1.5 hours per day (7.5 hours per week).  He continued to recommend 3 hours per week of 1:1 Orton-Gillingham instruction.  His recommendations for summer 2010 were consistent with those for 2009 (4.5 hours per week of speech and a total of 15 hours of Orton-Gillingham).

The Board failed to convene a PPT meeting to review John's progress or to develop an IEP for the summer of 2010 or for the 2010-2011 school year.

By letter dated June 30, 2010, Ms. Doe informed the Board that she intended to provide summer services to John, similar to the program she had provided the previous summer, and requested ELPS to pay for this programming.  The Board's new Assistant Superintendent for Special Education and Pupil Personnel, Brian Reas, responded to Ms. Doe by stating that the Board would not fund any services, nor would it provide John with an IEP, unless he was enrolled in the ELPS.

By letter dated August 15, 2010, Ms. Doe notified the Board of her intent to continue John's placement at SSA for the 2010-2011 school year, with specialized services including of 7.5 hours of 1:1 speech-language therapy per week and 3 hours of 1:1 Orton-Gillingham instruction per week.  She again stated her intent that this program be paid for the Board.

The Board did not respond and did not pay for John's program during the summer of 2010 or during the 2010-2011 school year.  By failing to propose any program or placement for

John, the Board again violated John's right to a FAPE, as well as violating Ms. Doe's right as a parent to participate in the development of John's educational program.

On September 30, 2010, Ms. Doe filed a due process hearing request. A hearing was held on December 1, 15, and 17, 2010. Dr. Kemper, Ms. Theadore, Ms. Campbell, SSA Head of School Karen Rosenberg, Ms. Doe, and John all testified on the Does' behalf. The Board called only one witness on its behalf, Mr. Reas, who admitted during his testimony that he had no personal knowledge of John and little prior involvement with the case.

The hearing officer issued a decision on January 10, 2011, denying all relief despite the Does' presentation of substantial evidence of the Board's violations of John's rights and despite the Board's failure to produce a single witness who had direct knowledge of John. Among other things, the hearing officer erroneously concluded that the Board's 2009-2010 IEP offered John a FAPE; that SSA was not an appropriate placement; that no evidence was presented regarding services that Ms. Doe obtained; and that any procedural violations by the Board had not denied John FAPE. Incredibly, while the hearing officer acknowledged the Board failed to develop an IEP for the 2010-2011 school year – arguably the most fundamental obligation the Board has under IDEA – she ordered no relief as a result.

The Does now appeal this decision based on the administrative record, and have also submitted as additional evidence for the Court's review the affidavits of Dr. Kemper, who re-evaluated John in April 2011; Anthony Bram, Ph.D., a clinical psychologist who evaluated John in June 2011; Ms. Theadore and Ms. Campbell, who have continued to provide specialized services to John since the date of the hearing; Ms. Rosenberg, who continues to supervise John's education at SSA; and Ms. Doe. This evidence, as well as the evidence in the administrative record, plainly shows that John has continued to make progress in all spheres -- academic, social

and emotional – as a result of the program as that Ms. Doe has provided for him (SSA plus specialized services) since 2008 and through the date of this filing.

## STATUTORY FRAMEWORK

The statutory scheme for the education of children with disabilities, embodied in IDEA, has been summarized in numerous opinions, *e.g., Frank G. v. Board of Educ. of Hyde Park.*, 459 F.3d 356, 363-65 (2d Cir. 2006), and need not be repeated in detail here.  Briefly, in order to receive federal funding under IDEA, a state must ensure that "[FAPE] is available to all children with disabilities residing in the State."  20 U.S.C. § 1412(a)(1)(A).  To determine a child's eligibility for special education, the local educational agency ("LEA") will conduct an evaluation.  20 U.S.C. § 1414(a)(1).  Once the student is determined to be a "child with a disability" within the meaning of 20 U.S.C. § 1401(3), an "IEP Team," consisting of representatives of the LEA and the child's parents, meets to develop an IEP, which is a written statement specifying, *inter alia*, the special education and related services to be provided to the child.  *See id.* §1414 (d)(1)(A), (B), (d)(2), (d)(3).  In Connecticut, the IEP Team is referred to as the "PPT".  Conn. Agencies Regs. §§ 10-76a-15, 10-76d-10, 10-76d-11.[7]

The IEP has justly been termed the "key element of the IDEA," *Frank G.*, 459 F.3d at 363, and the "'centerpiece of the IDEA's education delivery system.'"  *Mackey v. Board of Educ. for the Arlington Cent. Sch. Dist.,* 386 F.3d 158, 160 (2d Cir. 2004) (quoting *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)).[8]  The IEP must

---

[7]  Federal special education law incorporates state standards, but only to the extent that they are consistent with, and at least as exacting as, federal standards.  *See Mrs. C. v. Wheaton*, 916 F.2d 69, 73 (2d Cir. 1990).  The states are free to provide greater protections (whether procedural or substantive) for parents and students if they choose.  *See, e.g., David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 420 (1st Cir. 1985).

[8]  IDEA has been reauthorized periodically, with the most recent reauthorization taking effect on July 1, 2005.  Some of the cases cited in this memorandum were decided under earlier versions of IDEA, such as

include "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 368 (1985).  In order to constitute a FAPE, the special education and related services must be "tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).

The school district must convene the PPT at least once per year to review the child's progress and to revise his IEP.  20 U.S.C. § 1414(d)(4)(A)(i)-(ii);  34 C.F.R. § 300.324(b); Conn. Agencies Regs. § 10-76d-11(b).  The district is required to have an IEP in effect for each eligible student as of the start of every school year.  20 U.S.C. § 1414(d)(2)(A);  34 C.F.R. § 300.323(a); Conn. Agencies Regs. § 10-76d-11(a).  The district must conduct a full re-evaluation of the student's needs at least once every three years.  20 U.S.C. §1414(a)(2); 34 C.F.R. §300.303; Conn. Agencies Regs. § 10-76d-9.  The parent has the right to be present and participate in any meeting at which the child's IEP is developed, reviewed, or revised, or at which his placement is determined.  20 U.S.C. §§ 1414(d)(1)(B)(i), (e); 34 C.F.R. §§ 300.321(a)(1), 300.322, 300.501(b), (c); Conn. Agencies Regs. §10-76d-12(c).

Pursuant to the so-called "stay put" provisions of IDEA, if the parent and the LEA disagree about the adequacy of the IEP, the LEA must maintain the child in his last agreed-upon placement pending the outcome of the dispute, unless the parent and LEA agree otherwise.  20

---

*Mackey* (decided under IDEA 97), or were decided under IDEA's predecessor, the Education of the Handicapped Act ("EHA"; amended and name changed to IDEA in 1990).  Thus, citations to the statute in cases decided under earlier versions of the act may differ from current citations.  Where the statutory language remains similar, cases decided under earlier versions of the act constitute valid precedent in IDEA cases.  *See Mavis v. Sobol*, 839 F. Supp. 968, 969 n.1 (N.D.N.Y. 1993).

U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); Conn. Agencies Regs. § 10-76h-17(a).   This provision

essentially serves an automatic injunction that enforces the status quo for the child until the

parties have resolved their dispute.

When a parent and district disagree about what constitutes a FAPE for a child, the parent

may also choose to make a unilateral placement by enrolling the child in a private program

without the consent of the school district, at the parent's expense.   If the school district's

proposed program is found not to provide FAPE, and the private placement is appropriate, the

hearing officer or the court may order the school district to reimburse the parents for the cost of

the private program.   *Florence County School Dist. Four v. Carter*, 510 U.S. 7 (1993);

*Burlington*, 471 U.S. 359, 369-70 (1985); 20 U.S.C. § 1412(a)(10)(C)(ii).

Either party may seek an impartial due process hearing before a state administrative

agency (in Connecticut, the SDE's Bureau of Special Education).   20 U.S.C. § 1415(f); 34 C.F.R.

§ 300.507; Conn. Agencies Regs. §§ 10-76h-1 to10-76h-3.   Any party dissatisfied with the

administrative decision may bring a civil action in state or federal court, pursuant to 20 U.S.C. §

1415(i)(2).

## STANDARD OF REVIEW

The standard for district court review of an administrative decision under IDEA has justly

been described as "unusual."   *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 890 (9th

Cir. 1995).   The statute provides that, in any action under Section 1415(i)(2), the district court:

>   (i)      shall receive the records of the administrative proceedings;

>   (ii)     shall hear additional evidence at the request of a party; and

>   (iii)    basing its decision on the preponderance of the evidence, shall
>            grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(B).[9]  This is an "intermediate standard of review," falling somewhere

between trial *de novo* and the more customary review of administrative proceedings under the

"clear error" or "substantial evidence" standards.  *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083,

1086-87 (1st Cir. 1993), quoted in *P. v. Newington Bd. of Educ.*, 512 F.Supp.2d 89, 99 (D. Conn.

2007), *aff'd*, 546 F.3d 111 (2d Cir. 2008); *see also Amanda J. v. Clark County Sch. Dist.*, 267

F.3d 877, 887 (9th Cir. 2001) (Congress intended judicial review in IDEA cases to "differ[]

substantially from judicial review of other agency actions, in which courts generally are confined

to the administrative record and are held to a highly deferential standard of review").

　　　When considering a summary judgment motion in the IDEA context, the "court's inquiry

is not directed to discerning whether there are disputed issues of fact, but rather whether the

administrative record, together with any additional evidence, establishes that there has been

compliance with IDEA's processes and the child's educational needs have been appropriately

addressed."  *A.E. v. Westport Bd. of Educ.*, 463 F.Supp.2d 208, 215 (D. Conn. 2006); *see also P.*

*v. Newington*, 512 F.Supp.2d at 98 (2d Cir. 2008).  Courts must give "due weight" to

administrative proceedings, and may not "substitute their own notions of sound educational

policy for those of the school authorities they review."  *Walczak*, 142 F.3d at 129 (quoting

*Rowley*, 458 U.S. at 206, 208).  However, the court's "review must be searching, and we must

recognize that even when educational authorities act with the best intentions they may sometimes

fall short of their obligations under the IDEA, and courts must then act to ensure compliance with

Congress's directives."  *P. v. Newington Bd. of Educ.*, 546 F.3d 111, 120-21 (2d Cir. 2008).

---

[9]  Some of the cases cited in this memorandum were decided under the prior provision, 20 U.S.C. §
1415(e)(2).  The prior subsection (e)(2) and the present subsection (i)(2)(B) are identical, except for the
addition of small Roman numerals to create sub-subsections in (i)(2)(B).

In matters of law, or mixed issues of law and fact, the district court reviews the hearing officer's decision *de novo*. *Regional Sch. Dist. No. 9 Bd. of Educ. v. Mr. and Mrs. M.*, No. 07-01484, 2009 U.S. Dist. LEXIS 71032 at * 6 (D. Conn. Aug. 7, 2009). The application of the IDEA to the facts of a particular case is a mixed question of law and fact. *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005).

Where, as here, the parent of a disabled child seeks reimbursement of the costs of a unilateral placement, the Court conducts a three-step inquiry. First, the Court examines "whether the state has complied with the procedures set forth in the IDEA." *Cerra*, 427 F.3d at 192; *see A.E.*, 463 F.Supp.2d at 215. Next, the Court inquires "whether the IEP that the parties developed through IDEA's procedures is reasonably calculated to enable the child to receive educational benefits." *A.E.*, 463 F.Supp.2d at 215, citing *Cerra*, 427 F.3d at 192. Lastly, if the IEP is procedurally or substantively deficient, the Court will "proceed to the third step and ask whether the private schooling obtained by the parents is appropriate to meet the child's needs." *Id.* In assessing appropriateness under the second and third steps, the Second Circuit has emphasized the importance of "such objective evidence of progress as grades and test results." *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997); *see also, e.g., Frank G.*, 459 F.3d at 364; *Walczak*, 142 F.3d at 130. When the court assesses the appropriateness of a unilateral placement, "[n]o one factor is necessarily dispositive"; the court must "consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs." *Frank G.*, 459 F.3d at 364.

The Does, as the party seeking to overturn the hearing officer's decision, have the burden of proof to show that that decision was incorrect. *Schaffer v. Weast,* 546 U.S. 49 (U.S.). Pursuant to Regulations of Connecticut State Agencies 10-76h-14, the Board had the burden at

hearing to show by a preponderance of the evidence that any challenged IEP was appropriate for John, and Ms. Doe had the burden to show that the program she provided was appropriate for him.

## ARGUMENT

There are essentially two school years at issue in this case, 2009-2010 and 2010-2011, including the summers of 2009 and 2010.[10]  As to each of these periods, the Board committed procedural violations of John's and Ms. Doe's procedural rights that were so serious as to constitute violations of their right to FAPE.  As to each of these periods, the Board also committed substantive violations of John's right to FAPE by failing to provide him with an appropriate IEP and placement.  Throughout these periods, the program that Ms. Doe provided for John, consisting of SSA plus specialized services, appropriately met his needs.  The hearing officer erred in ruling against the Does on each of these issues.  For the reasons set forth below, the Court should enter summary judgment in the Does' favor as to each of these periods.

**I.    SUMMARY JUDGMENT SHOULD BE ENTERED IN THE DOES' FAVOR BECAUSE THE BOARD VIOLATED JOHN'S SUBSTANTIVE AND PROCEDURAL RIGHTS TO A FAPE DURING THE SUMMER OF 2009 AND THE 2009-2010 SCHOOL YEAR, AND THE PROGRAM PROVIDED BY MS. DOE DURING THIS TIME WAS APPROPRIATE.**

The court's inquiry into procedural violations is "no mere formality." *Walczak*, 142 F.3d at 129.  The importance that Congress attached to IDEA's procedural protections, particularly those ensuring parental participation in the IEP development process, "cannot be gainsaid." *Cerra*, 427 F.3d at 193, (quoting *Rowley*, 458 U.S. at 205).  Not every procedural violation

---

[10]  Ms. Doe's due process hearing request included a request for relief as to the 2008-2009 school year as well.  She seeks relief from this Court as to 2008-2009 only as to special education and related services that the Board agreed in the December 2008 IEP to provide, but unilaterally changed in the February 2009 amendment of that IEP.  *See* Local Rule 56(a)(1) Statement of Facts ¶ 41.

constitutes a denial of FAPE.  Procedural violations "clearly result in a denial of FAPE,"

however, when they "result in the loss of educational opportunity," or "seriously infringe the

parents' opportunity to participate in the IEP formulation process," or "cause[] a deprivation of

educational benefits."  *Amanda J.*, 267 F.3d at 892 (citations and internal quotation marks

omitted).  *See also, Briere v. Fair Haven Grade Sch. Dist.*, 984 F.Supp.1242, 1255 (D.Vt. 1996);

20 U.S.C. § 1415(f)(3)(E)(ii).  In this case, the Board committed serious procedural violations

that violated John's and Ms. Doe's rights to FAPE in both the 2009-2010 and 2010-2011 school

years.

### A. The Board Violated the Does' Procedural Rights With Regard to the 2009-2010 School Year and the Summer of 2009, and Those Violations Deprived John of FAPE.

#### 1. *The Board's Failure to Develop John's IEP at a PPT Meeting, Based on the Evaluations and Other Information Provided at the PPT, Violated Ms. Doe's Right to Parental Participation and John's Right to FAPE.*

As discussed above, a child's IEP is to be developed by an IEP Team which is required

by law to include the parent, at least one special education teacher, at least one regular education

teacher (if the child participates in a mainstream classroom), a qualified representative of the

school district, an individual who can interpret evaluation results, and other persons if invited by

the parent or district such as related service providers.  20 U.S.C. § 1401(3); 34 CFR § 300.321.

In Connecticut, the definition of a PPT includes "a group of certified or licensed professionals"

who are "knowledgeable in the areas necessary to determine and review the appropriate

educational program" for the child.  Conn. Agencies Regs. §10-76a(15).  One of a parent's most

important procedural rights is the right to participate in these Team meetings.  *Rowley,* 458 U.S.

at 205-206.  *See* 20 U.S.C. §§ 1414(d)(1)(B)(i), (e), 1415(b)(1); 34 C.F.R. §§ 300.321(a)(1),

300.322, 300.501(b), (c); Conn. Agencies Regs. § 10-76d-12(c).  Decisions regarding the child's

program and placement are to be made by the PPT, with parental input.

On June 17, 2009, the Board convened a PPT meeting for John.  Ms. Doe was present, as

were a number of professionals who were knowledgeable about John's needs and qualified to

review his program including Dr. Kemper, Ms. Theadore, Ms. Rosenberg, and Theresa Akerman,

who had provided John's 1:1 Orton-Gillingham instruction during the 2008-2009 school year.

These professionals stated that John continued to require placement in the small, supportive

environment at SSA, with specialized services consisting of 1:1 speech-language therapy and 1:1

Orton-Gillingham instruction.  Dr. Berglund was the sole attendee from ELPS present at this

meeting.  Dr. Berglund did not present or identify any additional or contrary evaluative evidence

about John at this meeting, yet nonetheless contested the recommendations of other PPT

members.  The Board failed to develop any IEP goals and objectives for John at this PPT

meeting, and failed at the meeting to determine his program and placement for the summer of

2009 or for the 2009-2010 school year.   *See* Local Rule 56(a)(1) Statement of Facts, ¶¶ 51-54

(hereinafter referred to as "Loc. R. 56(a)(1) Stmt.").

Instead of developing John's program and placement collaboratively at a PPT meeting as

required under the IDEA and state law, the Board unilaterally created an IEP for the 2009-2010

school year (including summer of 2009) for John and decided, without any parental input, to

propose a placement for John at ELPS' Niantic Center School.

Ms. Doe learned of the Board's proposed placement at the Niantic Center School at a

June 26, 2009 meeting with administrators.  Dr. Berglund informed Ms. Doe that the Board's IEP

was based on John's service providers' evaluations as presented at the June 17, 2009 meeting (a

similar representation appears in the IEP) – yet the IEP could not possibly have been based on

these evaluations because (as discussed in greater detail below) that it deviates so greatly from the recommendations at the PPT meeting.

In actuality, Board administrators impermissibly substituted their own judgment for the recommendations made by the PPT participants. *See* Loc. R. 56(a)(1) Stmt. ¶¶ 51- 64, 67, 69. The Board failed to develop the IEP at the PPT meeting, and further failed to base the IEP on the evaluations, reports, and opinions of the PPT participants with knowledge and expertise regarding John's needs. The Board could not and did not develop an appropriate IEP for John. (The inappropriateness of the IEP is discussed in greater detail below.) Thus, the Board's procedural violations led to a substantive denial of the free appropriate public education that is his right.

In light of these plain violations of the IDEA, the hearing officer erred when she concluded that the June 17, 2009 PPT "considered the evaluations and input of each of [the] participants." R. at 171. By failing to develop the 2009-2010 IEP at a PPT meeting with parental participation and failing to develop an IEP based upon the recommendations for John, the Board committed serious procedural violations that deprived John of a FAPE and deprived Ms. Doe of the opportunity to develop an IEP at a properly-constituted PPT.

**2. The Board Failed to Honor John's Stay-Put Right to Continue Receiving Services as Specified in His Previous IEP.**

One of IDEA's most basic procedural rights is the right to "stay-put," or placement pending appeal, pursuant to 20 U.S.C. § 1415(j) (discussed above).  *See also* 34 C.F.R. § 300.518(a); Conn. Agencies Regs. §10-76h-17(a).  Under 20 U.S.C. § 1415(j), the parties are required to maintain the status quo in the event of a disagreement over the child's program; unless the parent and LEA agree otherwise, "the child shall remain in the then-current educational placement of the child."  20 U.S.C. § 1415(j).  As the Second Circuit has explained,

> implicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing. To cut off public funds would amount to a unilateral change in placement, prohibited by [IDEA].

*Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982), *quoted in Mackey*, 386 F.3d 158, 163.

The "then-current educational placement" means the placement described in the child's most recently implemented IEP.  *Mackey*, 386 F.3d at 163.  The stay-put provision reflects Congress' determination that "'all handicapped children, *regardless of whether their case is meritorious or not*, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved.'"  *Id.* at 161 (quoting *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 83 (3d Cir. 1996) (emphasis supplied by Second Circuit)).  In this case, after his accepted 2008-2009 IEP expired and a dispute arose as to the 2009-2010 IEP, John had a stay-put right to continue receiving 1:1 speech therapy and 1:1 Orton-Gillingham instruction at the Board's expense, in the amounts specified in the 2008-2009 IEP.

Stay-put is "a procedural right that is activated as soon as the PPT reaches an impasse." *A.S. v. Board of Educ. for the Town of West Hartford*, 47 Fed. Appx. 615, 616 n.2 (2d Cir. 2002). The parent does not need to do anything particular to invoke it; the right arises by operation of law.  *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1040 (9th Cir. 2009).  In this case,

Ms. Doe specifically called John's stay-put right to the Board's attention on multiple occasions. The Board blatantly refused to honor that right. *See* Loc. R. 56(a)(1) Stmt. ¶¶ 55,  60. The Board should have been funding John's specialized services at the 2008-2009 levels throughout the 2009-2010 and 2010-2011 school years, and into the current school year, until this dispute is finally resolved.  It has not done so.  By withholding services that the Board was required by 20 U.S.C. § 1415(j) to continue providing, the Board has caused a significant deprivation of John's educational benefits.  Its violation of the procedural right to stay-put therefore denied, and is continuing to deny, John a free appropriate public education.

The hearing officer listed as one of the issues for hearing "[w]hether the IEP of 12/18/08 constitutes a stay-put placement."  R. at 157.[11]  She concluded that the "issue was moot" because it "was neither argued nor was evidence submitted regarding such claim."  R. at 168.   This was clear error.  As this Court has stated, "there is no exhaustion requirement for a stay-put claim." *Brennan v. Regional Sch. Dist. No. 1 Bd. of Educ.*, 531 F.Supp.2d 245, 264 n.18 (D. Conn. 2007) (citing *Murphy*, 297 F.2d at 199-200).  The hearing officer in this case improperly attempted to impose such a requirement.  Where, as in *Brennan*, the hearing officer failed to rule on the parent's stay-put claim, no deference is due because there is nothing to which to defer.  *Id.* at 264 n.19.  In this case, as in *Brennan*, the parent incurred expenses in order to provide private services specified in the last agreed-upon IEP.  She is therefore entitled to reimbursement of those expenses for services set forth in the stay-put 2008-2009 IEP, from the date on which the dispute about the 2009-2010 IEP arose until the final resolution of this matter, regardless of the

---

[11]   Actually, the stay-put issue concerns the February 10, 2009 IEP, which amended the December 18, 2008 by increasing the amount of John's speech-language therapy.  This was the last agreed-upon IEP. See Loc. R. 56(a)(1) Stmt. ¶ 41.

outcome of her claim for reimbursement of all expenses based on the Board's denial of FAPE.

*Brennan*, 531 F.Supp.2d at 265.

**B.   The Board's 2009-2010 IEP Was Substantively Inappropriate and Failed to Meet John's Needs.**

The IEP that the Board promulgated for John's 2009-2010 school year and the summer of 2009 failed to meet his unique needs.  As discussed above and in the Local Rule 56(a)(1) Statement, John has a complex constellation of disabilities.  These include a rare disorder involving impairment in the learning and use of syntax; an expressive language impairment; dyslexia; a "double deficit" phonological processing disorder; a disorder of written expression; and dysgraphia.  In addition, he has been diagnosed in the past with autism; he has social-pragmatic difficulties; he has executive functioning challenges; and anxiety.  His profile is further complicated by the fact that he is also extremely intelligent.

An IEP must be "'tailored to meet the unique needs of a particular child.'"  *Walczak*, 142 F.3d at 122 (quoting *Rowley*, 458 U.S. at 207); *see also Frank G.*, 459 F.3d at 363.  An IEP will be found to be appropriate if it is "reasonably calculated to enable the child to achieve educational benefits," *Rowley*, 458 U.S. at 206-07, *i.e.*, if it "is likely to produce a meaningful level of progress."  *Brennan*, 531 F.Supp.2d at 272.  Because of the individualized nature of the IEP, "the ultimate inquiry must be tailored to the individual student's disability and specific educational placement."  *Id.*

The Board – not Ms. Doe – had the burden of proof to show that the 2009-2010 IEP was appropriate.  Conn. Agencies Regs. § 10-76h-14(a).  In this case, the Board failed to meet its burden of proving that the 2009-2010 IEP was tailored to John's individual needs and that the IEP would enable him to make meaningful progress.  As a preliminary matter, the Board offered no evidence at hearing that identified what John's needs actually were for the 2009-2010 school

year, or what services and placement he required in order to meet those needs. The Board

presented virtually no current, credible evidence at the hearing, or at the June 2009 PPT, to rebut

the reasoned conclusions of the evaluators and service providers working with John. At the time

of the June 2009 PPT meeting, John had not attended ELPS for two and a half years (since

December 2006); as of the date of the hearing, he had been attending school outside ELPS for

four years. The Board indicated on John's December 2007, June 2008, and December 2008 IEPs

that he was due for a three-year re-evaluation in December 2008, yet the Board failed to conduct

such a re-evaluation and therefore did not have ELPS staff with direct knowledge of John who

could testify at hearing about his educational programming needs.[12] Loc. R. 56(a)(1) Stmt. ¶¶

54, 99, 122, 127, 129.

Secondly, the Board presented no evidence beyond the IEP itself that actually described

its proposed program for John at the Niantic Center School at the hearing. Further, the Board did

not offer any explanation for why its proposed IEP reduced John's speech-language services

during the 2009-2010 school year, despite Dr. Kemper's express recommendation that they

needed to be increased. The Board did not explain why John would not be provided with 1:1

instruction, or how the Niantic Center School would help John socially or emotionally.

The Board's sole witness was its Assistant Superintendent for Special Education and

Pupil Personnel, Mr. Reas, who had been employed in the district for less than six months as of

---

[12]  The record contains a brief report of a speech-language test, the Clinical Evaluation of Language
Fundamentals-Revised ("CELF-3"), administered at Lawrence & Memorial Hospital by Susan Alfiero-
Bavasso, MS, CCC-SLP, in January 2009; however, this evaluation was administered without the prior
consent of or notice to Ms. Doe, and the hearing officer so found. R. at 162. Because evaluation of John
without parental consent violated Ms. Does' rights pursuant to 20 U.S.C. § 1414 (a)(1)(D),  34 CFR §
300.300, Conn. Agencies Regs. § 10-76d-8, this evaluation should not have been substantively
considered by the hearing officer. In any event, Dr. Kemper, who is a professional in the field of speech
and language pathology, testified that the CELF-3 was obsolete (the CELF-4 having replaced it in 2004),

the date of the hearing.   Mr. Reas' background is as a special education teacher; he is not a

speech-language pathologist or a psycholinguist, nor is he trained in Orton-Gillingham

instruction.   He testified that he had never actually met John (except when John testified briefly

on the first day of hearing), nor had he or anyone else from the district observed John's program.

 While Mr. Reas stated at the hearing that John has "been part of our system since he turned

three, so there's ... a collection of people who have probably – who probably know him."  Mr.

Reas was unable to identify even one such person from ELPS who "probably" knew John (nor

did one testify).  Loc. R. 56(a)(1) Stmt. ¶¶ 118- 125. R. at 1913. Moreover, any knowledge of

John when he last attended ELPS in mid-first grade would be extremely stale either as of the

June 2009 PPT or as of the hearing date.[13]

        The Board appears to deliberately have turned a blind eye to the many sources of

information about John.  Mr. Reas admitted that he had not spoken with Dr. Kemper (except in

connection with the hearing).   He stated that only he and his "coordinator," Regina Olearczyk,

had reviewed Dr. Kemper's evaluations.  R. at 1922.  As Mr. Reas is not a speech-language

pathologist or psycholinguist, R. at 1959, 2222-23, nor as far as can be ascertained from the

record is Ms. Olearczyk, it appears that no one from the Board with experience and training

comparable to Dr. Kemper's reviewed, considered, and understood his reports.  Mr. Reas

admitted that he discounted Dr. Kemper's evaluations "because they weren't done as part of the

school's evaluation process."  R. 1915.  This admission during the hearing served to confirm that

---

that research had shown it to be invalid, and that it should not have been used.  R. at 1810-1811.  Neither
Ms. Alfiero-Bavasso nor any other speech-language pathologist testified for the district.

[13]  The hearing officer erred by making a similarly unfounded assumption ("I'm assuming that the other
people at the PPT saw the child, we have the regular ed. teacher, . . . we have assistant principal, we have
principal," R. at 1912) when in fact no regular education teacher, principal, or assistant principal
employed by the Board was among the attendees at the PPT meeting, and no such person testified for the
Board or supported the 2009-2010 IEP.

the Board violated its obligation to consider <u>all</u> relevant information about John's needs,
including independent educational evaluations obtained by the parent.  *See* 34 C.F.R. §
300.502(a); Conn. Agencies Regs. § 10-76d(9)(c)(3).

 Mr. Reas also testified that he had never spoken with Ms. Theadore or with Ms.
Campbell.  R. at 1913, 1921-1922. He acknowledged that no one from the Board with expertise
equivalent to Ms. Theadore's had reviewed her reports, and that no one from the Board with
expertise equivalent to Ms. Campbell's had reviewed hers.  R. at 1922-1923. Mr. Reas also
admitted that he had never spoken with Karen Rosenberg, the SSA Head of School, who at that
point had been supervising the SSA portion of John's program for two and a half years.  R. at
1924.  Mr. Reas had not even spoken with Mr. Buck, who had been involved in the development
of John's IEPs until December 2008.  When  Mr. Buck sought an opportunity to speak with him,
Mr. Reas refused to do so.  R. at 1947, 1959-1960.

 On his direct examination, Mr. Reas gave no testimony and expressed no opinion about
the 2009-2010 IEP.  See R. at 1896-1908.  Although he asserted that Dr. Kemper's
recommendations all could be provided within the ELPS, R. at 1907-1908, Mr. Reas ignored the
fact that the Board had failed to offer services and a placement consistent with those
recommendations.  Mr. Reas' responses to questions about the 2009-2010 IEP on cross-
examination similarly failed to establish that the IEP was appropriate to meet John's unique
needs.  For example, Mr. Reas stated his belief that an IEP providing 2.5 hours per week of
speech therapy, as the 2009-2010 IEP did, "could be FAPE."  R. at 1919.  However, Mr. Reas
failed to establish that an IEP providing 2.5 hours per week of speech would constitute FAPE <u>for
John</u>, in light of John's disabilities.

When asked for the basis for his opinions during his testimony, Mr. Reas stated generalities about "[m]y experience working with a lot of students with Autism," "[m]y experience working with a number of special education students," knowing the level of speech services that he considered appropriate for some nonverbal students, and "knowing what has been considered appropriate in at least three districts in Connecticut." R. at 1920-1921. Because IDEA requires an individually tailored plan and personalized instruction, however, the needs of other students with other disabilities whom Mr. Reas may have known, and the possible appropriateness of other IEPs that he may have seen, bear no relevance to the issue as to the appropriateness of John's 2009-2010 IEP.[14]

To provide FAPE, an IEP must offer the student the opportunity to make "meaningful progress." *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114, 1121 (2d Cir. 1997). In this case, Mr. Reas' opinion about the 2009-2010 IEP should carry no weight, given that he did not know John well enough even to state whether John had made progress at SSA with regard to his dyslexia. R. at 1923. Mr. Reas' lack of knowledge did not stop him from asserting an opinion as to the

---

[14] Mr. Reas also made a number of gratuitous criticisms of John's evaluators and services, and offered several unsupported assertions about their qualifications. For example, he testified that Ms. Theadore had not "spent too much time working with students – children," R. at 1921, but later admitted that he had no actual knowledge on this point, *id.*, and in fact her curriculum vitae shows that she concentrates on children's issues. R. 990-91. Mr. Reas also frequently critiqued Dr. Kemper during the hearing, including stating that "I don't believe [Dr. Kemper] carries the credentials to do "reading evaluations," R. at 1914, despite Dr. Kemper's testimony that as a psycholinguist, he did have such qualifications ("what I specialized in as a clinical psycholinguist" includes "specifically, the area of dyslexia"), R. at 1746, and that he had in fact written his dissertation on "how disordered syntax may contribute to subsequent reading disabilities and dyslexia." R. at 1748. Mr. Reas also asserted that "I don't see in his curriculum vitae that he's certified to be a speech pathologist for a school system," R. at 1914, but it is undisputed that Dr. Kemper's curriculum vitae shows that he is licensed and certified in speech-language pathology, and that in fact he served as a consultant to a school district for approximately 8 years. R. at 805. Lastly, Mr. Reas tried to argue with Dr. Kemper's recommendations, saying that, "having worked with many speech pathologists," he believed that "[t]here is a standard in providing [speech] services that there is only so much students can take in at one time" and that he was not aware of any research showing that 7.5 hours of speech services would be more helpful or appropriate than 2.5 hours. R. at 1920. Again, these are generalities and impressions that are not specific to John's needs and that Mr. Reas, not being a

ELPS' ability to meet John's social and emotional needs, however. Based on "[h]aving seen [John]," R. at 1933 – which occurred only when John testified briefly at the hearing, R. at 1909-1910,[15] – Mr. Reas opined that John "is not unlike other students who have needs" for physical and psychological safety, R. at 1933 and that John could attend ELPS just as those students did. R. at 1933-1934. This opinion lacks any basis, is not individualized to John's particular needs, and should have been given no weight by the hearing officer.

By contrast, Ms. Doe presented plentiful evidence about John's needs during the 2009-2010 school year and the appropriateness of the program she provided for him at SSA plus related services. For example, Ms. Doe presented the evaluation reports and recommendations of Dr. Kemper, a highly qualified psycholinguist. Dr. Kemper testified as to John's unique profile and the difficulty of finding everything John needs in one existing program. He testified that, for the 2009-2010 school year, John needed to attend a small, structured program such as SSA, with small classes and a low student-to-teacher ratio. He further stated that John needed to receive 2 hours per day (10 hours per week) of 1:1 tutorial in oral and written expression by a trained speech-language pathologist, and 3 hours per week of Orton-Gillingham reading instruction by a certified Orton-Gillingham tutor. For the summer of 2009, he stated that John required 4.5 hours per week of 1:1 speech-language services and a total of 15 hours of 1:1 Orton-Gillingham instruction.

Dr. Kemper also testified that Ms. Theadore, the speech-language pathologist who began working with John in June 2009, was experienced and utilizing an appropriate and effective approach with John. Ms. Theadore is unquestionably a highly qualified professional; she is an

speech pathologist, is not qualified to offer in any event.

[15] John's entire testimony takes up less than six pages of the transcript. R. at 1626-1632.

associate professor of communications who specializes in the treatment of complex language disorders. R. at 163. Ms. Theadore attended the June 2009 PPT meeting. Her reports of John's progress and of her observation of SSA were available at the hearing. *See* R. at 989-1003, 1037-1044, 1143-1149, 1185-1206, and 1235.[16]

Ms. Campbell, who has provided John's 1:1 Orton-Gillingham reading and spelling instruction since July 2009, also testified at the hearing and reported on John's progress. She, like Dr. Kemper, testified that John needed to continue the 1:1 Orton-Gillingham instruction at the level of 3 hours per week in order to make progress. Dr. Kemper and Ms. Campbell explained that many of the goals and objectives in the proposed IEP were not appropriate to address the level at which John was then functioning, and that the proposed "code emphasis" reading program, allegedly incorporating "Orton-Gillingham principles," would not meet his needs. They also explained why all of John's specialized instruction needed to be provided 1:1, rather than in the unspecified mixture of 1:1 and small group settings listed in the IEP.

Moreover, Ms. Rosenberg, Ms. Campbell, Dr. Kemper, and Ms. Doe all testified to John's vulnerability to feeling shamed, humiliated, and targeted by other children and to his need to feel safe and comfortable in his educational environment in order to benefit from academic instruction. They each expressed their belief that the larger public school environment that the Board had proposed placement was not appropriate for him. *See* Local R. 56(a)(1) Stmt. ¶¶ 34, 47-48, 51, 85-86.

---

[16] The hearing officer had stated at the hearing that she would exclude these documents, as well as Ms. Theadore's curriculum vitae and her written direct testimony, if Ms. Theadore did not appear and testify. R. at 1414. Ms. Theadore was available to testify but Ms. Doe did not call her as a witness, due to time limitations imposed by the hearing officer. Despite having excluded Ms. Theadore's evidence, the hearing officer referred to it herself in her decision, R. at 163, 165, and so reference to that evidence is permissible here.

In light of the paucity of the Board's evidence as to the substantive appropriateness of the IEP it proposed for John the 2009-2010 school year and the summer of 2009, and the plentiful evidence to the contrary presented by Ms. Doe, the hearing officer's finding that the 2009-2010 IEP was appropriate and provided John with FAPE was clearly contrary to the preponderance of the evidence. Moreover, her opinion contains little analysis or explanation of her conclusion. In fact, what she did note were Dr. Kemper's recommendations, R. at 162-163, and some of the ways in which he had found the Board's proposed 2009-2010 program and placement to be inappropriate to meet John's needs. R. at 163-164. As discussed above, this testimony (as well as other testimony by Ms. Campbell, Ms. Rosenberg, and Ms. Doe) was unrebutted.[17] The hearing officer did not cite any countervailing evidence in support of her conclusion. Rather, she simply listed the services to be provided under the IEP, without considering whether they satisfied John's particular needs (which, according to the unrebutted testimony, they did not). *See* R. at 164,170. With regard to the proposed placement within ELPS, she stated that "[n]o evidence was provided that either of these two schools [Niantic Center or Flanders Elementary] would be inappropriate." R. at 170.

This statement ignores crucial portions of the record. First, it was the Board's burden to come forward with evidence that the proposed placement would be appropriate for John, which (as discussed above), the Board utterly failed to do. Second, Ms. Doe in fact presented credible evidence from multiple witnesses with knowledge of John – Dr. Kemper, Ms. Campbell, Ms. Rosenberg, and Ms. Doe herself -- that a placement in classes of 15 to 16 students within a public

---

[17]  The Second Circuit has stated that a court, in reviewing a hearing officer's decision, may not "ch[oo]se between the views of conflicting experts on a controversial issue of educational policy." *Grim v. Rhinebeck Cent. Sch. Dist.*, 2003 U.S. App. LEXIS 27934 (2d Cir. Oct. 8, 2003). In this case, however, there were no conflicting experts, as the Board did not present the testimony of any witness qualified to dispute Dr. Kemper's and Ms. Campbell's findings and recommendations.

school setting was be inappropriate to meet John's social and emotional needs, would render him unavailable for learning, and that he required a small, supportive school setting with small class size and low student-to-teacher ratio in order to receive FAPE. *See* Local R. 56(a)(1) Stmt. ¶¶ 34, 47-48, 51, 85-86.

The hearing officer's conclusory statements hardly constitute the type of "thorough and careful" review that would be entitled to deference. *Walczak*, 142 F.2d at 129.

The hearing officer's only acknowledgment of the voluminous evidence of the IEP's inappropriateness was her statement that "[a]lthough Dr. Kemper opined that the Student requires a private day placement since he looks different and would be subject to bullying, this was not persuasive." R. at 170. This statement ignores the many other reasons why Dr. Kemper found the IEP to be inappropriate (e.g., insufficient amount of speech-language services, insufficient amount of 1:1 speech and reading services, inappropriate reading approach, inappropriate goals and objectives). The hearing officer also ignored the many other witnesses (Ms. Campbell, Ms. Rosenberg, and Ms. Doe) who testified to John's need for a placement in a small, supportive environment such as SSA. She did not cite any evidence that an ELPS placement would be appropriate for John (nor could she, in light of the lack of any basis for Mr. Reas' assertions to that effect, discussed above).[18] She did not give any explanation as to why she found Dr. Kemper's conclusion unpersuasive. Ordinarily, a hearing officer's assessment of credibility is entitled to deference. However, where, as here, "'the record read in its entirety

---

[18] The hearing officer alluded to a statement that Dr. Berglund made during the June 2009 PPT meeting, to the effect that "Niantic Center School is small and staffed with a highly qualified special education teacher." R. at 170. Dr. Berglund did not testify at the hearing. The classes that she characterized at the PPT meeting as "small" contained 15-16 students; the testimony of Dr. Kemper and other witnesses at hearing established that John requires classes that are much smaller (6-8 students) and requires a small, supportive environment overall. The qualifications of school staff are irrelevant where, as here, unrebutted testimony established that the quantity and qualities of the proposed services and program

would compel a contrary conclusion,'" the Court can and should give the hearing officer's

credibility determination no weight. *Amanda J.*, 267 F.3d at 889 (quoting *Carlisle Area Sch.

Dist. v. Scott P.*, 62 F.3d 520, 528-29 (3d Cir. 1995)).

For all of the foregoing reasons, the Court, after reviewing the entire record and

additional evidence, should conclude that the Board failed to carry its burden and that 2009-2010

IEP failed to offer John FAPE.

### C. The Program That Ms. Doe Provided for John During the 2009-2010 School Year and Summer 2009, Consisting of SSA Plus Specialized Services, Was Appropriate and Met John's Needs.

After finding the Board's IEP inappropriate, the Court must go on to consider whether the

program that Ms. Doe provided during the 2009-2010 school year and the summer of 2009 was

appropriate for John.  Ms. Doe had the burden of proof on this issue.  Conn. Agencies Regs.

§10-76h-14(c).  Ms. Doe met that burden, and the hearing officer erred in concluding otherwise.

The record, as well as the additional evidence, shows that the program Ms. Doe provided,

consisting of SSA plus specialized 1:1 speech-language services and Orton-Gillingham reading

instruction, appropriately met John's needs.

In *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993), the Supreme Court

made clear that in order to merit reimbursement under the IDEA, a parent's choice of program

need not meet the same standards to which a district's program would be held.  As the Court

explained:

> Nor do we believe that reimbursement is necessarily barred by a private
> school's failure to meet state education standards. . . . Indeed, the school
> district's emphasis on state standards is somewhat ironic.  As the Court of
> Appeals noted, "it hardly seems consistent with the Act's goals to forbid
> parents from educating their child at a school that provides an appropriate
> education simply because that school lacks the stamp of approval of the

were inappropriate to meet John's needs.

> same public school system that failed to meet the child's needs in the first
> place."  Accordingly, . . . [p]arents' failure to select a program known to
> be approved by the State in favor of an unapproved option is not itself a
> bar to reimbursement.

*Id.* at 14 (citations omitted).  Thus, "a private placement need not provide certified special

education teachers or an IEP for the disabled student."  *Frank G.*, 459 F.3d at 364.  The parent

need only show that the placement provided "some element of special education services in

which the public school placement was deficient."  *Id.* at 365.

In this case, Ms. Doe has presented plentiful, unrebutted, objective evidence that the

program of SSA plus specialized services was meeting John's needs and enabling him to make

educational progress.  Dr. Kemper's testimony, affidavit, and 2009, 2010, and 2011 re-

evaluations show, through the objective results of standardized tests, that John has made

significant progress in his areas of need, including oral language, reading, and spelling, during

the time that he has been was receiving that program and as a result of receiving that program.

*See* Loc. R. 56(a)(1) Stmt. ¶¶ 43-44, 92-93, 133-137.  (For ease of reference, comparisons of Dr.

Kemper's test results in a number of areas are attached to this memorandum in graph form, as

Exhibit A.) [19]  Ms. Campbell's testimony, report, and affidavit provide objective evidence as to

John's progress in reading, as a result of the program Ms. Doe has provided. *See* Loc. R. 56(a)(1)

Stmt. ¶¶ 90, 146-148.  Ms. Theadore's reports and affidavit provide objective evidence as to

John's progress in oral and written language, again as a result of the program Ms. Doe has

provided.  *See* R. at 989-1003, 1037-1044, 1143-1149, 1185-1206, and 1235; Loc. R. 56(a)(1)

Stmt.  ¶¶ 142-145.  John's SSA progress reports and Ms. Rosenberg's testimony and affidavit

---

[19]   In his May 2009 evaluation, Dr. Kemper did find that John had not made expected progress in one
area, spontaneous written expression.  This led Dr. Kemper to diagnose "a significant written expression
impairment, which is consistent with a diagnosis of dysgraphia," R. 855, and to recommend additional
1:1 speech and language services to address John's written and oral deficits.

provide objective evidence that he has been achieving good grades at SSA and advancing from grade to grade. Loc. R. 56(a)(1) Stmt. ¶¶ 149-151. John's grades, test scores, and regular advancement comprise exactly the type of objective evidence that the Second Circuit has characterized as probative. *See, e.g., Frank G.*, 459 F.3d at 365; *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120-21 (2d Cir. 1997). Where, as here, the student's "objective academic achievements are uncontradicted and certainly not 'trivial,'" they prove the appropriateness of the program in which the student made the progress. *Walczak*, 142 F.3d at 131.

In addition to the objective evidence of John's progress, the Court must consider "the totality of the circumstances," including John's social and emotional progress while receiving the program consisting of SSA plus specialized services. *Frank G.*, 459 F.3d at 365. This evidence, too, is plentiful and uncontested. As discussed above, Dr. Kemper, Ms. Campbell, Ms. Rosenberg, and Ms. Doe each testified as to John's need for a small, supportive setting such as SSA. Dr. Kemper and Ms. Campbell observed John at SSA and testified that SSA provided such a setting. Dr. Kemper described how it allowed John to perform academically (he observed John give an oral presentation) and to engage in social communication with peers at lunch and recess. R. at 1823-1825. Ms. Campbell explained how the atmosphere and approach at SSA dovetailed with the Orton-Gillingham instruction that she provided, as both increased John's sense of confidence and competence. R. at 1592-1593. Ms. Rosenberg described the ways in which SSA helped John learn to interact with peers, develop executive functioning skills, and address his anxiety. *See* Loc. R. 56(a)(1) Stmt. ¶¶ 82, 84-85. Ms. Doe provided similar evidence. *Id.* ¶ 86. Dr. Anthony Bram, a clinical psychologist who evaluated John in June 2011, found that John had made significant progress in that he had increased self-esteem, improved social pragmatics and was more trusting of others. *Id.* ¶¶ 141-143.

The affidavits of Dr. Bram, Dr. Kemper, Ms. Theadore, Ms. Campbell, Ms. Rosenberg, and Ms. Doe provide evidence of John's academic, social, and emotional progress in the program provided by Ms. Doe (SSA plus specialized services) since the date of the hearing.  Subsequent progress is relevant to show the appropriateness of the program and placement that a parent provided.  *Capistrano*, 59 F.3d at 896; *Town of Burlington v. Department of Educ. of Massachusetts*, 736 F.2d 773, 791 (1st Cir. 1984) ("in many instances experts who have testified at the administrative hearing will be bringing the court up to date on the child's progress from the time of the hearing"), *aff'd on other grounds*, 471 U.S. 359 (1985).

The hearing officer found that the program Ms. Doe provided was not appropriate.  R. at 174.  This conclusion is unsupported by the record.  The hearing officer erred, first, in focusing only on SSA in her discussion of the unilateral placement, *see* R. at 165-166, 174-175, when in fact the program that Ms. Doe provided must been seen as a whole, consisting of SSA plus the specialized speech and Orton-Gillingham services. The hearing officer apparently disregarded the specialized services altogether.  She stated, "The Parent is requesting reimbursement for . . . services privately obtained.  No evidence was presented during the hearing on this issue nor was this issue pursued."  R. at 175.  This statement is clearly unfounded.  As noted above, Ms. Doe in fact presented extensive evidence about the services that she provided privately for John.

The hearing officer faulted SSA because, she stated, it "provides no special education services whatsoever, does not implement the IEP, and the teachers are not special education certified."  R. at 174.  As discussed above, however, it is well established that a unilateral placement need not provide special education services, need not employ certified special education teachers, and need not implement an IEP,[20] as long as it meets the child's special needs

---

[20]  Thus, whether or not the parent "believes the program is appropriate as regards its ability to

in some way that the proposed public school placement did not. SSA met John's special needs in a number of ways. Here, as in *Frank G.*, "[t]he small class size offered at [the unilateral placement] was one element of the special education services necessary to address a significant deficiency in the inappropriate placement the school district offered." 459 F.3d at 365.[21]

Moreover, as in *Frank G.*, the private placement provided numerous accommodations and modifications to meet the student's needs. There, the Court found the private placement appropriate not only because of the small class size but because the teacher:

> adapted her instruction to meet [the student's] needs. [She] worked with [the student] one-on-one, created a communications book, gave [the student] extra time to complete work, and allowed him to work in isolated areas of the classroom. [The teacher] also adapted the methodology of instruction by allowing [the student] to take tests orally. . . [The student also] received assistance from a volunteer teacher's assistant . . .

*Frank G.,* 459 F.3d at 365-66. Similarly, in the instant case, Ms. Rosenberg testified that SSA modifies John's work by shortening his writing assignments to accommodate his deficits in that area. SSA modifies its grading criteria by grading his tests on information rather than on style. SSA employs strategies such as redirecting his oral responses when they are hard to follow and addressing his anxiety when he becomes overwhelmed. Aides work with him to teach him the vocabulary and strategies that he needs for successful interactions with peers. The staff members monitor his social interactions and intervene when necessary. SSA created a written plan to address John's executive functioning deficits; this is an individualized plan that does not apply to all students. SSA provided John with 1:1 advanced math instruction to address one of his areas of strength. The social studies teacher met with him 1:1 after school to make up work that he missed when he left to receive his specialized services. R. at 1280. These accommodations,

---

implement the IEP," R. at 174, is irrelevant. Moreover, Ms. Rosenberg did testify that SSA implements numerous of John's IEP goals and objectives to the best of its ability. See Loc. R. 56(a)(1) Stmt. ¶ 81.

modifications, instructional strategies, and services shows that the portion of John's program that took place at SSA, like the student's private school program in *Frank G.*, was appropriate not only because of the small class size, but also because his program included numerous elements that were specially designed to meet his needs. *See Frank G.*, 459 F.3d at 366-67; *Knable v. Bexley*, 238 F.3d 755, 770 (6th Cir. 2001) (cited with approval in *Frank G.*); *Briere v. Fair Haven Grade Sch. Dist.*, 948 F. Supp. 1242, 1257 (D. Vt. 1996) (private school appropriately met student's needs by providing "a structured, individualized, supportive environment within which to learn," including small class sizes "permitting individual attention and encouraging [the student] to interact with other students").

To obtain reimbursement under IDEA, "parents need not show that a private placement furnishes every service necessary to maximize their child's potential." *Frank G.*, 459 F.3d at 365. *See also, e.g., Alamo Heights Ind. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (9th Cir. 1986); *Norton Sch. Comm. v. Massachusetts Dep't. of Educ.*, 768 F. Supp. 900, 910 (D. Mass. 1991). Dr. Kemper testified, and the rest of the evidence Ms. Doe presented showed, that John is a child with a complicated profile and that it is difficult if not impossible to find a program that can address all of his needs under one roof. *See, e.g.,* Loc. R. 56(a)(1) Stmt. ¶ 47. The fact that he needed to leave SSA two afternoons per week does not mean that SSA is inappropriate, as the hearing officer thought. R. at 174.[22] Rather, in devising a program consisting of SSA plus specialized services, Ms. Doe arrived at a creative, flexible, and appropriate way of meeting John's unique needs, when the Board had failed to do so.

---

[21] Even the hearing officer acknowledged that John benefits from the small class size at SSA. R. at 174.
[22] In so concluding, the hearing officer appears to have ignored Ms. Rosenberg's and Ms. Doe's testimony that, either at SSA or at home, John made up much of the work he missed. *See, e.g.,* R. at 1280.

For all of the foregoing reasons, the Court, after reviewing the entire record and additional evidence, should conclude that Ms. Doe has carried her burden and that the program that she provided for John, consisting of SSA plus related services, "reasonably serve[d his] individual needs." *Frank G.*, 459 F.3d at 365.

## II.  SUMMARY JUDGMENT SHOULD BE ENTERED IN THE DOES' FAVOR AS TO THE 2010-2011 SCHOOL YEAR AND SUMMER OF 2010, BECAUSE THE BOARD VIOLATED JOHN'S SUBSTANTIVE AND PROCEDURAL RIGHTS TO FAPE, AND THE PROGRAM PROVIDED BY MS. DOE WAS APPROPRIATE TO MEET HIS NEEDS.

The evidence at hearing clearly established, and the hearing officer found, that "[t]he Board has not conducted an annual review, proposed a program, or held a PPT for the 2010-2011 school year." R. at 168, 176. The Board failed to propose an IEP for John for 2010-2011 or for the summer of 2010; thus, he had been without an IEP for approximately seven months as of the date of the decision.  Inexplicably, the hearing officer failed to conclude that this fundamental violation of John's rights deprived him of FAPE.  Instead, she stated that "[t]o the extent any procedural violations occurred, such violations were not sufficiently significant to render invalid a proposed IEP, nor did any procedural violation result in a denial of FAPE to the Student." R. at 176. *See also* R. at 172.  The hearing officer ordered the Board to convene a PPT meeting within 15 days of her decision "to conduct an annual review, and [to] review possible alternative placements for the Student."  R. at 176.   She failed to order any other relief for the Board's violation of John's procedural and substantive rights during 2010-2011 and the summer of 2010.

As the Supreme Court has stated, the "core of [IDEA] . . . is the cooperative process that it establishes between parents and schools," and the "central vehicle for this collaboration is the IEP process." *Shaffer v. Weast*, 546 U.S. 49, 53 (2005).  Here, the Board failed to re-evaluate John, in violation of 20 U.S.C. § 1414(a)(2), and 34 C.F.R. § 300.303, and Conn. Agencies Regs.

§ 10-76d-9.  It failed to convene an IEP Team to review and revise his IEP, in violation of 20

U.S.C. § 1414(d)(4)(A)(i)-(ii), 34 C.F.R. § 300.324(b), and Conn. Agencies Regs. § 10-76d-

11(b).  The Board failed to afford Ms. Doe her rights to be present and participate in meetings to

develop John's IEP and determine his placement, in violation of 20 U.S.C. §§ 1414(d)(1)(B)(i),

(e),  34 C.F.R. §§ 300.321(a)(1), 300.322, 300.501(b), (c), and Conn. Agencies Regs. § 10-76d-

12(c).  It failed to develop an IEP for the summer of 2010 and the 2010-2011 school year.  The

Board failed to have an IEP in effect for John as of the start of the 2010-2011 school year, in

violation of 20 U.S.C. § 1414(d)(2)(A), 34 C.F.R. § 300.323(a), and Conn. Agencies Regs.  § 10-

76d-11(a), and failed to have any IEP in effect for months thereafter.[23]

These types of violations "go to the heart of parental participation," and are so serious as

to "constitute a denial of a free appropriate public education per se."  *Briere*, 948 F. Supp. at

1255.  *See also Davis v. Wappingers Cent. Sch. Dist.*, Nos. 10-1160, 10-1429, 2011 U.S. App.

LEXIS 11262 at *6 (2d Cir. June 3, 2011);  *Knable*, 238 F.3d at 768 (requirement of a written

IEP should "be enforced rigorously"); *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1525-26 (9th Cir.

1994).  As the Supreme Court has stated, "when a child requires special-education services, a

school district's failure to propose an IEP of any kind is at least as serious a violation of its

responsibilities under IDEA as a failure to provide an adequate IEP."  *Forest Grove Sch. Dist. v.

T.A.*, 129 S. Ct. 2484, 2491 (2009).  Clearly, the Board's multiple violations of John's and Ms.

Doe's rights "impeded [John's] right to a [FAPE]," "significantly impeded [Ms. Doe's]

opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to

[John]," and "caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(2).

---

[23] Even if the Board thought that Ms. Doe would reject anything it offered, it was still required to comply
with IDEA's procedures and make a formal written offer of placement.  *Knable*, 238 F.3d at 768; *Union
Sch. Dist.*, 15 F.3d at 1525-26.

It appears from the record that the Board ignored its obligation to develop John's IEP for the summer of 2010 and the 2010-2011 school year because it contended that New London, where SSA is located, was responsible instead.  That conclusion is plainly wrong.  John is a unilaterally placed private student where FAPE is at issue, pursuant to 20 U.S.C. § 1412(a)(10)(C), not a parentally-placed private student pursuant to 20 U.S.C. § 1412(a)(10)(A); thus, East Lyme as his district of residence remains responsible for him.[24]  Even assuming *arguendo* that the Board truly believed it was not responsible for John, the district's subjective intent is "not material," where the 2010-2011 school year "began without an IEP in place or ready to be in place and as a result he was denied the free appropriate public education to which he was entitled."  *Gerstmyer v. Howard County Pub. Sch.*, 850 F. Supp. 361, 366 (D. Md. 1994).

In instituting the statutory scheme that we now know as IDEA, Congress did not intend to "create a right without a remedy."  *Burr v. Ambach*, 863 F.2d 1071, 1078 (2d Cir. 1988).  Reimbursement is an equitable remedy, as to which the Court enjoys "broad discretion" in fashioning relief.  *Burlington*, 471 U.S. at 369.  Where, as in this case, the district "abrogated its obligation to provide an appropriate educational program," that fact weighs heavily in favor of reimbursement.  *Susquenita Sch. Dist. v. Raelee S.*, 25 IDELR 120, 126-27 (M.D. Pa.), *aff'd*, 96 F.3d 78 (3d Cir. 1996).  Any other result would constitute an "empty victory" for Ms. Doe.

_____

[24]  The Board raised this argument on a motion to dismiss the hearing request, R. at 225-329, which the hearing officer denied.  R. at 69.  Although her discussion of the issue in her decision is rather opaque, R. at 175-176, she implicitly found that the Board was responsible for John when she ordered it to convene a PPT for him.  R. at 176.  The Board has not appealed either the denial of the motion to dismiss or the order to convene the PPT.  Thus, the question of district responsibility should not be an issue in the instant action.

*Alamo Heights Independent Sch. Dist. v. State Bd. of Education*, 790 F.2d 1153, 1161 (5th Cir. 1986) (quoting *Burlington*, 471 U.S. at 370).[25]

     As a matter of law, the hearing officer erred in failing to recognize that the Board's multiple, serious procedural violations were so fundamental as to constitute denials of FAPE. She also erred in failing to order any remedy for these violations.  There was no IEP to consider for the summer of 2010 or the 2010-2011 school year, so the second stage of the three-step inquiry does not apply.  As to the third step, for all of the reasons discussed above the program that Ms. Doe provided (SSA plus specialized services) was appropriate throughout the time period at issue.  Thus, in the face of the Board's blatant disregard of John's and Ms. Doe's rights, the hearing officer should have ordered – and the Court should now order – reimbursement of all of Ms. Doe's expenses connected with that program, including SSA tuition, the costs of the specialized services, and transportation.

## CONCLUSION

     For the reasons set forth above, the plaintiffs' motion for summary judgment should be granted in its entirety.

                                        Respectfully submitted,

                                        JOHN DOE and JANE DOE

                                        By their attorneys,

                                        /s/ *Barbara L. Cox*
                                        BARBARA L. COX
                                        Fed. Bar No. Ct08523
                                        The Gallagher Law Firm

---

[25]  The hearing officer failed even to consider an award of compensatory education, stating that Ms. Doe had not sufficiently identified the compensatory services sought.  R. at 175.  Compensatory education is an available remedy for violations of IDEA.  *E.g., P. v. Newington*, 546 F.3d at 123.  In this case, however, reimbursement is the only remedy that will satisfy the equitable and policy considerations set forth in *Burlington*, 471 U.S. at 370-71, and *Florence County*, 510 U.S. at 12, 15-16.

1377 Boulevard, P.O. Box 1925
New Haven, CT 06509
Tel.: (203) 624-4165; Fax: (203) 865-5598
Fax: (617) 367-2988
Email: bcox@gallagher-lawfirm.com


/s/ *Eileen M. Hagerty*
Eileen M. Hagerty
Fed. Bar No. phv04555
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA 02114
Tel.: (617) 227-7031; Fax: (617) 367-2988
Email: ehagerty@kcslegal.com

Dated: January 17, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2012 a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


/s/ *Eileen M. Hagerty*
Eileen M. Hagerty
Fed. Bar No. phv04555