IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
--------------------------------------------------------x
                                    :
JOHN DOE, by and through his Parent, :        3:11 CV 291 (JBA)
JANE DOE,                           :
                                    :
v.                                  :
                                    :
EAST LYME BOARD OF EDUCATION        :
and the CONNECTICUT STATE           :
DEPARTMENT OF EDUCATION             :        DATE: AUGUST 14, 2012
--------------------------------------------------------x
```

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On February 24, 2011, John Doe ["John" or "student"], by and through his Parent,

Jane Doe ["Ms. Doe," "parent" or "plaintiff"], commenced this action seeking judicial review,

pursuant to the Individuals with Disabilities Education Act ["IDEA"], 20 U.S.C. §§ 1400-1482,

and CONN. GEN. STAT. § 10-76j, of a decision and order rendered by the Connecticut State

Department of Education, dated January 10, 2011, in which plaintiff seeks reversal of the

decision and order, insofar as the decision and order denied plaintiff's requests for relief from

defendant East Lyme Board of Education[1] [the "Board"] regarding the 2008-2009, 2009-2010

and 2010-2011 school years and the summers of 2009 and 2010.  (Dkt. #1).[2]  Plaintiff seeks

a declaration that the programs that the parent provided during this relevant time frame,

consisting of the Solomon Schechter Academy ["SSA"] in New London, Connecticut, plus

special education and related services from private providers and services provided during

the school years and summers, were and are appropriate to meet the student's needs. (Id.).

---

[1]Plaintiff filed her Notice of Voluntary Dismissal as to defendant Connecticut State
Department of Education on March 17, 2011.  (Dkt. #16).

[2]Attached to plaintiff's Complaint is the Final Decision and Order, dated January 10, 2011.
(Exh. A).

Plaintiff also seeks reimbursement for expenses that the parent has incurred in connection with these programs and placements, and appeals the Hearing Officer's decision and order on grounds that relief should have been granted in plaintiff's favor, in light of the Hearing Officer's finding that defendant failed to offer the student any educational services for the summer of 2010 and the 2010-2011 school year.  (Id.).

On April 25, 2011, defendant filed its answer (Dkt. #22), and on January 17, 2012, the parties filed cross-motions for summary judgment (Dkts. ##38-48; see also Dkts. ##27-37),[3] with which motion plaintiff filed six affidavits.  (Dkts. ##41-46).[4]  On the same day, the three-volume Administrative Record ["Admin. Rec."], dated May 10, 2011, consisting of 2224 pages, was filed under seal.  (Dkt. #48).  On March 7, 2012, United States District Judge Janet Bond Arterton referred all of the pending motions to this Magistrate Judge.  (Dkt. #59).

On February 10, 2012, defendant filed its objection to the affidavits filed in support of plaintiff's Motion for Summary Judgment (Dkt. #49), and nine days later, defendant filed

---

[3]Attached to plaintiff's brief in support (Dkt. #39) are charts depicting John Doe's scores on several tests between 2008-2011. (Exh. 1).

Attached as Exh. A to defendant's brief in support (Dkt. #43) is a letter from the United States Department of Education, dated March 23, 2007.

[4]The following affidavits and exhibits were filed with plaintiff's motion, brief in support and Local 56(a)(1) Statement (Dkts. ##38-40): affidavit of Dr. Anthony D. Bram, sworn to January 14, 2012, with a copy of his curriculum vitae and a copy of the June 2011 psychological evaluation reports attached (Dkt. #41); affidavit of Geraldine Theadore, sworn to January 16, 2012, with copies of her curriculum vitae and her report attached (Dkt. #42); affidavit of Jane Doe, sworn to January 17, 2012 (Dkt. #43); affidavit of Janet Campbell, sworn to January 15, 2012, with a copy of her certification attached (Dkt. #44); affidavit of Karen Rosenberg, sworn to January 16, 2012, with copies of 2010-2011 and 2011-2012 progress reports attached (Dkt. #45); and affidavit of Dr. Robert Kemper, sworn to January 11, 2012, with a copy of his report attached (Dkt. #46).  The attachments have been filed under seal.  (See Dkt. #57).

2

a Motion to Stay. (Dkt. #50). This Magistrate Judge granted the stay (see Dkts. ##51-53), and after briefing was complete (Dkts. ##54-58), this Magistrate Judge issued an Order on Defendant's Objection to Plaintiff's Supplementation of the Record on Summary Judgment, on April 12, 2012 (Dkt. #60)["April Order"], in which the Court held that some of the above-referenced additional evidence may be considered by the Court if the Court ultimately concluded that the challenged IEP was inadequate. (At 15-16).[5]

On May 17, 2012, plaintiff filed her brief in opposition to defendant's Motion for Summary Judgment (Dkt. #64; see Dkts. ##61-63), and on the same day, defendant filed its brief in opposition and response to plaintiff's 56(a)(1) Statement. (Dkts. ##65-66; see Dkts. ##61-63).[6] On June 11, 2012, defendant filed its reply brief (Dkt. #69), and on the same day, plaintiff also filed a reply brief. (Dkt. #70).

For the reasons set forth below, plaintiff's Motion for Summary Judgment (Dkt. #38) is granted in part and denied in part and defendant's Motion for Summary Judgment (Dkt.

---

[5]Specifically, in the April Order, the Court held that the 2011-2012 school year records are not subject to consideration as they are a full year after the last evidence before the Hearing Officer (at 15, n. 18); the content of Dr. Bram's report may be relevant to the determination of whether SSA was an appropriate placement for the child in 2010-2011 (at 14); the remaining school records for the 2010-2011 school year may be relevant, but Rosenberg's affidavit will not be considered (at 14-15); Theadore's report of September 2011, which covers the school year 2010-2011 and the summer of 2011, may be relevant (at 15); Campbell and Dr. Kemper's affidavits are evidence that this Court may consider (id.); however, portions of the Theadore, Campbell and Dr. Kemper affidavits in which the affiants aver to more information than he or she has actual knowledge, will not be considered, and the Court will assign such weight as it deems appropriate to Ms. Doe's affidavit, in which she "goes far beyond attesting to the child's progress . . . ." (Id. at 15, n. 20). As referenced above, in conclusion, this Court held that the "above-referenced evidence [may be considered], . . . only if the Court later concludes that the challenged IEP was inadequate . . . ." Id. at 15-16 (citation & emphasis omitted).

The only additional evidence upon which the Court will rely is the Second Affidavit of Ms. Doe, sworn to February 17, 2012 (Dkt. #55)["Doe Aff't II"], to the limited extent set forth in Section III.B. infra.

[6]Attached to Dkt. #65 is a copy of correspondence from the United States Department of Education, dated January 7, 2010. (Exh. A) ["OSEP Letter"].

#47) is <u>granted in part and denied in part</u>.

## I. BACKGROUND

John Doe and Ms. Doe at all times relevant to this case have resided in East Lyme, Connecticut.  (Compl. ¶¶ 2-3).  John is a student identified as being eligible for special education and related services under the category of Autism, under the IDEA. (Admin. Rec. at 159, Findings of Fact ["FOF"] ¶ 1).  John attended East Lyme schools for preschool, kindergarten and half of first grade. (<u>Id.</u> at 159).  Thereafter, he attended Hope Academy, a private special education facility in Orange, Connecticut, at the Board's expense from January 2007 through June 2008, for the remainder of first grade and all of second grade. (<u>Id.</u> at 159).

### A. 2008-2009 SCHOOL YEAR (THIRD GRADE) and SUMMER 2009

A Planning and Placement Team ["PPT"] convened on June 12, 2008, and in an Individual Education Plan ["IEP"] bearing the same date, covering the 2008-2009 school year, the Board proposed to continue John's program and placement at Hope Academy for third grade.  (<u>Id.</u> at 160, FOF ¶ 5). On August 18, 2008, Ms. Doe spoke with Stephen Buck, the Board's then-Director of Special Education, regarding her concerns at Hope, including John's social development, lack of interaction with typical peers, and that the student had reportedly been hit and harassed by another student at Hope.  (<u>Id.</u> at 160-61, FOF ¶ 11). Buck represented that John would be placed on a leave of absence from Hope.  (<u>Id.</u>).  In the fall of 2008, Ms. Doe enrolled John at Solomon Schechter Academy ["SSA"], a private, religious school in New London, CT. (<u>Id.</u> at 160-61, FOF ¶¶ 6, 12).

On October 2, 2008, Robert L. Kemper, PhD, a clinical psycholinguist, evaluated John at Ms. Doe's request, and on December 12, 2008, Ms. Doe provided a copy of Dr. Kemper's

report to Buck. (Id. at 161, FOF ¶¶ 13-14; id. at 811-33).[7] After Dr. Kemper's evaluation, Ms. Doe explored language immersion schools in four different states, but she was unable to find an appropriate school that was willing to accept John.  (Id. at 161, FOF ¶ 16).  Dr. Kemper subsequently withdrew his recommendation of a language immersion program.  (Id. at 162-63, FOF ¶ 25).

The next PPT meeting was held on December 18, 2008, during which it was agreed that although Ms. Doe was responsible for tuition and transportation costs if she intended to keep John at SSA, the Board would pay for a total of nine hours per week of special education and related services, consisting of five hours per week of specialized 1:1 reading instruction using the Orton-Gillingham method, 2.5 hours per week of 1:1 speech-language therapy, and 1.5 hours per week of occupational and physical therapy  (Id. at 2117, 2128), along with an assistive technology evaluation.  (Id. at 2117; id. at 161-62, FOF ¶¶ 17-19). The decision made at this PPT meeting was memorialized in an IEP dated December 18, 2008.  (Id. at 2116-28).   Ms. Doe confirmed by way of a letter dated December 21, 2008, the agreement of what the Board would provide, and confirmed that Ms. Doe would be responsible for the SSA tuition, extended day programming at SSA, a math aide at SSA, Dr. Kemper's evaluation, Dr. Kemper's participation in the PPT, and a neuropsychological evaluation by Dr. Synthia Brooks. (Id. at 2129-30; id. at 162, FOF ¶ 20).

In February 2009, the Board, through Dr. Corrine Berglund, who replaced Buck as the

---

[7]Dr. Kemper diagnosed John with dyslexia, and a specific language impairment, including an expressive language disorder and underlying syntatic deficits.  (Id. at 823-24). He recommended that John be enrolled in a language immersion program with a low student-to-teacher ratio, and that he receive a daily 1:1 reading tutorial using Orton-Gillingham principles, plus at least 2.25 hours per week of additional 1:1 reading instruction and at least two hours per week of 1:1 speech-language therapy by a certified speech-language pathologist.  (Id. at 827; id. at 161, FOF ¶ 14).

Board's Director of Special Education, and Ms. Doe, agreed to add an additional .5 hours of speech-language therapy; the agreement was memorialized in an amended IEP, dated February 10, 2009.  (Id. at 2144-47; id. at 162, FOF ¶ 22).  On February 15, 2009, the 2008-2009 IEP was revised further to increase the speech and language services to three hours per week. (Id. a 2144-47; id. at 162, FOF ¶ 23).  The Board arranged for Alison Bateson-Toupin, M.A., CCC-SLP, to provide John with two hours per week of speech-language therapy from February 2009 until June 2009 (id. at 2150, 2168), and for another speech pathologist, Linda Boucher, M.S., CCC/SLP, to provide John with an additional hour of speech-language therapy per week from January 22, 2009 to June 11, 2009.  (Id. at 2143, 2172). The Board also arranged for Theresa Akerman to provide five hours per week of Orton-Gillingham reading instruction. (Id. at 838, 2142).

On May 15, 2009, Dr. Kemper performed a modified psycholinguistic evaluation, re-evaluating John in areas relating to reading, written expression, and underpinnings of literacy acquisition.  (Id. at 845-58; id. at 162, FOF ¶ 25).  Dr. Kemper found that John had made "significant gains" in reading; his phonemic decoding efficiency, oral reading comprehension, silent reading, and independent reading had also improved since the date of Dr. Kemper's previous evaluation.  (Id. at  849, 852; id. at 162, FOF ¶ 25).  However, John continued to be below average in phonological awareness and phonological memory and he regressed in several aspects of spontaneous writing. (Id. at 853-54; id. at 162, FOF ¶ 25).  Dr. Kemper changed his prior recommendation from a language immersion school to a "small, structured education program[]" (id. at 856; id. at 162, FOF ¶ 25), with a low student-to-teacher ratio. (Id. at 1798-99).  Dr. Kemper further recommended that John receive a two-hour daily 1:1 tutorial in oral and written expression, taught by a speech and language pathologist with

training and experience in the remediation of deficits such as the ones John has.  (Id. at 856; id. at 162, FOF ¶ 25).  Dr. Kemper also recommended that John receive 1:1 Orton-Gillingham reading instruction in the amount of three hours per week from a certified Orton-Gillingham tutor, and 4.5 hours per week of speech-language therapy and a total of fifteen hours (for the entire summer) of individual Orton-Gillingham tutoring, in order to prevent loss of skills over the summer. (Id. at 1802; id. at 162-63, FOF ¶ 25).

### B. 2009-2010 SCHOOL YEAR (FOURTH GRADE) AND SUMMER 2010

In June 2009, Geraldine Theodore, MS, CCC-SLP, an associate professor of communications, and a supervisor of graduate student clinicians in speech-language pathology, specializing in the treatment of complex language disorders, began providing John with speech-language therapy.  (Id. at 163, FOF ¶¶ 28-29).[8]  On June 8 and 15, 2009, Dr. Berglund and Ms. Doe met to discuss extended school year services for John, during which meetings Ms. Doe requested that the Board pay for Theodore's services for June 2009 and the summer of 2009; the Board, through Dr. Berglund, agreed to pay for the June 2009 services. (Id. at 163, FOF ¶¶ 30-31).

On June 17, 2009, the PPT convened at SSA to conduct an annual review of John's program. (Id. at 163, FOF ¶ 32, id. at 877-916).[9]  Dr. Berglund administered the PPT and Dr. Kemper participated by telephone and conveyed his recommendations. (Id. at 163, FOF ¶¶

---

[8]The Hearing Officer indicated at the hearing that she might exclude Theodore's reports, as well as Theodore's curriculum vitae and her written direct testimony, if Theodore did not appear and testify. (Id. at 1414-15).  Theodore did not testify, due to time limitations, but despite having excluded Theodore's evidence, the Hearing Officer considered several of Theodore's reports and her curriculum vitae in her decision. (Id. at 163, ¶¶ 28-29).

[9]At the PPT meeting, Ms. Doe asserted John's "stay put" right, pursuant to 20 U.S.C. § 1415(j), to continue receiving the program agreed upon in the 2008-2009 IEP.  (Id. at 878-79, 882, 886-88).

32-33).  Dr. Kemper opined that John required a highly structured, closely monitored school setting in a classroom of an eight to one student/teacher ratio, together with two hours per day (i.e., ten hours per week) of speech-language therapy and three hours per week of Orton-Gillingham instruction.  (Id. at 163, FOF ¶ 33; id. at 894-95, 1847).  Dr. Kemper emphasized the need for the speech therapy to be provided by a speech pathologist who is highly experienced in working with children with expressive language deficits similar to those of John.  (Id. at 896-97).[10]

Akerman, the Orton-Gillingham instructor who provided John with Orton-Gillingham instruction during the 2008-2009 school year, also attended the June 17, 2009 PPT meeting; she recommended that John receive three sessions per week of Orton-Gillingham instruction, for 1.5 hours per session (a total of 4.5 hours of Orton-Gillingham instruction per week), during both the 2009-2010 school year and the summer of 2009. (Id. at 907-10).[11]

At the PPT, Dr. Berglund took the position that if Ms. Doe elected to continue John's enrollment at SSA for the 2009-2010 school year, then the Board would no longer be responsible for John's education because SSA is located in New London.  (Id. at 164, FOF ¶ 39; id. at 879, 885-86, 889, 893).  Ms. Doe then requested information on out of district placements other than SSA, in response to which Dr. Berglund informed her that her best suggestion was the Niantic Center School because it was a small environment and has

_____

[10]Later, as discussed below, Dr. Kemper testified that the appropriate placement, although "not a perfect program for him[,]"was the Curtis Blake Day Center. (Id. at 1832).

[11]The Board was also provided with an adaptive technology evaluation report by Lauren Skau, MT-BC, M.A., CCC-SLP (id. at 2153-63), for which the Board had arranged (id. at 2151), and progress notes by physical therapist Matthew Luginbuhl, PT (id. at 2165-67), and occupational therapist Jennifer Stylianos, OTR/L, ATP. (Id. at 2175).  At the June 17, 2009 PPT meeting, Luginbuhl recommended that John receive one hour per week of physical therapy and one hour per week of occupational therapy during the school year, as well as ten hours of occupational therapy during the summer. (Id. at 902-07).  None of these services are offered at SSA.

"probably one of the most excellent" special education teachers available.  (Id. at 164, FOF ¶ 40; id. at 879-80).

On June 26, 2009, Ms. Doe met with Dr. Berglund and Assistant Superintendent Dr. Paul Freeman to discuss the first version of the IEP.[12]  (Id. at 164, FOF ¶ 41; id. at 918-64). At this meeting, Ms. Doe expressed concern that the Niantic Center was "in violation of Dr. Kemper's recommendation."  (Id. at 922).  Dr. Berglund responded that at the Niantic Center School, John would be placed in classes of fifteen to sixteen students, and as an alternative, the Board proposed John's "home school[,]" Flanders Elementary, where classes would be even larger.  (Id. at 923-24, 927-28).  As a result of the June 26, 2009 meeting, the Board agreed, by way of a revised version of the IEP, to reinstate occupational and physical therapy and provide some extended school year services.  (Id. at 932-34, 954-55, 969).  Included in the revised IEP was that for 2009-2010, East Lyme would provide an appropriate program with a case manager and weekly team meetings, code emphasis reading instruction that incorporated Orton-Gillingham principles, fifty minutes daily; and speech language therapy, 2.5 hours per week, OT one hour/week (.5 direct & consult), PT consult and Adaptive PE twenty minutes per week as detailed in the IEP, along with transportation if appropriate.  (Id. at 2188).  The service delivery portion of the IEP also specified that the Board would provide one hour per week of consultation to John's program by a physical therapist, fifty minutes per week of in-class keyboarding instruction by a classroom teacher, and one hour per week of small group social/behavioral instruction by a "Psychologist/SLP."  (Id. at 2207).

For the summer of 2009, the Board's revised IEP proposed to provide John, from July

---

[12]Plaintiff testified that on June 23, 2009, she met with the Board's Superintendent, Dr. Paul Smotas, and Assistant Superintendent Freeman to discuss Dr. Berglund's contention that New London, rather than East Lyme, was responsible for John's education. (Id. at 1489-90).

7 to August 14, 2009, with two hours per day of "[c]ode [e]mphasis" reading and writing instruction and one hour per week of speech-language therapy. (Id.).  The IEP also provided for two hours per week of "SLP consult" (consultation between a speech pathologist and the special education teacher), for the same six-week period. (Id.).  By letter faxed to Dr. Berglund on July 1, 2009, Ms. Doe rejected the Board's proposed extended school year program for the summer of 2009 as inappropriate. (Id. at 165, FOF ¶ 44; id. at 968).  She outlined the summer program that she intended to provide for John, consisting of 4.5 hours per week of 1:1 speech-language therapy and a total of eighteen hours of 1:1 Orton-Gillingham instruction by a certified Orton-Gillingham tutor.  (Id. at 968).  However, plaintiff testified that she did not make any requests to change this IEP after she reviewed the final copy.  (Id. at 1547-48).

Thereafter, Ms. Doe sent several letters to the Board advising it of related services that she planned to secure and that she expected these services to be paid at public expense.  (Id. at 165, FOF ¶ 45; see id. at 972-73, 984).  Ms. Doe also sent copies of progress reports, report cards, and evaluations to the Board as well as three letters asking it to clarify and/or correct claimed factual inaccuracies on the June 17, 2009 IEP.  (Id. at 165, FOF ¶ 45).

On January 7, 2010, Janet Campbell, an Orton-Gillingham practitioner who began working with John in July 2009, evaluated John and recommended that "because [John] receives no Special Education services during his private school day, it is imperative that his significant reading and spelling skill gaps continue to be aggressively addressed outside of school, at such a rate of intensity that [John] achieves grade-level parity with his peers as soon as possible." (Id. at 165, FOF ¶ 46; see id. at 1035).  Additionally, Campbell opined that

10

John needed an individualized program, and that the goals identified in the IEP regarding a code emphasis program were not sufficient as they did not include phonics or oral fluency goals. (Id. at 1585-86, 1588).

On April 8, 2010, Dr. Kemper performed a full Psycholinguistic Reevaluation of John, in which he noted meaningful progress regarding spontaneous communicative discourse, pragmatic skills and phonemic decoding, and that John was much more able to carry on a conversation, but that John did not make any gains in written expression, despite approximately 6.5 hours of high quality, individual language therapy. (Id. at 165, FOF ¶ 47; id. at 1064-83, 1813-15).   Dr. Kemper recommended that John "continue to be educated within the context of a small, student/teacher ratio program, in which he is familiar, and feels comfortable with participating across a variety of communicative contexts without fear of verbal competition." (Id. at 1078).  Dr. Kemper recommended that John receive 1.5 hours per day (7.5 hours per week) of individual speech-language therapy by a clinician trained and experienced in oral and written expressive language disorders, and that he continue to receive three hours per week of individual Orton-Gillingham instructions. (Id.).  For the summer, Dr. Kemper recommended that John receive 4.5 hours per week of individual speech-language therapy and a total of fifteen hours of individual Orton-Gillingham instruction. (Id.).

### C. 2010-2011 SCHOOL YEAR (FIFTH GRADE) AND SUMMER 2010

By letter dated June 30, 2010 (sent to the Board on that date and re-sent on July 11, 2010), Ms. Doe informed the Board that, because it had not offered any extended school year services for John for the summer of 2010, she intended to provide services, at the public's expenses, consisting of approximately 6.5 hours per week of individual speech-

language therapy and a total of fifteen hours of individual Orton-Gillingham instruction. (Id. at 165, FOF ¶¶ 48-49; id. at 1152-56).  By letter dated July 13, 2010 (postmarked July 21, 2010), the Board, through Brian Reas, its Assistant Superintendent for Special Education and Pupil Personnel, informed Ms. Doe that it would not fund extended school year services for John, and that "[John] is not currently enrolled in East Lyme Public Schools and therefore does not have a current [IEP]. If [John] were to be registered in East Lyme Public Schools, he would have a program provided to him per the decision of the [PPT]." (Id. at 1157-58). On August 15, 2010, Ms. Doe sent Reas a letter informing him of her intent to provide John, at the public's expense, with approximately five additional hours of Orton-Gillingham instruction over the summer of 2010.  (Id. at 1165-67).

D. ADMINISTRATIVE HEARING

Plaintiff commenced due process procedures on September 30, 2010, pursuant to CONN. GEN. STAT. § 10-76h and 20 U.S.C. § 1415 and in accordance with Connecticut's Uniform Administrative Procedures Act, CONN. GEN. STAT. §§4-176e – 4-178; 4-181a and 4-186.  (Id. at 158-59).[13]  Plaintiff sought reimbursement for the SSA tuition and for private services and consultants. (See id. at 210-12). The thirteen issues presented before the Hearing Officer fell under several categories: (1) whether the parent was entitled to tuition reimbursement; (2) whether the Board was responsible for paying the attendance and participation of the plaintiff's consultants at PPT meetings; (3) whether the Board committed procedural violations; and (4) whether the remedy of compensatory education was

---

[13]Previously, Ms. Doe filed a request for due process in April 2010, at which time she was represented by different counsel, which counsel withdrew from the case.  (See id. at 376-77).  A second attorney appeared for plaintiff in August, but one week later he withdrew his appearance, leading Ms. Doe to request that the matter be dismissed without prejudice.  (See id. at 377-78). The Hearing Officer granted her request and on September 23, 2010, the matter was dismissed without prejudice. (See id. at 378).

appropriate. (Id. at 157-58).  In addition, plaintiff initially requested that the December 18, 2008 IEP be John's stay put placement. (Id. at 157).

Hearings were held on December 1, 15 and 17, 2010, at which Ms. Doe, Campbell, John, Rosenberg, and Dr. Kemper testified on behalf of the parent and student, and Reas testified on behalf of the Board.   (Id. at 1372-992).  Post-hearing briefs were filed on December 27, 2010. (Id. at 158; id. at 78-156).  Hearing Officer Elisabeth Borrino issued a twenty page, single-spaced decision on January 10, 2011, setting forth detailed findings of fact and conclusions of law. (Id. at 157-77).

## E. TESTIMONY REGARDING THE SSA PROGRAM

SSA is a regular education facility with a 6.5 hour school day, which includes Judaic Studies for approximately two hours a day -- one third of the program.  (Id. at 165, FOF ¶¶ 51, 54; id. at 1661).  No special education is provided, just an "atmosphere that is accepting of [s]pecial [e]d."  (Id. at 1667).  SSA does not develop or implement IEPs, nor does it employ staff certified to teach special education students.  (Id. at 165-66, FOF ¶51; id. at 1668).  At the hearing, Karen Rosenberg, the head of SSA since 1989, testified that there were twenty-eight regular students, ranging from kindergarten through sixth grade, and four pre-K students, along with three full time instructors, one of whom taught Judaic Studies. (Id. at 166, FOF ¶¶ 52, 55; id. at 1658, 1663-64). John received "pull out" speech, language therapy, and Orton-Gillingham tutoring from private service providers for approximately one-third of the school day, none of which was during the two hours of religious instruction; John missed social studies and Spanish instruction during this time, and to keep him from falling behind, he received additional instruction from his teacher.  (Id. at 165, FOF ¶¶ 51, 57; id. at 1675-76).  John also missed art, one period of math, and computer, due to being picked

13

up by Ms. Doe for specialized instruction.  (Id. at 166, FOF ¶ 59; id. at 1276).  When John was pulled out of school for the day, Ms. Doe picked him up on Mondays at approximately noon, and on Thursdays from just before lunch, returning for the last day of class – approximately 11:30 to 2:00p.m. (Id. at 166, FOF ¶ 61; id. at 1708-10).

As stated above, John began attending SSA in the fall of 2008.  (Id. at 161, FOF ¶ 12).  He returned for the fourth grade (2009-2010 school year), with additional services consisting of 6.5 hours of 1:1 speech-language therapy per week (4.5 hours from Ms. Theadore and two hours from Joan Cohen), three hours of 1:1 Orton-Gillingham instruction by Campbell, one hour of individual occupational therapy, and one hour of individual physical therapy per week. (Id. at 1504-05).[14]  On August 15, 2010,  Ms. Doe sent the Board written notice of her intent to continue John's placement at SSA with related services for the 2010-2011 school year, consisting of SSA plus 7.5 hours of speech-language therapy per week, three hours of Orton-Gillingham instruction per week, and two hours of assistive technology services per month (for a period of at least three months).  (Id. at 1162).

According to his 2009-2010 report card, John made satisfactory progress in most areas, and was noted to be "outstanding" in participation.  (Id. at 167, FOF ¶ 65).  He needed improvement in areas involving work habits and was "progressing" in many other areas; in addition, he was absent seven days during the first and second marking periods,

---

[14]On September 28, 2009, Ms. Doe wrote to Dr. Berglund, notifying the Board of her intent to begin providing four hours per month of direct, individual instruction by Skau to implement to recommendations that Skau had made in her April 15, 2009 assistive technology evaluation. (Id. at 988, 2153-63). Dr. Berglund replied by letter dated October 6, 2009, reiterating the Board's decision not to provide "services other than those delineated in the IEP of 6/17/09." (Id. at 1004). By letter dated February 23, 2010, Ms. Doe informed Dr. Berglund that she had purchased a laptop computer for John as recommended by Skau to assist him with writing. (Id. at 1050-53, 2161). Ms. Doe stated her intent that the cost of acquiring and configuring the laptop be at public expense. (Id. at 1050).

and tardy forty-five days. (Id.).  At the December 15, 2010 hearing, Dr. Kemper testified that the appropriate placement, although "not a perfect program for him," was the Curtis Blake Day Center. (Id. at 1832).  Dr. Kemper also opined that during the time period that John was at SSA, he received appropriate Orton-Gillingham instruction from an outside tutor (id. at 1836), and he had no knowledge about the qualifications of the teachers at SSA or in East Lyme. (Id. at 1841-42). During the 2008-2009, 2009-2010, and 2010-2011 school years, John both progressed and regressed in his educational program, and he was a member of the school basketball team and school choir.  (Id. at 167, FOF ¶ 66). Rosenberg also testified that John  "had interactions with children that [she] felt could have led to bullying."  (Id. at 1700).

### F. TESTIMONY REGARDING EAST LYME PUBLIC SCHOOL'S ABILITY TO PROVIDE A FREE APPROPRIATE PUBLIC EDUCATION ["FAPE"]

Reas, who is the Assistant Superintendent for Special Education and Pupil Personnel for the Board since July 1, 2010,[15] testified on behalf of the Board at the administrative hearing. (Id. at 167, FOF ¶71; id. at 1896).  Reas was not present at the PPT meetings at which John's 2008-2009 and 2009-2010 IEP's were developed, as such meetings predated Reas' tenure with East Lyme Public Schools.  (Id. at 1908).  The Board requires that special education staff be certified by the State of Connecticut, including training after being hired, which requires approximately three to four years, and that there be staff members trained in Orton-Gillingham techniques.  (Id. at 1906).  The Board has certified speech pathologists, psychologists, special education teachers, occupational therapists and physical therapists on

---

[15]Reas was formerly the Director of Support Services, which includes Special Education for the East Hampton Public Schools, and as an educator, he was a special education teacher with a focus on learning disabilities.  (Id. at 167, FOF ¶ 71; id. at 1897).  As an educator, he set up the program for Autism within the school to which he was assigned.  (Id.).

staff.  (Id. at 1906-07).   John excels in mathematics and the Board has qualified teachers in the upper grades who can teach him at advanced levels. (Id. at 1937-38).  Additionally, East Lyme has an anti-bullying policy.  (Id. at 1908).[16]

### G. HEARING OFFICER'S DECISION[17]

In her decision, the Hearing Officer concluded that the Board offered a free appropriate public education ["FAPE"](id. at 170);  Ms. Doe was offered a full opportunity to participate and provide information regarding evaluations that were performed (id. at 170-71); the December 18, 2008 PPT considered the evaluations and input of Dr. Kemper and Rosenberg, and the June 17, 2009 PPT considered the evaluations and input of Dr. Kemper, Rosenberg, and Theodore (id. at 171); the Board met its burden of proof as to the 2008-2009 and 2009-2010 school years, and the summer of 2009 (id. at 173), although no evidence was presented that the Board held a PPT or proposed a program for the 2010-2011 school year or the summer of 2010 (id.);[18] SSA was not an appropriate placement (id. at 174-

---

[16]Reas also testified that New London, not East Lyme, is responsible for John's education. (Id. at 1904).

[17]Of the issues presented, many were disposed of due to lack of evidence or briefing during the hearings. Plaintiff failed to present evidence or argument as to whether the Board should be responsible for evaluations, consultations and attendance at PPT's by plaintiff's consultants and whether the December 8, 2008 IEP was plaintiff's stay put placement. (Id. at 168, FOF ¶¶ 80-81). Plaintiff's post-hearing brief did not address these issues. (Id. at 79-96). In addition, insufficient evidence was submitted and no argument presented regarding the claim of whether the 2009 IEP, as amended, was drafted properly. (Id. at 168, FOF ¶ 83; id. at 86-89, 1543-47). Furthermore, no evidence was submitted as to the claim for compensatory education; no specific services were sought. (Id. at 175; see id. at 96). The primary issue and focus of the proceedings was whether SSA was an appropriate educational placement for the student, a prerequisite to reimbursement. (Id. at 169-76).

[18]The Hearing Officer also concluded that Ms. Doe's agreement with Buck that the Board would reserve the Hope Academy 2008-2009 placement until she was able to determine if SSA was acceptable after John had an opportunity to attend, demonstrates that Ms. Doe "impliedly, if not expressly, conceded that Hope Academy was acceptable absent her being satisfied with SSA and that the 2008-2009 IEP offered FAPE." (Id. at 173).

75),[19] and the Board is not financially responsible for the private placement at SSA nor is it financially responsible for the cost of related expenses while John was enrolled at SSA (id.); and the Board violated the IDEA by not conducting an annual review for the school year 2010-2011, and not continuing to hold PPT meetings and develop IEP's. (Id. at 175-76). Accordingly, the Hearing Officer ordered the Board to convene a PPT meeting within fifteen days of the date of the decision to conduct an annual review, and review possible alternative placements for John.  (Id. at 176).

H. PARTIES' ARGUMENTS

In her motion, plaintiff seeks relief as to the following portions of the Hearing Officer's decision: the portions of the decision which held that the Board offered John FAPE for the 2008-2009 and 2009-2010 school years, and the summers of 2009 and 2010; the portion of the decision which held that "SSA is not an appropriate placement" for John; the portion of the decision that held that the Board is not financially responsible for SSA tuition or for the cost of related services; the failure of the decision to find explicitly that the Board's failure to develop an IEP for the summer of 2010 violated John's right to FAPE, and the failure to order relief for that violation; the failure of the decision to find explicitly that the Board's failure to develop an IEP for the 2010-2011 school year deprived John of FAPE, and the failure to order relief for that violation; the failure to hold that the programs and placements provided by Ms. Doe during the periods at issue were and are appropriate to meet John's

---

[19]Specifically, the Hearing Officer concluded that the "only benefit" of SSA "is the small class size[,]" as SSA provides no special education services, does not implement the IEP, does not have special education teachers, and John was routinely removed at noon on Mondays and from 11:30-2:00 on Thursdays, which caused him to miss computer instruction, social studies, and art. (Id. at 174).  The Hearing Officer also noted that "the record establishes that [Ms. Doe] also does not believe the program is appropriate as regards [to] its ability to implement the IEP [as Ms. Doe] has been utilizing the services of private practitioners to provide the necessary special education services to [John] – outside of SSA – and totally separate and distinct from it." (Id.).

needs; the failure to order reimbursement for the programs and placements provided by Ms. Doe including SSA tuition, additional services (including speech-language therapy and Orton-Gillingham instruction), and transportation during the 2009-2010 and 2010-2011 school years, and services and transportation during the summers of 2009 and 2010; the failure to grant relief for the Board's violation of John's "stay-put" rights pursuant to 20 U.S.C. § 1415(j); and the conclusion that the Board's procedural violations were not sufficiently significant to invalidate any proposed IEP or constitute a denial of FAPE.  (Dkt. #38, at 2-3).[20]

Conversely, defendant seeks entry of judgment as the administrative record supports the decision that the Board provided John with a FAPE; Ms. Doe's unilateral placement at SSA was inappropriate; and Ms. Doe is not entitled to reimbursement.  (Dkt. #47, Brief at 15-26).

## II. STATUTORY FRAMEWORK

The IDEA "'represents an ambitious federal effort' to ensure that all children are given access to a public education regardless of any disabilities they may suffer.'" A.S. v. Trumbull Bd. of Educ., 414 F. Supp. 2d 152, 169 (D. Conn. 2006), quoting Bd. of Educ. of Hendrick

---

[20]Accordingly, plaintiff seeks reversal of a decision and order rendered by the Connecticut State Department of Education ["SDE"], dated January 10, 2011 (see Dkt. #38, Exh. A), insofar as the decision and order denied the plaintiff's requests for relief regarding the 2008-2009, 2009-2010 and 2010-2011 school years and the summers of 2009 and 2010; a declaration that the programs that Ms. Doe provided for John during the 2008-2009, 2009-2010 and 2010-2011 school years at SSA, plus special education and related services from private providers, as well as services that Ms. Doe provided during the summers of 2009 and 2010, were and are appropriate to meet John's needs; an order requiring reimbursement of expenses that Ms. Doe has incurred in connection with John's programs and placements for the 2008-2009, 2009-2010, and 2010-2011 school years, and the summers of 2009 and 2010; and an award of compensatory services for the 2008-2009, 2009-2010, and 2010-2011 school years, and the summers of 2009 and 2010. (Dkt. #38, at 3-4).

Plaintiff also notes that for the 2008-2009 school year, plaintiff seeks relief only as to special education and related services that the Board agreed to provide to John but failed to provide in full; plaintiff does not seek reimbursement for SSA tuition for that school year.  (Id. at 4, n.1; see Dkt. #47, Brief at 20-23).

Hudson Cent. Sch. Dist, Westchester County v. Rowley, 458 U.S. 176, 179 (1982) ["Rowley"](interpreting the Education for All Handicapped Children Act, subsequently amended and renamed IDEA).  In order for a state to receive federal funding under the IDEA, a state must ensure that "[FAPE] is available to all children with disabilities residing in the State."  20 U.S.C. § 1412(a)(1)(A).  As the Second Circuit instructs, when reviewing administrative decisions under the IDEA, "a district court must make a two-step inquiry: first, the court must consider whether the state complied with the Act's procedural requirements." Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir. 1997), quoting Rowley, 458 U.S. at 206-07.  Second, in order to constitute a FAPE, the special education and related services must be "tailored to meet the unique needs of a particular child, 20 U.S.C. § 1401(a)(18), and be 'reasonably calculated to enable the child to receive educational benefits[.]'" Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998), quoting Rowley, 458 U.S. at 207.  A child's eligibility for special education is determined by a local educational agency ["LEA"], which conducts an evaluation.  20 U.S.C. § 1414(a)(1)(A)-(B). When a student is determined to be a "child with a disability" within the meaning of 20 U.S.C. § 1401(3), an "IEP Team," consisting of representatives of the LEA and the child's parents, meets to develop an IEP.  See 20 U.S.C. § 1414(a)(1)(A), (B), (d)(1)-(3).[21]  In Connecticut, the IEP Team is referred to as the "PPT."  Conn. Agencies Regs. §§ 10-76a-1(15), 10-76d-10, 10-76d-11.

   When parents and a district disagree about what constitutes a FAPE for a child, the

_____

[21]An IEP is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" D.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507-08 (2d Cir. 2006), quoting Honig v. Doe, 484 U.S. 305, 311 (1988), amended on other grounds, 480 F.3d 138 (2d Cir. 2007); see also 20 U.S.C. §§ 1401(14), 1414(d)(1)(A).

parents may enroll their child in a private school without the district's consent and at their own expense, and if the hearing officer or court finds that the proposed program does not provide FAPE, the district may be ordered to reimburse the parents for the cost of the private program.  20 U.S.C. § 1412(a)(10)(C)(ii).   Either party may seek an impartial due process hearing before a state administrative agency, which in Connecticut is SDE's Bureau of Education, 20 U.S.C. §§ 1415(f), 34 C.F.R. § 300.507; Conn. Agencies Regs. §§ 10-76h-1 to 10-76h-3, and any party dissatisfied with the administrative decision may bring a civil action in state or federal court pursuant to 20 U.S.C. § 1415(i)(2).

### III. DISCUSSION

When a district court decides a summary judgment on an IDEA appeal, the district court is "not dealing with summary judgment in its traditional setting." A.E. v. Westport Bd. of Educ., 463 F. Supp. 2d 208, 214 (D. Conn. 2006)(quotations & citations omitted), aff'd, 251 Fed. Appx. 685 (2d Cir. 2007).  The "court's inquiry is not directed to discerning whether there are disputed issues of fact, but rather whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." Id. at 215.  The district court must review the administrative record, according substantial deference to the hearing officer's findings, before making a determination based on a "preponderance of the evidence." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005)(citations omitted).   As the U.S. Supreme Court has cautioned, when reviewing an administrative decision in that context, courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.  Courts must give "'due weight' to the factual and educational determinations of the hearing

officer, 'mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" <u>Plainville Bd. of Educ. v. R.N.</u>, No. 3:09-CV-241(RNC), 2012 WL 1094640, at *6 (D. Conn. Mar. 31, 2012)["<u>R.N.</u>"], <u>quoting Lillbask v. State of Conn. Dep't of Educ.</u>, 397 F.3d 77, 82 (2d Cir. 2005).

In a case in which plaintiff seeks reimbursement for an alternative placement, the court must engage in a three-step inquiry:

> First, we examine whether the state has complied with the procedures set forth in the IDEA. Second, we consider whether the IEP developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits . . . . If . . . the IEP is procedurally or substantively deficient, we proceed to the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs.

<u>Cerra</u>, 427 F.3d at 192 (internal quotations & citations omitted).[22]

A. 2009-2010 SCHOOL YEAR AND SUMMER OF 2009

1. PROCEDURAL VIOLATIONS

"Procedural flaws alone do not automatically require a court to find that a board denied a student a FAPE.  Procedural flaws that result in the loss of an educational opportunity, or that seriously infringe the parents' opportunity to participate in the IEP formulation process, however, 'clearly result in the denial of a FAPE.'" <u>A.E.,</u> 463 F. Supp. 2d at 216, <u>quoting W.A. v. Pascarella</u>, 153 F. Supp. 2d 144, 153 (D. Conn. 2001).   In this case, plaintiff contends that the Board "plain[ly] violat[ed] . . . the IDEA" by failing to develop the

---

[22]Plaintiff asserts that whether a particular IEP provides FAPE is a mixed question of law and fact, which the Court reviews <u>de novo</u>, and the degree of deference accorded by the Court depends on the quality of the hearing officer's decision.  (Dkt. #64, at 11). Defendant contests plaintiff's position (Dkt. #65, at 20), and contends that even using such a standard, there are "numerous cases in which the courts in this district affirmed the state administrative hearing officer's decision . . . ."  (<u>Id.</u> at 21-23).  <u>See</u> Section III.A.3. <u>infra</u>.

IEP at the June 17, 2009 PPT meeting, and by failing to base the IEP on the evaluations, reports, and opinions of the PPT participants with knowledge and expertise regarding John's needs.  (Dkt. #39, at 17-19).  According to plaintiff, in light of these violations, the Hearing Officer erred when she concluded that the June 17, 2009 PPT "considered the evaluations and input of each of [the] participants."  (Id. at 19).   Conversely, defendant contends that plaintiff's claim has been rejected by other courts, and an IEP need not recommend a placement at a specific school in order to satisfy the IDEA.  (Dkt. #65, at 7-8).

Furthermore, plaintiff argues that the Board failed to meet its burden of proving that the 2009-2010 IEP was tailored to John's individual needs and that the IEP would enable him to make meaningful progress as the Board offered no evidence as to what John's needs are, presented no evidence to rebut the conclusions of the evaluators and service providers working with John, and offered no evidence beyond the IEP itself that described the proposed program at the Niantic Center School.  (Dkt. #39, at 22-31).  Additionally, plaintiff asserts that the Hearing Officer provided conclusory statements that do not constitute the "thorough and careful" review that would be entitled to deference.  (Dkt. #39, at 30, citing Walczak, 142 F.2d at 129).  Plaintiff also contends that she satisfied her burden of establishing that John's placement at SSA plus specialized services was appropriate to meet his needs, as Ms. Doe produced objective academic achievements and evidence of John's social and emotional progress, and the Hearing Officer's conclusion that the program was not appropriate is not supported by the record.  (Dkt. #39, at 32-34).

In sum, plaintiff asserts that the Board was required to accept the opinions and recommendations of Dr. Kemper and others for the student's IEP and placement at SSA. Along with Dr. Berglund, Ms. Doe, Dr. Kemper, Rosenberg, Boucher, Matthew Luginbuhl, and

Akerman all participated in the June 17, 2009 PPT meeting at which some of plaintiff's professionals opined that John continued to require placement in a small, supportive environment, with specialized services consisting of 1:1 speech-language therapy and 1:1 Orton-Gillingham instruction.  (See Admin. Rec. at 877-916).  However, contrary to plaintiff's assertion, Dr. Kemper did not opine that John receive special education or services through or at SSA with SSA staff; rather, he recommended the outside providers for this purpose. (Id. at 1078-82).  Similarly, Boucher voiced a general recommendation of "continu[ing] therapy with a focus on oral and written communication," and Luginbuhl recommended PT and OT therapy, which were not available at SSA.  (Id. at 902, 905-08).[23]

While parents may attend and participate collaboratively in a PPT, they "do not have the power to veto or dictate the terms of an IEP." J.C. v. New Fairfield Bd. of Educ., Civ. No. 3:08-cv-1591(VLB), 2011 WL 1322563, at *16 (D. Conn. March 31, 2011).  The parental participation requirements of the IDEA do "not equate to a mandate for the provision of recommended services, if the services that are otherwise being provided constitute [a] FAPE." W.A., 153 F. Supp. 2d at 154 (internal quotations & citation omitted).  Similarly, as defendant observes, according to the United States Department of Education Office of Special Education Programs ["OSEP"]:

> The IEP [t]eam meeting serves as a communication vehicle between parents and school personnel and enables them, as equal participants, to make joint informed decisions regarding the services that are necessary to meet the unique needs of the child.  The IEP team should work towards a general agreement, but the public agency is ultimately responsible for ensuring the IEP includes the services that the child needs in order to receive a [FAPE]. It is not appropriate to make IEP decisions based on a majority "vote."  If the team cannot reach agreement, the public agency must determine the

---

[23]At the June 17, 2009 PPT meeting, Luginbuhl recommended that John receive one hour per week of physical therapy and one hour per week of occupational therapy during the school year, as well as ten hours of occupational therapy during the summer. (Id. at 902-08).

appropriate services  . . . .

(Dkt. #65, Exh. 1, OSEP Letter).

Additionally, plaintiff asserts that instead of collaboratively developing the IEP at the PPT meeting, the Board "unilaterally created an IEP for the 2009-2010 school year (including summer of 2009) for John and decided, without any parental input, to propose a placement for John at . . . Niantic Center School."  (Dkt. #39, at 18).[24]  However, "[t]his does not suffice to establish a procedural violation. [The] IDEA simply requires the [Board] to <u>review</u> evaluation results in developing an IEP." <u>Brennan v. Regional Sch. Dist. No. 1 Bd. of Educ.</u>, 531 F. Supp. 2d 245, 274 (D. Conn. 2008)(emphasis in original); 20 U.S.C. § 1414(d)(3)(a)(2).  As the meeting minutes reflect, Dr. Berglund listened to the evaluations and recommendations presented at the June 2009 PPT meeting, and then presented the IEP.  Plaintiff's contention that the IEP was "unilaterally created" is also without merit as "once [a] PPT concluded that the draft IEP was appropriate, it was free to reject the more restrictive placement[s] [presented by the parents] without further consideration."  <u>Brennan</u>, 531 F. Supp. 2d at 275.  In <u>Brennan</u>, U.S. District Judge Janet C. Hall rejected a plaintiff's claim of procedural violations even where the Board preconceived and pre-drafted an IEP prior to the meeting, in which IEP the parents' placement request was rejected, and which IEP was written prior to the evaluations being made available.  <u>Id.</u> at 274.  As Judge Hall appropriately observed: "Nothing in IDEA requires the district to change its initial views of what is appropriate after it reviews new evaluation data."  <u>Id.</u>  Thus, the decision by the

_____

[24]The record of the June 17, 2009 PPT begins with the Board, through Dr. Berglund, articulating its position that if John were to stay at SSA, New London, not East Lyme, would be financially responsible.  (Admin. Rec. at 878-88, 888-89).   In response to this position, Ms. Doe inquired into the options in East Lyme, while also asserting and acknowledging that it was a planning, not placement, PPT, at which her consultants were available to offer their recommendations.  (<u>Id.</u> at 889-93).

Board to propose a placement for John at Niantic Center School, rather than accepting plaintiff's position, does not constitute a meritorious procedural violation.

<u>2. STAY PUT PROVISION</u>

In her decision, the Hearing Officer listed as one of the issues for the hearing "[w]hether the IEP of 12/18/08 constitutes a stay-put placement[?]" (Admin. Rec. at 157, ¶ 7). She concluded that the "issue was moot[]" because it "was neither argued nor was evidence submitted regarding such a claim." (<u>Id.</u> at 168, FOF ¶ 81).

Plaintiff asserts that the Hearing Officer's conclusion that the issue of whether the December 18, 2008 IEP constituted a stay-put placement was moot is "clear error" as there is no exhaustion requirement for such a claim. (Dkt. #39, at 20-22; <u>see</u> Dkt. #64, at 40; Dkt. #70, at 2-9). Defendant responds that the Hearing Officer did not impose an "exhaustion requirement" on the parent, but rather, found the issue moot or abandoned because the parent did not pursue it throughout the hearing, and it is a fact that the 2008-2009 "agreement" terminated at the conclusion of the 2008-2009 school year. (Dkt. #65, at 14-19; <u>see</u> Dkt. #69, at 9-10).

Pursuant to 20 U.S.C. § 1415(j), "during the pendency of any proceedings conducted pursuant to this section, unless the State or [LEA] and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . ." As an initial matter, as in <u>Brennan</u>, 531 F. Supp. 2d. at 264, the stay-put claim was not presented to the Hearing Officer, and thus the court "need not apply any deference to the [Hearing Officer's] decision–[as] there is simply nothing to defer to." <u>Id.</u> at 264, n.19.[25] Thus, the issue is

[25]Furthermore, although there does not appear to be a dispute between the parties on this issue, it is well settled that there is no exhaustion requirement for a stay-put claim. <u>Brennan</u>, 531 F. Supp. 2d at 264, n. 18, <u>citing Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.</u>, 297 F.3d 195, 199-200 (2d Cir. 2002).

whether the 2008-2009 agreement at issue terminated at the conclusion of the 2008-2009 school year.

Under § 1415(j), "[a]n agreement in which a board of education agrees to pay tuition to a private school makes that school the child's pendency placement <u>unless the stipulation is explicitly limited to a specific school year or definite time period."</u> <u>K.G. v. Plainville Bd. of Educ.</u>, No. 3:06 CV 1907 (CFD), 2007 WL 80671, at *2 (D. Conn. Jan. 9, 2007)(multiple citations omitted)(emphasis in original).   In this case, the stay put issue concerns the February 10, 2009 IEP, which amended the December 18, 2008 IEP by increasing the amount of John's speech-language therapy.  (Admin. Rec. at 2144-47).  A stay put order is triggered by the "pendency of any administrative or judicial proceedings as set forth in Section 10-76h-3[.]" Conn. Agencies Regs § 10-76h-17.  Section 10-76h-3 addresses the request for a hearing, <u>i.e.</u>, the filing of a due process complaint.  Conn. Agencies Regs. § 10-76h-3.   However, the Second Circuit, in a footnote in <u>A.S. v. Bd. of Educ. for Town of W. Hartford</u>, 47 Fed. Appx. 615 (2d Cir. 2002),[26] noted that "[u]nder the IDEA, a 'stay put' is a procedural right that is activated as soon as the PPT reaches an impasse and is issued pursuant to 20 U.S.C. § 1415(j) . . . ."  <u>Id.</u> at 616, n.2.

Plaintiff asserts that the PPT reached a impasse in June 2009 when Ms. Doe formally rejected the proposed 2009-2010 IEP at the June PPT, when she made clear that she was claiming her stay put rights (<u>see</u> Admin. Rec. at 878-79, 882, 886-87), followed by letters dated July 1, July 2, and July 13, 2009.[27] In contrast, defendant contends that the 2008-2009

---

[26]In <u>A.S.</u>, the Second Circuit issued a three-page summary order affirming the district court's decision, and referred to the stay put provision in the footnote discussed above. <u>Id.</u> at 616, n.2.

[27]Plaintiff filed her first request for due process in April 2010, which was later dismissed without prejudice upon plaintiff's request.  (<u>See id.</u> at 376-78).

IEP expired at the end of that school year.  The record is clear that a dispute arose over the 2009-2010 IEP before the conclusion of the 2008-2009 school year.  (See id. at 878-79, 882, 886-964).  Accordingly, plaintiff is entitled to reimbursement for services set forth in the stay put 2008-2009 IEP, from the date the dispute about the 2009-2010 IEP arose until the dispute over that school year was no longer pending, regardless of the outcome of her claim for reimbursement of all expenses based on the Board's denial of FAPE.[28] Brennan, 531 F. Supp. 2d at 266-67, citing Mackey v . Bd. of Educ. for Arlington Central Sch. Dist., 386 F.3d 158, 160-61 (2d Cir.)(the stay put provision reflects Congress' policy "choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their [stay put] educational placement until the dispute with regard to their placement is ultimately resolved.")(citations & internal quotations omitted)(emphasis in original), opinion supplemented by Mackey v. Bd. of Educ. for Arlington Central Sch. Dist., 112 Fed. Appx. 89 (2d Cir. 2004).

### 3. ADEQUACY OF THE IEP

According to defendant, the Hearing Officer's findings of FAPE for the 2009-2010 school year is supported by the record as the student's needs were documented in the IEP; the IEP detailed the specific program for John and where it could be best implemented; other social/emotional and communication areas of need were addressed; the IEP addressed nearly all of John's needs, and in some ways exceeded the parent's expectations; the PPT need not adopt the parents' recommendations; and plaintiff's characterization of the evidence attempts to omit the testimony of Reas, while crediting Dr. Kemper's testimony in full.  (Dkt. #65, at

---

[28]Accordingly, plaintiff is entitled to relief for the special education and related services that the Board agreed to provide John as set forth in the stay put 2008-2009 IEP for 2008-2009 and 2009-2010, as the Court resolves the dispute over 2009-2010 school year below by concluding that the student was offered a FAPE for the 2009-2010 school year.  See note 54 infra.

9-13; Dkt. #69, at 2-5). Defendant asserts that it is beyond this Court's expertise to substitute its own judgment as to the alleged deficiencies in the IEP. (Dkt. #65, at 11).

In their brief in opposition to defendant's motion, plaintiff contends that Reas had no basis for his opinion as Reas' opinion was not tailored to John's disability and needs (Dkt. #64, at 5); the IEP failed to follow Dr. Kemper's recommendations (id. at 6-8); and the student's social and emotional needs were not considered (id. at 8-9). Furthermore, in their moving brief, plaintiff contends that the Board failed to meet its burden of proving that the 2009-2010 IEP was tailored to John's individual needs and that the IEP would enable him to make meaningful progress as there was no evidence at the hearing as to what John's actual needs were for the 2009-2010 school year, and the Board presented no evidence supporting the IEP. (Dkt. #39, at 22-31).

### a. 2009-2010 IEP

After the June 2009 PPT, at which Dr. Berglund appeared for the Board, along with Dr. Kemper and four other witnesses who appeared on behalf of the student, Ms. Doe met with Dr. Berglund and Assistant Superintendent Freeman, at which meeting, Ms. Doe articulated what she believed were the inadequacies of the IEP, which included placement in Niantic Center School with a class of fifteen or sixteen students. (Admin. Rec. at 922-24, 927-28). As a result of this June 26, 2009 meeting, the Board agreed, by way of a revised version of the IEP, to reinstate occupational and physical therapy and provide some extended school year services. (Id. at 932-34, 954-55, 969). Additionally, included in the revised IEP was that for 2009-2010, East Lyme would provide an appropriate program, as recommended by the speech language pathologist, with a case manager and weekly team meetings, to "tie the pieces of [John's] program together . . ." (id. at 2171), along with code emphasis reading

instruction that incorporates Orton-Gillingham principles, for fifty minutes daily, which amount exceeds the three hours per week of Orton-Gillingham instruction recommended by Dr. Kemper.[29]  (Id. at 2188).   Additionally, the IEP included  speech language therapy, 2.5 hours per week, OT one hour/week (.5 direct & consult), PT consult and Adaptive PE twenty minutes/week as detailed in the IEP, along with transportation, if appropriate.  (Id.).  The service delivery portion of the IEP also specified that the Board would provide an hour per week of consultation to John's program by a physical therapist, fifty minutes per week of in-class keyboarding instruction by a classroom teacher, and one hour per week of small group social/behavioral instruction by "Psychologist/SLP." (Id. at 2207).  For the summer of 2009, the Board's revised IEP proposed to provide John, from July 7 to August 14, 2009, with two hours per day of "code emphasis" reading and writing instruction and one hour per week of speech-language therapy. (Id.).[30]  The IEP also provided for two hours per week of "SLP consult" (consultation between a speech pathologist and the special education teacher), for the same six-week period. (Id.).

At the hearing, Reas testified that there are certified speech pathologists, psychologists, special education teachers, occupational therapists, and physical therapists who are "all . . . part of our team[,]" as well as individuals trained in Orton-Gillingham techniques.   (Id. at 1906). None of these specialists are employed at SSA, nor is any of its

---

[29]Dr. Kemper opined that John required a highly structured, closely monitored school setting in a classroom of an eight to one student/teacher ratio, together with two hours per day (i.e., ten hours per week) of speech-language therapy and three hours per week of Orton-Gillingham instruction.  (Id. at 894-95, 1847).

[30]As stated above, by letter faxed to Dr. Berglund on July 1, 2009, Ms. Doe rejected the Board's proposed extended school year program for the summer of 2009 as inappropriate. (Id. at 968).  She outlined the summer program that she intended to provide for John, consisting of 4.5 hours per week of 1:1 speech-language therapy and a total of eighteen hours of 1:1 Orton-Gillingham instruction by a certified Orton-Gillingham tutor.  (Id.).

staff special education certified. (<u>Id.</u> at 165-66, FOF ¶51; <u>id.</u> at 1668). Reas testified that based upon his review of Dr. Kemper's recommendations, there are no recommendations that East Lyme cannot provide within its public schools, (<u>id.</u> at 1907-08), and as stated above, the IEP exceeds Dr. Kemper's recommendation regarding Orton-Gillingham instruction.[31]   Conversely, Dr. Kemper opined that the IEP included several goals and objectives that were not consistent with John's then-current level of functioning, lacked specificity in terms of discussing or identifying problem areas or are too general, some areas were completely in polar opposition, or atypical or what the student needed, and Dr. Kemper did not support the Board's speech and language recommendations.  (<u>Id.</u> at 1805-06).[32]

Other needs were also identified in the revised IEP, including in the social/emotional area and communication, in that the student was continuing to work on recognizing others' personal space, social cues, and pragmatic language, verbal formulations, narrative development, articulation and rate, formulation of complex and lengthy sentences, for which the "goals and objectives" were recorded as reflected in the PPT meeting (<u>see id.</u> at 877-916), including reading skills, language skills, spelling, articulation, general clarity,

---

[31]Reas did acknowledge, however, that he did not recall if anyone from East Lyme ever observed John. (<u>Id.</u> at 1913).

Additionally, Reas testified that he would give Dr. Kemper's recommendations "limited . . . weight" in light of his area of expertise as he is not certified to be a speech pathologist for a school system, he does evaluations outside his area of expertise, such as in the area of Dyslexia, for which he does not carry credentials, and Reas did not know the questions posed to "initiate those evaluations because they weren't done as part of the school's evaluation process."  (<u>Id.</u> at 1915).

As to the opinions of the speech pathologist, Reas commented that he could not tell from her curriculum vitae whether she has spent "much time working with student – children."  (<u>Id.</u> at 1921).

[32]Contrary to plaintiff's assertion, in addition to considering the testimony of Dr. Kemper, the Hearing Officer also considered the testimony of Campbell and Rosenberg.  (<u>See id.</u> at 166-67, FOF ¶¶ 52-70).

understanding and use of syntax, morphology, word retrieval, formulation of complex sentences, social pragmatic skills, computer lab, and social/behavioral skills. (Id. at 2192, 2195-203).  Dr. Kemper testified that John's educational setting is "absolutely crucial[]" for John, in that "he needs to be in a program, where he feels safe, and he feels secure, and he feels available for learning[.]" (Id. at 1830).  Reas testified that John's physical safety as well as his social, psychological, and emotional needs were considered, and "[h]aving seen [John,] . . . [he] is not unlike other students who have needs."  (Id. at 1932-33).

At the hearing, Dr. Kemper testified that John has a high IQ so he needs a curriculum that will challenge him intellectually, while addressing his severe language impairment.  (Id. at 1880-81). Reas testified that East Lyme would be able to use math texts at two grade levels above to teach John math, which is a subject area in which John excels. (Id. at 1937). SSA does not have qualified teachers in the upper grades to provide this advancement, and thus according to Reas, East Lyme may be "more appropriate."  (Id. at 1938).

### b. APPLICABILITY OF THE STANDARD OF REVIEW

As stated above, in the second step of the district court's two-step inquiry, the court must determine if the special education and related services are "tailored to meet the unique needs of a particular child, 20 U.S.C. § 1401(a)(18), and [are] 'reasonably calculated to enable the child to receive educational benefits.'" Walczak, 142 F.3d at 122, quoting Rowley, 458 U.S. at 207.   Thus, "[i]mplicit in the congressional purpose of providing access to a [FAPE] is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." Rowley, 458 U.S. at 200; see 20 U.S.C. § 1401(9).  That being said, however, the Board need not "furnish[ ] . . . every special service necessary to maximize each handicapped child's potential . . . ." Rowley, 458

U.S. at 199.   Rather, "[i]n order to avoid 'impermissibly meddling in state educational methodology,' a district court must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." Cerra, 427 F.3d at 195 (citations omitted).   This Court fully recognizes that federal courts "are expected to give 'due weight' to these proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."   Walzcak, 142 F.3d at 129, quoting Rowley, 458 U.S. at 206 (additional internal quotations & citation omitted).   It is the Board that bears the burden of proving that the 2009-2010 IEP was appropriate.   Conn. Agencies Regs. § 10-76h-14(a).

As the Second Circuit clarified earlier this summer, this Circuit agrees that the "standard for reviewing administrative determinations 'requires a more critical appraisal of the agency determination than clear-error review . . . but . . . nevertheless [ ] falls well short of complete de novo review . . . . [I]n the course of th[is] oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.'" M.H v. New York City Dept. of Educ., 685 F.3d 217, Nos. 10-2418, 10-2181, 2012 WL 2477649, at *22 (2d Cir. June 29, 2012)(citation & internal quotation omitted)(alteration in original).[33]   The Court continued:

> In many determinations made by administrative officers, the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court. But the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role.

---

[33]See note 34 infra.

Id.  "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations whether the IEP was developed according to the proper procedures."  Id. (citation omitted).  Similarly, "[d]ecisions involving a dispute over an appropriate educational methodology[,]" as in this case, "should be afforded more deference than determinations concerning whether there have been objective indications of progress." Id. (citations omitted).

"[E]ven if the Court were convinced that [Ms. Doe was] correct that [her] preferred educational program was superior to the Board's, that fact alone would be insufficient to justify granting judgment for [p]laintiffs."  A.S., 414 F. Supp. 2d at 174 (citation omitted). This case draws similarity to the circumstances considered by U.S. District Judge Mark R. Kravitz in A.S., in which case Judge Kravitz agreed with the Hearing Officer's conclusion  that larger class sizes than that which the parents preferred, team-taught classes with a special education teacher, counseling with the school's social worker, speech and occupational specialists, and a PPT including a "series of concrete goals[,]" together constituted a "thoughtful, individually tailored effort to marshal the Board's resources on [the student's] behalf."  Id.

In this case, the PPT meetings were appropriately designed to advance John's educational progress, and although the classes "may not have been as small as [Ms. Doe] would have preferred[,]" id., small group and individual instruction was provided for in the IEP.  (Admin. Rec. at 2203, 2207-08).  Additionally, as in M.H., 2012 WL 2477649, at *36,[34]

_____

[34]M.H. involved appeals heard in tandem of plaintiffs M.H. and E.K. on behalf of P.H., and of plaintiff M.S., individually and collectively on behalf of D.S., and plaintiff L.S., individually and collectively on behalf of D.S.  In M.H.'s case, the court affirmed the district court's conclusion, inter alia, that the IEP did not comply with the procedural requirements of the IDEA in that the State Review Officer's ["SRO"] conclusions were not grounded in "thoughtful and careful" analysis, the SRO's conclusion was poorly reasoned, and it "was not a situation in which the court credited the

in this case, the "the only people . . . who had met and evaluated [the student]" opined as to a instruction differing in part from that articulated in the IEP.  However, also as in M.H., the Hearing Officer's determination was based on her assessment of the credibility of the witnesses testifying and her own understanding of educational methodology.  Furthermore, as the Second Circuit has made clear, when a hearing officer's determination "concern[s] the substantive adequacy of the IEP, [it is] a question requiring expertise on education of autistic children . . . to which court therefore should usually defer to administrative decisionmakers."  Id. (citation omitted).   Thus, on the basis of the foregoing, her decision is entitled to deference.[35]

## 4. PLACEMENT AT SSA AND REIMBURSEMENT

The Court need not address the issue of parental placement and reimbursement for the 2009-2010 school year and summer of 2009.  The issue of whether the parents of a

_____

conclusions that were most consistent with its own subjective analysis."  Id. at *25-27 (citations omitted).  The court also held that as to the substantive challenges, the "SRO's failure to consider any of the evidence regarding [the methodology at issue] and its propriety for [the student] is more than an error in the analysis of proper educational methodology.  It is a failure to consider highly significant evidence in the record."  Id. at *28-30.  In M.S.'s case, the outcome of which is relied upon above, the court affirmed the district court's rejection of plaintiffs' procedural challenges, and as to the substantive challenges, concluded that the independent hearing officer, who was presented with conflicting evidence on the question of methodoloy, with some witnesses testifying that D.S. would thrive in a 6:1:1 program, while others expressed a view of 1:1 ABA therapy, reached his conclusion based on an assessment of the credibility of the witnesses testifying before him.  Id. at *36.

While the facts in this case are not as persuasive as those in M.H., in that the Hearing Officer in this case heard the testimony of only one individual on behalf of the Board, this Hearing Officer's decision includes a recitation of the opinions articulated by the individuals testifying on plaintiff's behalf, and a consideration and assessment of such opinions and credibility, along with the opinion of the Board.

[35]While the Hearing Officer's conclusion may not have been the conclusion reached by this Court, this Court is bound by the deferential standard applied in a case such as this.

In light of this conclusion above, the Court need not consider the additional evidence relating to 2009-2010, submitted with plaintiff's Motion for Summary Judgment (see April Order, at 16; Dkts. ##41-46), other than to the limited extent in Section III.B. infra.  See also note 5 supra.

disabled child are entitled to reimbursement for the costs of a private school turns on two

questions: "first, whether the challenged IEP was adequate to provide a child with a [FAPE];

and second, whether the private educational services obtained by the parents were

appropriate to the child's needs."  M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir.

2000)(multiple citations omitted).  As in this case, "[i]f the challenged IEP was adequate, the

state has satisfied its obligations under the IDEA and the necessary inquiry is at an end." Id.

(citation omitted).

### B. 2010-2011 SCHOOL YEAR AND SUMMER OF 2010

According to plaintiff, the Hearing Officer erred in failing to conclude that the absence

of a proposed IEP for 2010-2011 or for the summer of 2010[36] was a fundamental violation

of John's rights which deprived him of a FAPE.  (Dkt. #39, at 37-38).[37]  In their brief in

opposition to defendant's motion, plaintiff asserts that the Board was required to continue

to offer John FAPE, as John continued to reside in East Lyme and Ms. Doe continued to seek

---

[36]Specifically, plaintiff contends that the Board failed to re-evaluate John, in violation of 20
U.S.C. § 1414(a)(2), and 34 C.F.R. § 300.303, and Conn. Agencies Regs. § 10-76d-9; it failed
to convene an IEP Team to review and revise his IEP, in violation of 20 U.S.C. § 1414(d)(4)(A)(i)-(ii),
34 C.F.R. § 300.324(b), and Conn. Agencies Regs. § 10-76d-11(b); it failed to afford Ms. Doe her
rights to be present and participate in meetings to develop John's IEP and determine his
placement, in violation of 20 U.S.C. §§ 1414(d)(1)(B)(i), (e), 34 C.F.R. §§ 300.321(a)(1), 300.322,
300.501(b), (c), and Conn. Agencies Regs. § 10-76d-12(c); it failed to develop an IEP for the
summer of 2010 and the 2010-2011 school year; it failed to have an IEP in effect for John as of the
start of the 2010-2011 school year, in violation of 20 U.S.C. § 1414(d)(2)(A), 34 C.F.R. §
300.323(a), and Conn. Agencies Regs. § 10-76d-11(a), and failed to have any IEP in effect for
months thereafter. (Dkt. #39, at 37-38).

[37]In its brief in opposition, defendant failed to address this issue. (See Dkt. #65).
Furthermore, contrary to defendant's assertion in its reply brief (Dkt. #69, at 1), it is not
"undisputed" that the Hearing Officer established that John was offered FAPE for the 2010-2011
school year as well as the summer of 2010.  In her decision, the Hearing Officer concluded that the
Board offered John FAPE for the 2008-2009 and 2009-2010 school years, as well as for the summer
of 2009; and as to the 2010-2011 school year, the conclusion articulated by the Hearing Officer
was simply that the Board did not conduct an annual review for that school year.  (Admin. Rec. at
176, ¶ 3).

reimbursement for his program pursuant to 20 U.S.C. § 1412(a)(10)(c), and the Hearing Officer already rejected arguments to the contrary. (Dkt. #64, at 12-19).[38]

In her decision, the Hearing Officer concluded that "[t]he Board has not conducted an annual review, proposed a program, or held a PPT for the 2010-2011 school year." (Admin. Rec. at 168, FOF ¶ 85; see id. at 169, ¶ 3).[39]  The IDEA requires a child's IEP Team to formulate a new IEP at least every year.  20 U.S.C. § 1414(d)(4)(A)(I); see 20 U.S.C. § 1414(d)(1)(a)(i)(VIII)(the IDEA requires an IEP to be "updated annually"; 20 U.S.C. § 1414(d)(4)(a)(ii)(The IDEA requires an IEP to be revised "as appropriate[.]"); see also Regional Sch. Dist. No. 9 Bd. of Educ. v. Mr. & Mrs. M., No. 3:07-cv-1484(WWE), 2009 WL 2514064, at *8 (D. Conn. Aug. 7, 2009)["Mr. & Mrs. M"](once a student is determined eligible for special education services, an IEP must be developed each year)(citation omitted).  "[W]hen a child requires special [ ] education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under the IDEA as a failure to provide an adequate IEP."  Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 238-39 (2009).

U.S. District Judge Robert N. Chatigny recently held, in a case in which it was "undisputed that an IEP was never developed[,]" that "[u]nless the Board provides an adequate defense, then, a finding that [the Board] failed to provide FAPE for that school year is proper."  R.N., 2012 WL 1094640, at *11.  Defendant's defense in this case is that John

---

[38]To the extent the Board addresses this issue at all (see Dkt. #69, at 5-6), the Board limits its response to contending that "even if the Court finds a procedural violation such procedural failures are grounds for reimbursement only if" the procedural violations "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a [FAPE]; or (III) caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).

[39]See note 37 supra and note 40 infra.

was enrolled in SSA which is located in New London, not East Lyme, and "at no time did . . . Ms. Doe show an interest in returning to East Lyme schools." (Dkt. #69, at 6). However, the Hearing Officer rejected this defense by denying in full defendant's Motion to Dismiss on this precise issue. (See Admin. Rec. at 69, 224-34; see also id. at 331-43, 349-55).[40] Moreover, case law, both in this District and elsewhere, supports plaintiff's position. See, e.g., James v. Upper Arlington Sch. Dist., 228 F.3d 764, 766-68 (6th Cir. 2000), cert. denied, 532 U.S. 995 (2001)(a school district's refusal to hold a requested IEP pre-enrollment for a child domiciled in district is a violation of the Act);[41] Moorestown Twp. Bd. of Educ. v. S.D., 811 F. Supp. 2d 1057, 1067-77 (D.N.J. 2011)("residency, rather than enrollment, triggers a district's FAPE obligations"); Mr. & Mrs. M, 2009 WL 2514064, at *10 ("the LEA where the student resides was not relieved of its IDEA obligations by the fact that the LEA where the student attended school 'may have [IDEA obligations] of its own'"), quoting District of Columbia v. Abramson, 493 F. Supp. 2d 80, 86 (D.D.C. 2007)(school district's FAPE obligations extended to student who attended private school in Connecticut, because he

---

[40]As plaintiff appropriately notes, the Board did not appeal that order. (See Dkt. #39, at 39, n. 24; Dkt. #64, at 13).

[41]In that case, the court ruled:

To hold otherwise would allow the school to slough off any response to its duty until the parents either performed the futile act of enrolling their son for one day and then withdrawing him as soon as the IEP was complete, or, worse, leaving the child in an arguably inadequate program for a year just to reestablish his legal rights. Neither action seems to be compelled by the statutory scheme or the case law.

Id. at 768. See also Moorestown Twp. Bd. of Educ. v S.D, 811 F. Supp. 2d 1057, 1070-71 (D.N.J. 2011)("Surely, Congress did not intend to turn special education into a game of poker, where the school district does not have to show its cards until after the parents have taken the gamble of enrolling their child, and the child bears the risk of losing an appropriate education.")(emphasis in original).

maintained his D.C. residency).[42]

As Ms. Doe herself acknowledges, immediately following the Hearing Officer's Decision on January 10, 2011, PPT meetings were held on February 4, March 31, October 3, and November 4, 2011, with regard to John's placement at East Lyme Middle School for seventh grade; both sides had multiple representatives in attendance.  (Doe Aff't II, ¶¶ 11-16).

### C. APPROPRIATENESS OF SSA

Ms. Doe has established that the Board denied John a FAPE for the 2010-2011 school year; therefore, it is necessary to determine whether the private educational services Ms. Doe obtained for John were appropriate. A parent who seeks reimbursement for a private

---

[42]Conversely, the cases defendant cites to support its position that a different framework under the IDEA applies to when a student is unilaterally placed are inapposite, as while the premise may be accurate, these cases do not support a position that East Lyme is relieved of its IDEA responsibilities for a student who is unilaterally placed outside of distict. See, e.g., Hooks v. Clark County Sch. Dist., 228 F.3d 1036, 1039-41 (9th Cir. 2000), cert. denied, 532 U.S. 971 (2001); J.P.E.H. v. Hooksett Sch. Dist, Civ. No. 07-cv-276-SM, 2008 WL 4681827, at *2 (D.N.H. Oct. 22, 2008)(enrollment outside of district coupled with a stated intention not to return him to the district amounted to a change of circumstances such that need for services passed to the district in which the private school was located), citing 34 C.F.R. § 300.137 (no parentally-placed private school child with a disability has an individual right to receive some or all of the special education services that the child would receive if enrolled in public school).  It is beyond dispute that students who are enrolled in private schools by their parents are entitled to more limited services, commonly known as "equitable participation."  20 U.S.C. § 1412(a)(10)(A)(ii)(II).  Moreover, such children are entitled to some services from the district where the private school is located.  20 U.S.C. § 1412(a)(10); 34 C.F.R. §§ 300.132, 300.137-139.

The Court notes that while unlike in James, 228 F.3d at 768, and Moorestown, 811 F. Supp. 2d at 1060, plaintiff in this case did not request an evaluation or IEP in the year in which it was not done, nonetheless Ms. Doe was in regular contact with East Lyme by sending John's progress reports and report cards, and repeatedly informed the Board that she expected that the services she was providing would be reimbursed at public expense.  (See Admin. Rec. at 1045, 1048, 1084-85, 1150, 1152, 1154-56, 1177); but see Mr. & Mrs. M, 2009 WL 2514064, at *11 (while attending a private school in Utah, the student remained officially registered at the Connecticut public school in his district). Additionally, in a letter dated August 15, 2010, Ms. Doe informed Reas that in the absence of being offered an IEP for a FAPE for the 2010-2011 school year, she would be sending her son to SSA with related services, both of which she "expect[ed]" would be at public expense. (Admin. Rec. at 1162-64).

placement bears the burden of demonstrating that the private placement is appropriate. Frank G. v. Bd. of Educ. Of Hyde Park, 459 F.3d 356, 364 (2d Cir. 2006)(citation omitted), cert. denied, 552 U.S. 985 (2007).  The appropriateness of the private program, much like the public program discussed above, depends on whether it is "likely to produce progress, not regression."  Gagliardo v. Arlington Centr. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007), quoting Walczak, 142 F.3d at 130 (internal quotations omitted).  "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs."  Frank G., 459 F.3d at 364 (citation omitted).[43]  Moreover, while parents "need not show that a private placement furnishes every special service necessary to maximize their child's potential[,]" parents must show that the "placement provides 'educational instruction specifically designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.'"  Frank G., 459 F.3d at 365, quoting Rowley, 458 U.S. at 188-89 (internal quotations omitted).[44]

As the Hearing Officer found, SSA "provides no special education services whatsoever, does not implement the IEP, and the teachers are not special education certified."  (Admin. Rec. at 174. FOF ¶ 22; see id. at 166-67, FOF ¶¶ 52-66, 1035).  However, a unilateral

---

[43]The Second Circuit has allowed retrospective evidence to show that placement in a private school was appropriate.  See Frank G., 459 F.3d at 367; see R.N., 2012 WL 1094640, at *9 (articulating that such evidence, while relevant, "must be appropriately discounted to avoid hindsight bias").

[44]Plaintiff contends that Ms. Doe has satisfied her burden of establishing that the program she chose "provide[d] some element of special education services in which the public school placement was deficient" (Dkt. #64, at 20 (emphasis in original)(citations omitted); see id. at 19-32), and Campbell's and Theadore's additional instruction constitutes an "element of special education services in which the public school placement was deficient[.]"  (Id. at 22-24).

Case 3:11-cv-00291-JBA   Document 71   Filed 08/14/12   Page 40 of 45

placement need not provide special education services, nor must it employ certified special education teachers or implement an IEP.  See Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 14 (1993).  Plaintiff contends that SSA met John's special needs in that it offered small class sizes, John's writing assignments were shortened to accommodate his deficits, the grading was based on information rather than style, and certain "strategies" were implemented. (Dkt. #39, at 35-36).  SSA's small class size, and its "atmosphere that is accepting of [s]pecial [e]d," as Rosenberg described SSA (Admin. Rec. at 1667), are not elements of special education services that would so transform SSA into an appropriate placement. As the Second Circuit observed in Gagliardo:

> Indeed, even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where, as here, the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not.  A unilateral private placement is only appropriate if it provides education instruction specifically designed to meet the unique needs of a handicapped child.

489 F.3d at 115 (citations & internal quotations omitted)(emphasis in original).

In addition to the program at SSA, John also received speech-language therapy from Theadore (see Admin. Rec., at 996-1003, 1037-43, 1143-1149, 1185-1206, 1235), and Orton-Gillingham instruction from Campbell (see id. at 1030-31, 1033-35, 1236-38).  The SSA report cards, the progress reports, the comparison of Dr. Kemper's 2009 and 2010 testing results, and the progress testified to by Campbell at the hearing demonstrate the objective and measurable progress that John has made with the combination of his placement at SSA and the additional services secured by Ms. Doe.  (Id. at 860–64, 869, 1004-09, 1019-24, 1046-47, 1106-10, 1168-71; compare id. at 845-64 with 1064-83).[45] However, there is also

_____

[45]None of the additional evidence submitted for the 2010-2011 school year, which evidence was considered in the April Ruling, alters this Court's conclusion as to the appropriateness of the

objective evidence of regression as well. In his 2010 report, while Dr. Kemper noted meaningful progress regarding spontaneous communicative discourse, pragmatic skills and phonemic decoding, and John was much more able to carry on a conversation, he also noted that John did not make any gains in written expression, despite approximately 6.5 hours of high quality, individual language therapy.  (Id. at 165, FOF ¶ 47; id. at 1064-83, 1813-15).

Even considering the progress made with the combination of services,"such progress does not itself demonstrate that a private placement was appropriate." Gagliardo, 489 F.3d at 115 (citations omitted). To accommodate all of the additional services necessary for John which SSA did not provide,[46] John needed to be removed from school for approximately one-third of the school day for John's speech and language therapy and Orton-Gillingham tutoring from the private service providers; none of this time was during the two hours of religious instruction, which instruction makes up one-third of the school day, but rather during his math, social studies, Spanish, computer, and art classes.[47] (Admin. Rec. at 165-66, FOF ¶ 51; id. at 1675-76).[48]  As Campbell emphasized in her January 2010 progress report, it is

placement.  (See Dkts. ##41, 42, 44, 45, Exh & 46).

[46]On August 15, 2010, Ms. Doe sent the Board written notice of her intent to continue John's placement at SSA with related services for the 2010-2011 school year, consisting of SSA plus 7.5 hours of speech-language therapy per week, three hours of Orton-Gillingham instruction per week, and two hours of assistive technology services per month (for a period of at least three months).  (Id. at 1162).

[47]John missed social studies and Spanish instruction during this time, and in order to keep him from falling behind, he required additional instruction from his teacher.  (Admin. Rec. at 166, FOF ¶ 57; id. at 1675-76).  John also missed art, one period of math, and computer due to being picked up by Ms. Doe for specialized instruction.  (Id. at 166, FOF ¶ 59; id. at 1276).  When John was pulled out, Ms. Doe picked him up on Mondays at approximately noon and was out for two and one-half hours on Thursdays.  (Id. at 1708-10).

[48]Stated differently by the Hearing Officer, "[n]otably, the record [of the removal for and utilization of outside services] establishes that [Ms. Doe] also does not believe the program is appropriate as regards to its ability to implement the IEP." (Id. at 174).  See also notes 18-19 supra.

"imperative" that John's "significant reading and spelling skill gaps continue to be aggressively addressed outside of school," because John "receives no [s]pecial [e]ducation services during his private school day[.]"  (Id. at 1035).   Dr. Kemper also clearly testified that SSA cannot provide the kind of program that John needs.  (Id. at 1883).[49]

Lastly, while there are some material differences, the circumstances in this case parallel those in J.G. v. Kiryas Joel Union Free Sch. Dist., 777 F. Supp. 2d 606 (S.D.N.Y. 2011),[50] in that a substantial amount of John's day at SSA was spent learning secular studies, and all of John's special education program occurred outside of SSA.  As the court in J.G. appropriately reasoned, "[u]ltimately, decisions about [a disabled child's] education rest in the hands of [the] parents –as they appropriately should. . . But this right is hardly absolute. In choosing a private school placement . . . , parents cannot expect the public funding will subsidize their choice."  Id. at 657 (citations omitted).   The court continued: "[I]n opting unilaterally to place [the child at a private Jewish school], though he was otherwise entitled to receive a [FAPE], [the parents] must accept that public monies will not fund it."  Id. at

---

[49]At the December 15, 2010 hearing, Dr. Kemper testified that the appropriate placement, although "not a perfect program for him[,]" was a language emersion program at the Curtis Blake Day Center. (Id. at 1832; see also id. at 1869-70).  However, the student was not accepted to Curtis Blake.  (Id. at 1460-61).

Rosenberg testified at the December hearing that plaintiff sent her son to SSA "to provide him a social peer group, where he could participate in a classroom discussion, both for socialization and for a challenge to his – for academics."  (Id. at 1735).  According to Rosenberg, the decision had nothing to do with special education. (Id.).

[50]In J.G., the private school was a yeshiva, which devoted almost one hundred percent of its time to religious education, while in this case, approximately fifty percent of John's day was spent on secular activities, and the student in J.G was profoundly delayed. See id. at 616-34. However, as in this case, the parents' placement in J.G. provided no special education and none of its teachers were qualified to provide special education services.  Id. at 656.

657-58.[51]  In this case, plaintiff has not satisfied her burden of establishing that SSA, in particular, even with the additional educational services, was an appropriate placement.[52]

### D. REIMBURSEMENT

Upon review of an administrative decision, a district court retains authority to "grant such relief as the court determines is appropriate[,]" 20 U.S.C. § 1415(i)(2)(C)(iii), and such relief includes the power to reimburse parents for their expenditures on private education.

---

[51]"[A]ny suggestion to the contrary by this Court might run afoul of the other constitutional religion clause." Id. at 658 (citations omitted).

[52]Plaintiff asserts that equities weigh in favor of their reimbursement claim as the Board has unclean hands, having "deliberately violated a number of John's and Ms. Doe's basic rights under IDEA and Connecticut law." (Dkt. #64, at 32-40). Defendant contends that plaintiff failed to demonstrate that John's placement was appropriate as his entire special education program occurs outside of SSA (Dkt. #69, at 6-9), and the equities weigh in favor of the Board as notice of the placement was not given until after the placement. (Id. at 9-10). Specifically, defendant asserts that Ms. Doe did not properly notify the Board of her intent to place John at SSA at public expense in the 2008-2009 school year, and suggests that failure to do so precludes reimbursement for subsequent years. (Dkt. #47, Brief at 21-22.  See 20 U.S.C. § 1412(a)(10)(C)(iii)(limitations on reimbursement when parents enroll a student in private schools without consent of or referral by the public agency).

The Hearing Officer included in her Findings of Fact that in August 2008, Ms. Doe informed Buck of the problems John was having at Hope Academy and that the parent would enroll him at SSA on a trial basis in September 2008. (Admin. Rec. at 160-61, FOF ¶ 11). As Ms. Doe also acknowledged in her hearing testimony, she did not provide prior written notice to the Board that she was enrolling John at SSA, nor did she inform the Board that she expected such placement to be at public expense prior thereto. (Id. at 161, FOF ¶ 12; see id. at 1466).  Additionally, at the December 2008 PPT, Ms. Doe was informed that the Board would pay for some specified services, but she would remain responsible for tuition and transportation costs if she kept John at SSA. (Id. at 161, FOF ¶ 17; see id. at 1470).  Ms. Doe accepted the 2008 PPT recommendations and did not request that the Board pay for the SSA tuition or other costs. (Id. at 161, FOF ¶ 17).

Ms. Doe testified that she provided written notice of John's placement at SSA in 2009 for the 2009-2010 school year, and in 2010 for the 2010-2011 school year. (Id. at 1503-04).  In light of the conclusion reached above, the only year subject to a claim for reimbursement in this case is the 2010-2011 school year and summer 2010, at which time John was denied a FAPE by virtue of the Board's failure to convene a PPT and develop an IEP.  Moreover, the application of 20 U.S.C. § 1412(a)(10)(C)(iii) is discretionary as reimbursement "may be reduced or denied" if notice is not given. Id.; Mr. & Mrs. M, 2009 WL 2514064, at *9 (emphasis added), citing 20 U.S.C. § 1412(a)(10)(C)(iii); 24 C.F.R. § 300.148(d)(1). Accordingly, while in light of the conclusion reached above, this Court need not address the issue of reimbursement, defendant's claim regarding plaintiff's lack of written notice before unilaterally placing John in SSA in 2008 is misplaced as this would not constitute an absolute bar to reimbursement going forward.

Mr. & Mrs. M, 2009 WL 2514064, at *9 (citation omitted).    The "IDEA authorizes reimbursement for the cost of private special[]education services when a school district fails to provide a FAPE and the private[]school placement is appropriate, regardless of whether the child previously received special education or related services through the public school." Forest Grove, 557 U.S. at 247.   In this case, for the reasons discussed in Section III.C. supra, this Court has concluded that the private school placement was not appropriate, and thus reimbursement is not an available remedy. See Cerra, 427 F.3d at 192 (when parents seek reimbursement, the court must engage in a three-step inquiry: (1) whether the state complied with the procedures in the IDEA; (2) whether the IEP is reasonably calculated to enable the child to receive educational benefits; and (3) whether the private schooling obtained by the parents is appropriate to the child's needs)(internal quotations & citations omitted).

## IV. CONCLUSION

For the reasons stated above, plaintiff's Motion for Summary Judgment (Dkt. #38) is granted in part such that the Board violated plaintiff's right to a FAPE in the 2010-2011 school year and summer 2010[53], and violated plaintiff's "stay put" right,[54] and is denied in all

---

[53]For the reasons stated in Section III.B. supra, no damages are awarded for this violation.

[54]While plaintiff has not made a specific request for reimbursement for the violation of her "stay put" right, such remedy derives from the decisions by the Board at the December 2008 PPT during which it was agreed that although Ms. Doe was responsible for tuition and transportation costs if she intended to keep John at SSA, the Board would pay for a total of nine hours per week of special education and related services, consisting of five hours per week fo specialized 1:1 reading instruction using the Orton-Gillingham method, 2.5 hours per week of 1:1 speech-language therapy, and 1.5 hours per week of occupational and physical therapy  (Admin. Rec. at 2117, 2128), along with an assistive technology evaluation.  (Id. at 2117).  The decision made at this PPT meeting was memorialized in an IEP dated December 18, 2008.  (Id. at 2116-28).   Ms. Doe confirmed by way of a letter dated December 21, 2008 the agreement of what the Board would provide, and confirmed that Ms. Doe would be responsible for the SSA tuition, extended day programming at SSA, a math aide at SSA, Dr. Kemper's evaluation, Dr. Kemper's participation in the PPT, and an additional neuropsychological evaluation. (Id. at 2129-30).

other respects (i.e., the 2009-2010 and summer 2010 IEP was adequate to provide a FAPE, and plaintiff's unilateral placement at SSA with additional services was not appropriate); and

defendant's Motion for Summary Judgment (Dkt. #47) is granted in part such that the 2009-2010 and summer 2010 IEP was adequate to provide a FAPE, and is denied in all other respects (i.e., the Board failed to offer a FAPE by failing to provide an IEP in the 2010-2011 school year and summer 2011).

See 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen days after service of same);** FED. R. CIV. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary, H&HS, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

Dated at New Haven, Connecticut, this 14th day of August, 2012.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge

---

In addition, in February 2009, the Board, through Dr. Berglund and Ms. Doe, agreed to add an additional .5 hours of speech-language therapy; the agreement was memorialized in an amended IEP, dated February 10, 2009. (Id. at 2144-47; id. at 162, FOF ¶ 22). On February 15, 2009, the 2008-2009 IEP was revised further to increase the speech and language services to three hours per week. (Id. a 2144-47; id. at 162, FOF ¶ 23). (See also Dkt. #38, at 4, n.1 & note 20 supra).

If the parties are unable to agree as to the scope and/or value of these services for the 2008-2009 and 2009-2010 school years, for which Ms. Doe is entitled to reimbursement, then **on or before September 7, 2012**, plaintiff will file a memorandum of law quantifying these amounts, with appropriate supporting affidavits and documents, to which defendants may file a memorandum in opposition **on or before September 19, 2012**, Plaintiff may file a reply brief, if any, **on or before September 25, 2012**; if plaintiff does not intend to file a reply brief, she will advise Chambers and defense counsel accordingly, in writing.