UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE, by and through his parent, JANE DOE<br>    *Plaintiffs*,<br>*v.*<br>EAST LYME BOARD OF EDUCATION,<br>    *Defendant.* | Civil No. 3:11cv291 (JBA)<br><br>June 29, 2017 |

**MEMORANDUM OF DECISION ON REIMBURSEMENT OF PLAINTIFFS' OUT-OF-POCKET EXPENSES AND COMPENSATORY EDUCATION**

This case, brought by Plaintiff John Doe, by and through his parent Jane Doe, (together "Plaintiffs") against the East Lyme Board of Education ("the Board" or "Defendant") for violations of the Individuals with Disabilities Education Act (the "IDEA" or the "Act"), is before the Court on remand from the Second Circuit to conduct further proceedings and craft a remedy consistent with the Circuit's opinion. This Court held a nonconsecutive three-day bench trial September 22, 2016, December 12, 2016, and January 6, 2017, during which the parties called witnesses and introduced evidence.

In summary, and for the reasons discussed in the Memorandum of Decision (the "Judgment" or the "Decision") that follows, the Board must reimburse Plaintiffs in full for Ms. Doe's out-of-pocket expenses plus interest and place $203,478.10[1] for compensatory education

---

[1] This calculation is based upon reimbursement expenses only through January 11, 2017. Should Plaintiffs submit appropriate additional documentation of reimbursable expenses incurred between then and the date of Judgment (as discussed below), which the Court credits, the amount of compensatory education will be reduced accordingly and the reimbursement calculation concurrently increased.

into an escrow account for John Doe, to remain open for six years or until John graduates college, whichever occurs first.

This compensatory education award is equivalent to the value of the covered services which were never provided him by either the Board or Ms. Doe, at the fair market rates available to Ms. Doe, not the rates the Board would pay. Since the Court finds that John's educational needs will continue through college and that he will continue to benefit from services analogous to those in the Stay-Put IEP ("individualized education plan"), an escrow account shall be opened for the benefit of John Doe as soon as practicable after all calculations have been finalized and shall remain open until John completes college or six years have passed, whichever occurs first. All expenses consistent with this decision shall be reimbursed upon submission of documentation to an independent escrow agent and any funds remaining in the escrow account at its close shall be refunded to the Board.

## I. Background

### A. *Procedural History*

As detailed in Magistrate Judge Margolis's Recommended Ruling [Doc. # 71] on the parties' cross-motions for summary judgment and the Second Circuit's ruling, *Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 445 (2d Cir. 2015), John Doe is a child (originally) diagnosed with autism[2] who requires special education services. Until the 2009–2010 school year, the parent and the Board were able to agree on IEPs for John, which the Board would provide and fund. However, the parent

---

[2] Ms. Doe testified that John is no longer diagnosed with autism. (Tr. I at 141.) However, the most recent IEP developed by East Lyme offered into evidence, created in June 2015, continues to list autism as John's "primary disability." (*See* Ex. B (June 2015 IEP) at 1.)

and the Board were unable to reach such an agreement for the 2009–2010 school year, and as a result, the parent placed John in a private school outside the District and continued to privately obtain some of the related services previously funded by the Board.

Plaintiff brought suit under the IDEA, claiming that Defendant had failed to provide John with a free and adequate public education ("FAPE"), as required by the IDEA, by offering John an inadequate IEP for the 2009–2010 school year and by failing to offer him any IEP for the 2010–2011 and subsequent school years.

This Court, largely adopting Magistrate Judge Margolis's Recommended Ruling, found [Doc. # 79] that the Board had provided John with a FAPE for the 2009–2010 school year, and that although the Board had violated the IDEA by failing to offer the student an IEP for the 2010–2011 and subsequent school years, Plaintiffs were not entitled to relief because the private school at which the parent had placed the child was an inappropriate placement. (*See* Ruling on Objs. to Rec. R. Summ. J. at 8–15). The Court further found, however, that the Board had violated the "stay-put" provision of the IDEA, 20 U.S.C. § 1415(j), which requires that "during the pendency of any proceedings conducted pursuant to this section . . . the child shall remain in the then-current educational placement of the child," by failing to fund the services described in the 2008–2009 IEP after the parties reached an impasse on June 17, 2009. (*Id.* at 3–6.) The Court therefore ordered Defendant to reimburse Plaintiffs for expenses the parent incurred from June 17, 2009 through the date final judgment in this case is entered.[3] (*Id.* at 6.) The Court later determined that amount to

---

[3] The Court held in its Ruling on the Parties' Objections to the Recommended Ruling regarding the value of services to be reimbursed that "plaintiffs are entitled to stay put reimbursement from the date a dispute arises until the date the dispute over the challenged school year is no longer pending, which courts have recognized extends at least through the a district court's entry of final judgment." (Ruling on Objs. to Rec. R. Stay-Put [Doc. # 101] at 5.) The Second

be $97,445. (Ruling on Objs. to Rec. R. Stay-Put at 10.) Defendant paid that sum to Plaintiff in June 2015.[4]

Both parties appealed the Court's decision. On appeal, the Second Circuit affirmed the Court's judgment in most respects but vacated the award of reimbursement, holding that: (1) the parent should have been reimbursed for the full value of the services the Board was required to fund under the 2008–2009 IEP, not for the (lesser) amount that the parent actually expended in obtaining some of the services provided for by the IEP, *East Lyme BOE*, 790 F.3d at 445; and (2) the stay-put obligation was triggered on April 27, 2010, when the parent initiated the administrative due process proceedings, not on June 17, 2009, when the parties reached an impasse, *id.* at 455.

The Second Circuit noted, however, that "an award of damages to make up the difference is impermissible under the IDEA." *Id.* at 456. Compensatory education ("prospective equitable relief, requiring a school district to fund education beyond the expiration of a child's eligibility as a remedy for any earlier deprivations in the child's education"), on the other hand, is permissible. *Id.* (internal quotation marks omitted). Therefore, the court remanded the case to this Court to

---

Circuit explained the reason for this: "Section 1415(j) represents Congress's policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved. In short, the stay-put provision means that an educational agency is required to maintain the status quo placement even if the child would otherwise have no substantive right to it." *East Lyme BOE*, 790 F.3d at 453 (internal quotation marks, citations, and emphasis omitted).

[4] This amount stems from the calculation done by the Magistrate Judge in the Recommended Ruling [Doc. # 92], which this Court then affirmed (and updated based on the additional time that had passed during which Ms. Doe continued to accrue expenses on related services) in its Ruling [Doc. # 101] on the Parties' Objections to the Recommended Ruling.

calculate the total value of the related services specified in the amended 2008–2009 IEP for the period from April 27, 2010, to the (as yet undetermined) date of the new final judgment; order the Board to reimburse the Parent for out-of-pocket expenses incurred on covered services during that period; and direct the Board to provide (with the parent's requisite participation) the remainder of the total value as compensatory education to commence at the conclusion of litigation.

*Id.* at 457 (internal citations omitted).

The *East Lyme* panel found that "[a]lthough [it had] typically endorsed compensatory education as a remedy for substantive FAPE claims . . . there is no reason why the remedy should not be equally available for stay-put violations." *E. Lyme Bd. of Educ.*, 790 F.3d at 456. Consequently, this appears to be the first time a district court in the Second Circuit has been asked to craft a compensatory education award for violation of the stay-put provision.

### B. The 2016-17 Bench Trial

At trial, Plaintiffs offered testimony from John Doe's mother, Ms. Jane Doe, as well as Dr. Robert Kemper, a speech and language pathologist and psycholinguist who is familiar with John Doe's disability and his progression.

Dr. Kemper's particular areas of expertise include how children understand and process oral and written language; reading disabilities, including dyslexia; disorders of written expression; social communicative disabilities; and syntax disorders. (Bench Trial Transcript ("Tr.") I at 213:2-214:9; Pl.'s Ex. 1 (Dr. Kemper Curriculum Vitae).) Dr. Kemper first encountered John in 2008 at age eight, when he was initially asked to perform a psycholinguistic evaluation of John. (*See* Pl.'s Ex. 18 (10/2/08 Report of Psycholinguistic Evaluation).) He subsequently evaluated John in 2009, 2010, and 2011, (*see* Pl.'s Ex.'s 19 (5/15/09 Report of Modified Psycholinguistic Evaluation); Ex. 20 (4/8/10 Report of Psycholinguistic Reevaluation; Ex. 21 (4/28/11 Report of Psycholinguistic Reevaluation)), conducted a school observation of John at the Schechter Academy in 2010 (tr. II

at 256:3-10), and most recently met with John in 2016 (*see* Pl.'s Ex. 22 (7/7/16 Report of Progress for [John Doe]); Tr. I at 140:11-13).

Defendant called the former Assistant Superintendent for Special Education and Pupil Services, Ms. Donna Gittleman, who began at East Lyme in 2014. (Tr. II at 410:7-8.) As its second witness, the Board presented Interim Special Services Director, Ms. Kimberly Davis, whose tenure began July 1, 2016.

John Doe is now entering his senior year of high school at Lyme-Old Lyme High School and is on track to graduate at the conclusion of the 2017-2018 school year. (Tr. I at 15-16; Tr. I at 191:21-23.) John intends to pursue a bachelor's degree beginning in the 2018-2019 school year. (Tr. II at 317:19-318:4.)

The Court's findings of fact are integrated into the "Discussion" section below because a significant portion of what this Court must now decide involves factual determinations.

## II. Discussion

In any action brought under the IDEA, the court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). In turn, "the only restriction is that 'the relief is to be appropriate in light of the purpose of the Act.'" *E. Lyme Bd. of Educ.*, 790 F.3d 440, 454 (quoting *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 374 (1996)).[5] The Supreme Court has emphasized that IDEA relief depends upon "equitable considerations" and that "the court enjoys 'broad discretion'" in crafting the remedy. *Florence Cty.*

---

[5] "Congress stated the purpose of the Act in these words: 'to assure that all handicapped children have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of handicapped children and their parents or guardians are protected.'" *Burlington*, 471 U.S. at 367 (quoting 20 U.S.C. § 1400(c)).

*Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 16 (1993) (quoting *Burlington*, 471 U.S. at 374).

Here, the Second Circuit held "that the appropriate equitable relief for a stay-put violation is reimbursement or compensatory education (or both) for the full value of services that the educational agency was required to fund, not the (lesser) value of services the Parent was able to afford." *E. Lyme Bd. of Educ.*, 790 F.3d at 445.

On remand the parties, true to character, take diametrically opposing positions on nearly every issue before this Court. Rather than acknowledging what is a relatively clear directive from the Second Circuit, Defendant continues to resist its obligations under the IDEA, contesting every dollar to which Plaintiffs claim entitlement. Specifically, Defendant maintains Ms. Doe is not entitled to reimbursement for the full amount she expended on out-of-pocket Covered Services and contends that John Doe should not receive any compensatory education at all. Accordingly, the Court will first decide the amount Defendant is required to reimburse Plaintiffs for out-of-pocket expenses for covered services privately funded by Ms. Doe and will then proceed to the issue of compensatory education, including the value of that which is owed John, as well as the logistics and structure of the award.

### A. The Reimbursement of Covered Out-of-Pocket Expenses[6]

#### 1. *Plaintiffs are Entitled to Reimbursement for the Full Amount Expended on Covered Services*

---

[6] The Court ruled at the pre-trial conference held on March 17, 2016 that Plaintiff is not entitled to reimbursement for services or other items that were not specified in the Stay-Put IEP ("Uncovered Services"). Therefore, Plaintiffs did not submit evidence with regard to Uncovered Services at the bench trial on remand.

The Board agrees that Ms. Doe's expenditures on related services specified in the Stay-Put IEP ("Covered Services") total $121,441.25 for the period from April 27, 2010 through September 7, 2016.[7] (Def.'s Post Trial Mem [Doc. # 234] at 9.) Plaintiffs submitted a supplemental affidavit [Doc. # 236] of Jane Doe, updating this figure by providing information on her out-of-pocket expenditures from September 8, 2016 through January 11, 2017, which totaled $8,155.40. Defendant did not object to this updated sum in its Reply Memorandum [Doc. #238].

However, Defendant disputes that it is required to reimburse the full amount of Ms. Doe's out-of-pocket expenses. Defendant first maintains that, because on December 7, 2016 Ms. Doe rejected the services of Nicole Burke, the teacher that the Board had offered to provide to tutor John Doe in reading instruction, the Board is responsible only for reimbursement at the rate of $37.56 per hour after that point, the amount it would have paid for Ms. Burke's services. Similarly Defendant maintains that the Board is responsible only for reimbursement of speech language services at the rate it would have paid a qualified provider after it notified Ms. Doe on January 20, 2016 of this intention. Defendant reasons that "a school district cannot be required to bear whatever additional cost was incurred as a result of the parent's decision to keep the student with his private service providers, rather than, for example, accepting the same services directly from

_____

[7] Covered Services, i.e., the services listed in the 2008-2009 amended IEP, consist of three hours per week of speech-language therapy ("S/L"), five hours per week of Orton-Gillingham reading instruction ("O/G"), and an hour and a half per week of occupational/physical therapy ("OT/PT"). (Def. Ex. A (the "Stay-Put IEP"). Based on the Second Circuit's opinion, *Doe*, 790 F.3d at 455, extended school year (summer) services are not included.

the school district" because the IDEA does not permit parents to select their providers. (Tr. I at 26:22-27:5.)[8]

### a. Plaintiffs are not Entitled to Reimbursement for the 12.2 Hours of Physical Therapy Ms. Doe Provided

It is undisputed that Ms. Doe never provided John with any occupational therapy services (Tr. I at 58:3-4), but she did take him to Lawrence Memorial Hospital for 12.2 hours of physical therapy, which Plaintiffs have included in their calculation of the reimbursement for out-of-pocket expenses. (*See* Pl.'s Post Trial Mem. at B2-3.) Defendant has stipulated and maintained on several occasions its agreement with Plaintiff's calculation of Ms. Doe's out-of-pocket expenses. (*See e.g.*, Def.'s Supp. Trial Memo [Doc. # 209] at 4-5.) Notwithstanding this stipulation, the Court will not award Plaintiffs reimbursement of the physical therapy costs because the parties appear to have overlooked the Court's prior determination that those hours were paid by insurance. Indeed, Ms. Doe's third affidavit [Doc. # 82] from October 12, 2012 states as much: "[t]he cost of that physical therapy [she was able to provide] was covered by insurance." (Doe Aff. ¶ 6.) The Magistrate Judge therefore did not award any reimbursement for physical therapy (*see* Recommended Ruling on Stay-Put Reimbursement [Doc. # 92] at 13), which decision this Court adopted (*see* Ruling on the Parties' Objections to the Recommended Ruling [Doc. # 101] at 9).[9] Accordingly the Court will

---

[8] The Board also argues in its Memorandum with respect both to the O/G and S/L services that it pays no additional fee to its providers when services take place during the school day and therefore that the Court should somehow further discount the amount it owes Plaintiffs on this basis. (Def.'s Trial Mem. at 11-13.) Because there was no evidence that the Board ever made any concrete offer to Plaintiffs to provide services during the school day, to the extent it offered to provide the services at all, any further discount would be based on speculation.

[9] Although at trial when Ms. Doe was asked if the 12.2 hours were covered by insurance she responded that they were not, the Court presumes this was an error given Ms. Doe's earlier sworn

reduce Plaintiff's calculation for Ms. Doe's reimbursement expenses by $2,340.00, the amount claimed for services which were paid for by insurance. (*See* Pl.'s Post Trial Mem. at B2-3.)

> *b. Ms. Burke was not an Appropriate Provider of* Orton-Gillingham Reading *Instruction Under John Doe's Stay-Put IEP*[10]

In John Doe's Stay-Put IEP, the parties agreed that his reading instruction would consist of the O/G methodology and that John's O/G instruction would be provided by a "Tutor" and would be "Community-Based." (Def.'s Ex. A (Stay-Put IEP) at 2.1, 10.1.) Accordingly, John is entitled to continue receiving reading instruction using this method and under these conditions. *See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 171 (2d Cir. 2014) (the stay-put provision of the IDEA "requires a school district to continue funding whatever educational placement was last agreed upon for the child until the relevant administrative and judicial proceedings are complete."); *Mackey v. Board of Educ. for the Arlington Cent. Sch. Dist.*, 386 F.3d 158, 163 (2d Cir. 2004) (stay-put analysis looks to the IEP that was "most recently implemented," "actually functioning," or "previously implemented," as of the time the dispute arose.") (internal quotation

---

statement, which occurred far closer in time to when the physical therapy services were provided. (Tr. I at 164:15-165:4.)

[10] Defendant's February 16 Trial Memo [Doc. # 178] claims that any award that this Court makes for reimbursement of the O/G services must subtract "any charges incurred by the Parent from December 7, 2015 to the present for the different provider that the Parent has unilaterally chosen to provide Orton-Gillingham tutoring, to the extent that such charges exceed the charges for the 5 hours' worth of Orton-Gillingham tutoring that the Board would have had to pay Ms. Burke."(Def.'s Trial Memo. [Doc. # 178] at 8.) However, in four subsequent submissions Defendant stipulated that it owes Plaintiff $15,718.50 in reimbursement costs through March 11, 2016. (*See* Def.'s 4/7/16 Status Report [Doc. # 190] at 2) ("Based on the evidence submitted by Plaintiffs with their Trial Memorandum (Dkt. # 179), from April 27, 2010 through March 11, 2016 . . . the Board owes Plaintiffs $15,718.50."); Def.'s 6/16/16 Status Report [Doc. # 195] at 2 (same); Def.'s 8/5/16 Status Report [Doc. # 205] at 2 (same); Def.'s Supp. Trial Memo at 4-5) (same).)

marks and citations omitted). At its core, the dispute between the parties regarding reimbursement is whether Ms. Burke was qualified to provide the O/G reading instruction to which John Doe was entitled and from which he was continuing to benefit.[11]

As evidenced by Ms. Doe's rejection of Ms. Burke, Plaintiffs vehemently contest that Ms. Burke is appropriately qualified to provide reading instruction to John. They argue, based upon Dr. Kemper's testimony, that in order for a provider to be appropriate to provide O/G instruction to John, "that individual must have completed a rigorous course of training overseen by the non-profit Academy of Orton-Gillingham Practitioners and Educators ("AOGPE")." (Pl.'s Post Trial Mem at 6-7 (citing Tr. II at 238:11-240:19).) Plaintiffs urge that John Doe's "stay-put guarantee to [O/G] instruction would be vitiated . . . if the Board were permitted to use an individual such as Ms. Burke, who . . . lacks sufficient grounding in that method." (Pl.'s Reply at 3.)

Defendant asserts that "[a]ccording to 34 CFR 300.15, 'qualified' means 'that a person has met [the state educational agency's] approved or recognized certification, licensing, registration or other comparable requirements that apply to the area in which he or she is providing special education or related services.'" (Def.'s Post Trial Mem. at 10.) Defendant then proffers that because Ms. Burke is certified by the Connecticut Department of Education to teach reading for students

---

[11] Dr. Kemper testified that John has required and continues to require the Orton-Gillingham approach to the teaching of reading in order to make progress. Dr. Kemper explained that Orton-Gillingham is a unique set of specialized principles that can be implemented effectively only by a qualified provider. (Tr. II at 234:19-235:9, 235:22-236:2.) He testified that Orton-Gillingham instruction, provided 1:1 by qualified individuals, is the only method of reading instruction that has ever worked with John, and is the reason that John has done as well as he has with reading. (Id. at 265:15-20, 266:14-17; 330:1-10.) Ms. Doe also testified that, based on her observation of her son, Orton-Gillingham was the only method that worked for him. (Tr. I at 85:25-86:3.)

11

grades 7-12, has a Bachelor's degree in English, has a Master's degree in Reading, is trained in O/G principles and has tutored other students with dyslexia, she "is qualified to provide reading instruction to the Student using O/G principles." (Def.'s Post Trial Mem. at 10.)[12]

However, as Plaintiff points out, 34 CFR 300.15 does not contain the language quoted by Defendant and is irrelevant.[13] Although the Court was unable to identify the exact language Defendant cites in any regulation or statute, the relevant section of the IDEA appears to be Section 1412(a)(14), titled "Personnel qualifications."[14] That section states with respect to "Related services personnel and paraprofessionals," that "[t]he qualifications under subparagraph (A) include qualifications for related services personnel and paraprofessionals that–(i) are consistent with any State-approved or State-recognized certification, licensing, registration, or other comparable requirements *that apply to the professional discipline in which those personnel are providing . . .*

---

[12] Defendant relies upon *T.M. v. Cornwall Central School District* to argue that Ms. Doe's rejection of Ms. Burke was improper because "[t]he IDEA's pendency provision does not entitle a disabled child to keep receiving services from the exact same service providers . . .; instead, it only entitles the child to receive the same general type of educational program." (*See* Def.'s Post Trial Mem at 7-8 (quoting *T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 171 (2d Cir. 2014).) In that case, the Second Circuit ruled that the parents were not entitled to recover more than the district's cost to provide stay-put services, where the district had offered to provide "the exact same services" as the parents had been providing, but the parents preferred to continue using the independent professionals who had been working with the student. *Id.* Unlike here, there was no dispute as to the district providers' qualifications and thus it was evident that the child was indeed receiving "the same general type of educational program." *Id.*

[13] That section states: "[e]valuation means procedures used in accordance with §§ 300.304 through 300.311 to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs." 34 C.F.R. § 300.15.

[14] Plaintiffs speculate that perhaps Defendant intended to refer to 34 C.F.R. § 300.18, which concerns "[h]ighly qualified special education teachers." However, the language Defendant quotes does not appear in this Section either. Moreover, the school's own selection, Ms. Burke, is not a certified special education teacher.

*related services . . . .*" 20 U.S.C.A. § 1412(a)(14)(B)(i) (emphasis added).[15] Thus, the focus is on state-approved certification that applies to the area in which services are being provided. Here, the "professional discipline" is specifically the instruction using the O/G methodology, which does not appear to have a specific state certification program, but rather there are several organizations which provide varying types of certifications. (*See* Tr. II at 244:22-245:1.)

Ms. Doe testified that the original provider under the Stay-Put IEP, Theresa Ackerman, was certified by the AOGPE (Tr. I at 172:5-8.) Dr. Kemper testified that "[b]ecause of the severity of dyslexia that John presented, [he] determined right off the bat he really needed a pure Orton-Gillingham approach from a highly qualified person through the Orton-Gillingham board of practitioners."[16] (Tr. II at 329:18-20.) The evidence adduced at trial revealed that Ms. Burke had only limited training in O/G instruction, having taken a single introductory course through a group called the Institute for Multi-Sensory Education ("IMSE"). (Tr. II at 386:2-4.) This program consists of only 30 hours of classroom instruction, with no practicum. (Tr. II at 386:2-16.) After Ms. Burke attended this program, IMSE's own materials state that she was trained only to work with students in kindergarten through grade three. (Tr. II at 245:18-22.) At the time the Board proposed her as an instructor for John, he was a sophomore in high school. Dr. Kemper agreed that for these reasons Ms. Burke was not an appropriate provider for John Doe. (*Id.* at 246:18-

---

[15] Section A states generally that the State educational agency is required to ensure that the "personnel necessary to carry out this subchapter are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities." 20 U.S.C.A. § 1412(a)(14)(A).

[16] When Dr. Kemper recommends the O/G approach for a child "it [must] . . . be a person who is certified by the Academy of Orton-Gillingham Practitioners and Educators, which is the certifying board for Orton-Gillingham." (Tr. II at 235:22-236:2.)

247:14.) Moreover, even Donna Gittleman acknowledged that an individual may be certified but may not be an appropriate provider for a particular student.

The Court also credits Ms. Doe's testimony that during the Stay-Put IEP period, the Board's then-Director of Special Education, Steve Buck, instructed her to locate community-based providers for the O/G services, for which the Board ultimately paid. (Tr. I at 122:6-13.) The Board did not introduce any evidence to the contrary. Where the very terms of the Stay-Put IEP specify community-based tutors, the Court will not now require that instruction be provided instead by a certified public school teacher.

The Court concludes that where the Stay-Put IEP specifically requires provision of O/G tutoring, an individual who is only trained to work with students up to the third grade level was, and continues to be, an inappropriate provider of these services for John Doe. Although Ms. Burke may be a qualified reading instructor, she does not possess the requisite expertise in O/G principles to effectively instruct John Doe using this method. The services of an inappropriate individual are hardly "the same services" as the Stay-Put IEP specified. *T. M.*, 752 F.3d at 171. Therefore, finding the testimony of Dr. Kemper and Ms. Doe as to the reasonableness of the rates she has paid for O/G services credible,[17] the Court orders that the Board reimburse Ms. Doe for the full amount she expended on these services.

---

[17] Dr. Kemper testified, based on his professional knowledge and experience, that the going rate in southern New England for such instructors is $90 to $200 per hour. Tr. II at 281:14-16. Ms. Doe testified, based on her extensive experience in locating providers and arranging for services for John, that Orton-Gillingham instructors in her area charge $93 to $125 per hour. Tr. I at 92:3-7. John's current Orton-Gillingham instructors, Ms. Stone and Janet Campbell, charge $93 and $125 per hour, respectively. Tr. I. 45:12-17.

### c.   Speech Language Services

By letter dated January 20, 2016 (*see* Def.'s Ex. I), "the Board notified the Parent that she would only be reimbursed for any providers she used for any speech language ('S/L') or occupational therapy/physical therapy ('OT/PT') services up to the amount of the rate the Board would have had to pay qualified providers for these services." (Def.'s Post Trial Mem. at 12.) Since that time Ms. Doe has funded speech language services, but not OT/PT.

The Board claims that the evidence established that it employs qualified personnel capable of providing the stay-put speech language services and that the speech pathologist it employs "adheres to the teacher's contract for tutoring hours worked outside the school day, and would therefore[] be paid $37.56 per hour for any such tutoring . . ." (*Id.*) However, as Plaintiffs point out, in that January 20 letter Ms. Gittleman conceded that the Board was unable to find qualified providers for John for S/L or OT/PT. (*See* Def.'s Ex. I (1/20/16 Letter From Ms. Gittleman.) Furthermore, Ms. Gittleman confirmed through trial testimony that the Board never identified a specific speech provider for John Doe, leaving Ms. Doe to locate and pay for such providers herself. Nor did the Board offer any evidence that Ms. Doe could actually obtain speech services for $37 per hour, which rate is not available to Ms. Doe, who is not a party to the Board's contract with its employees.[18]

Consequently, again crediting the testimony of Dr. Kemper and Ms. Doe as to the reasonableness of the rates Ms. Doe actually paid, the Court finds that the Board is required to reimburse Ms. Doe for the total amount she expended on speech language services.

---

[18] The testimony established that this figure is the district rate and is based on the Board's contractual arrangements with its employees' bargaining units, and bears no relationship to the actual, reasonable market rates charged by professionals in these fields.

### 2. Transportation Costs

Plaintiffs also seek reimbursement for the cost of transporting John to and from those Covered Services which had been provided at Plaintiffs' home under the Stay-Put IEP: five hours of O/G services and one hour of speech language therapy.[19] (Tr. I at 96:10-97:16). The Stay-Put IEP indicates that transportation was "N/A" (i.e., not applicable) and, as the Board urges, it was not under any obligation to pay any transportation costs for any Covered Services that were to be provided to John. Thus, the Board asserts that "the Stay-Put IEP cannot now be re-written to require the Board to reimburse the Parent" for these transportation costs. (Def.'s Reply at 2.) On the other hand, Plaintiffs argue that "[b]ut for the Board's violation of its stay-put obligations, Ms. Doe would not have had to incur these [transportation] expenses." (Pl.'s Post Trial Mem at 12.)

The Court agrees with Plaintiffs that transportation costs should be borne by the Board to the extent that its violation of John's stay-put rights caused those expenses to be incurred. Ms. Doe testified that the transportation expenses for services that would have been provided in her home under the Stay-Put IEP but to which she was forced to drive John once the Board ceased providing services totaled $6,654.84 for the period from April 27, 2010 to September 7, 2016, at the then-current IRS rates for each year. (Tr. I at 100:21-101:3.) Additionally, for the period from September 8, 2016 to January 11, 2017, those expenses total $43.20. (Doe. Aff. V [Doc. # 236] ¶ 12.) Adding these two amounts together produces a total stay-put transportation amount of $6,698.04 for the period from April 27, 2010 to January 11, 2017.

---

[19] Ms. Doe testified that she transported John to the other two hours of speech language therapy under the Stay-Put IEP. (Tr. I at 99:20-23.)

Accordingly, the Board shall reimburse Ms. Doe for transportation costs for travel to and from covered services which had previously taken place in her home, for a total of $6,698.04 through January 11, 2017. This figure may be supplemented with competent documentation by Plaintiffs within ten days of this Judgment to include any costs incurred between January 12, 2017 and the date of this Judgment.[20]

### 3. *Defendant Owes Interest on the Reimbursement Expenses*

In view of the length of time over which the Board knowingly persisted in its violations, the Board is ordered to pay interest to Ms. Doe on all of the items as to which this Court orders reimbursement. Interest at the rate set forth in 28 U.S.C. § 1961(a)[21] should accrue from the dates on which she paid for each service. *See Streck v. Bd. of Educ. of the E. Greenbush Cent. Sch. Dist.*, 408 F. App'x 411, 414-15 (2d Cir. 2010) ("because the Strecks incurred these costs years before the first district court decision in this case, the interest on these expenses should run not from the date

---

[20] Defendants shall have seven days thereafter to submit any response to Plaintiffs' submission.

[21] That provision provides in full:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

28 U.S.C.A. § 1961(a)

of the district court's first decision (as generally prescribed by 28 U.S.C. § 1961(a)), but from the date on which the Strecks actually paid each expense."). The parties will have twenty-one days from the date of this Judgment to submit their proposed interest calculations and methodology.

### 4. Total Amount Awarded Ms. Doe as Reimbursement to be Paid by Defendant

In summary, the Court finds that Defendant must reimburse Plaintiffs in the amount of $29,857.90 representing the total out-of-pocket expenditures ($127,302.90) on Covered Services from April 27, 2010 through January 11, 2017, of which $97,445.00 has already been reimbursed. Additionally, it shall reimburse $6,698.04 in transportation expenses, making the total reimbursement award through January 11, 2017 $36,555.94, plus interest to be determined.

### B. Compensatory Education

Compensatory education is "prospective equitable relief, requiring a school district to fund education beyond the expiration of a child's eligibility as a remedy for any earlier deprivations in the child's education." *E. Lyme Bd. of Educ.*, 790 F.3d at 456–5 (quoting *Somoza v. N.Y.C. Department of Education*, 538 F.3d 106, 109 n.2 (2d Cir. 2008)). In Connecticut, a child remains eligible under the IDEA until he or she reaches the age of twenty-one or graduates from high school, whichever occurs first. Conn. Gen. Stat. Ann. § 10-76d(b).[22] Unlike the standard for an IEP, which requires only that the schools provide "'some benefit,' compensatory awards must do more–

---

[22] The IDEA provides that "a free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21." 20 U.S.C. § 1412. However, "[t]he obligation to make a free appropriate public education available to all children with disabilities does not apply with respect to children aged . . . 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice." 20 U.S.C. § 1412(a)(1)(B)(i). The testimony of Ms. Davis further confirmed that once a child graduates from high school, the school district is no longer responsible for that child's special education needs.

they must *compensate*." *Reid*, 401 F.3d at 525 (quoting *Bd. of Ed. of the Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176 (1982)) (emphasis in original).[23]

The Second Circuit specifically found that John Doe is entitled to compensatory relief here, holding:

> [W]hen an educational agency has violated the stay-put provision, compensatory education may—and generally should—be awarded to make up for any appreciable difference between the full value of stay-put services owed and the (reimbursable) services the parent actually obtained. In this case, the Board owes . . . compensatory education to fill the gap of required services that the Parent did not fund.

*E. Lyme Bd. of Educ.*, 790 F.3d at 456–57. It then instructed this Court to calculate the total value of the services specified in the Stay-Put IEP owed to John for the relevant time period, and after accounting for the reimbursement of expenses already incurred, to "direct the Board to provide . . . the remainder of the total value as compensatory education to commence at the conclusion of litigation." *Id.* at 457. The Second Circuit emphasized that "[w]hatever its precise form, the remedy must be appropriate in light of the purpose of the [IDEA]," but left to this Court's equitable discretion "the mechanics of structuring the . . . award" including "whether compensatory education should be limited to the kinds of services specified in the amended 2008-2009 IEP, or encompass analogous educational services appropriate to the Student's current needs." *Id.*

---

[23] The Supreme Court in *Rowley* held that "[t]he basic floor of opportunity provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201. According to the DC Circuit, this standard "looks to the child's present abilities [and therefore] an IEP conforming to that standard carries no guarantee of undoing damage done by prior violations," in the way a compensatory award does. *Reid*, 401 F.3d at 523.

### 1. *The Value of the Compensatory Services due*

Despite the Second Circuit's instructions, Defendant argues that John Doe is not entitled to any compensatory education at all because "there has been no discernible lost progress attributable to any covered services not provided by the Board as per the Stay-Put IEP." (Def.'s Post Trial Mem. at 13.) According to Defendant, awarding compensatory damages would violate the Second Circuit's directive that compensatory education "'must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.'" *East Lyme Bd. of Educ.*, 790 F.3d at 457 (quoting *Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 524 (D.C. Cir. 2005)). Plaintiffs assert that Defendant's contention is spurious, and that the Court must order the Board to reimburse the "'just value'" of the stay-put services the Board should have provided. (Pl.'s Post Trial Mem. at 14 (quoting *Streck*, 280 F. App'x at 68-69).)

### a. *John Doe is Entitled to Compensatory Education*

Defendant mischaracterizes the Second Circuit's citation to *Reid* while ignoring the strong language in its decision directing the award of compensatory education. The language from *Reid* was included in the following manner, as a parenthetical only:

> Given the possibility that the Student's educational needs have changed since the commencement of proceedings, we leave to the district court whether compensatory education should be limited to the kinds of services specified in the amended 2008–2009 IEP, or encompass analogous educational services appropriate to the Student's current needs. *See Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 524 (D.C. Cir. 2005) ( "[T]he ultimate award [of compensatory education] must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.").

*E. Lyme Bd. of Educ.*, 790 F.3d at 457 (emphasis added).[24]

Taken in conjunction with the language directing this Court to award compensatory education to John Doe, the Second Circuit's citation to *Reid* was not, as Defendant contends, a "directive" that the Court undertake the impossible analysis of ascertaining what benefits John Doe would have received from services that were never provided. In fact, the Circuit's evident approval of this Court's consideration of John Doe's current needs so as to fashion the compensatory education such that it encompasses "analogous services" conflicts with Defendant's focus on whether the specific services in the IEP would have benefited John had they been provided.[25] *E. Lyme Bd. of Educ.*, 790 F.3d at 457. The Circuit opinion implicitly contemplates a broader inquiry, taking into consideration the fact that had the district not violated the IDEA, it would have created a new IEP for John each year, conforming to his changing needs.[26]

Defendant clings to the language in *Reid* and several subsequent district court cases in the context of the denial of a FAPE suggesting that if a student "has flourished in his current

---

[24] The "see" introductory signal "is used instead of '[no signal]' when the proposition is not directly stated by the cited authority but obviously follows from it[, meaning] there is an inferential step between the authority cited and the proposition it supports." *The Blue Book* 58 (20th Ed. 2015). Thus, the parenthetical in which the Second Circuit articulates the *Reid* standard is clearly used as support for the proposition in the sentence, *i.e.*, that this Court may consider including analogous services in any compensatory education award.

[25] The phrase "analogous services" is not one that appears to have been defined or even referenced in other IDEA cases. It is discussed in further detail below.

[26] Contrary to Defendant's contention otherwise, this Court found, and the Second Circuit agreed, that the Board's refusal to propose an IEP for the 2010-2011 school year or any of the subsequent school years amounted to a denial of a free and appropriate public education ("FAPE"). *E. Lyme Bd. of Educ.,* 790 F.3d at 450. The Board next proposed an IEP for the 2014-2015 school year. (Tr. I at 155:18-19 ("[t]here was a completed IEP for the years '14, '15 and '16.").

placement" compensatory education may not be required. *See Phillips ex rel. T.P. v. D.C.*, 736 F. Supp. 2d 240, 247 (D.D.C. 2010) (quoting *Thomas v. Dist. of Columbia*, 407 F.Supp.2d 102, 115 (D.D.C. 2005); *see also AS. v. Harrison Twp. Bd. of Educ.*, Civil No. 14-147 (NLH/KMW), 2016 U.S. Dist. LEXIS 57008, *12-13 (D.N.J. Apr. 29, 2016), *reconsideration granted in part and denied in part, on other grounds, AS. v. Harrison Twp. Bd. of Educ.*, 2016 U.S. Dist. LEXIS 109822 (D.N.J. Aug. 18, 2016) (compensatory education was unnecessary where "there was no discernable lost progress" because the student "was on the right educational path and did not require restoration[,] [and therefore a]warding [him] further compensatory education . . . would be akin to awarding damages which is not appropriate under the IDEA.")

However, these cases are distinguishable and ultimately do not support Defendant's contention. As Plaintiffs point out, the *Phillips* court clarified that if a child has been denied a FAPE, the court must apply the *Reid* standard to craft the requisite award, and indeed, "[o]nce a plaintiff has established that [he or] she is entitled to an award, simply refusing to grant one clashes with *Reid*." *Phillips*, 736 F. Supp. 2d at 248. Despite noting the theoretical possibility that an award of compensatory education may not be required where "the alleged deficiencies suffered by [the student] . . . have already been mitigated (or even totally alleviated) by his placement at [another] [s]chool," the district court emphasized that the ultimate focus required by *Reid* is the child's individual needs. *Id.* at 249. Where there was an insufficient evidentiary basis for concluding compensatory education was necessary to remedy the denial of the child's FAPE, that court remanded the case to the administrative Hearing Officer for further factual development regarding how the recommended compensatory education would "provide the educational benefits that likely would have accrued" had the services been "supplied in the first place." *Id.* quoting *Reid*, 401 F.3d at 524.

Similarly, *AS. v. Harrison Township Board of Education* arose in the context of the denial of a FAPE. There, the district court was reviewing an ALJ decision, requiring it to give "due weight and deference to the findings in the administrative proceedings." 2016 U.S. Dist. LEXIS 57008, *12-13. The school district had denied the student a FAPE for a single school year during which the student had been unilaterally placed in another school where he "had a one-on-one aide to help him, one regular teacher and one special education teacher, and a classroom maximum of 11 students, up to half of whom also had IEPs" and therefore received many of the same benefits as if he had been given the FAPE to which he was entitled. *Id.*[27]

Here however, the fact that this case involves violation of stay-put rights, as opposed to denial of a FAPE is critical. There is no dispute that the Board violated John Doe's stay-put rights, as confirmed by the Second Circuit, and therefore that certain services to which John was entitled under the Stay-Put IEP were never provided to him, either by his mother or Defendant. In contrast, when a school district denies a child a FAPE and that child attends another school instead, it is possible that this alternative school could provide the child with the benefits he or she would have obtained if not denied a FAPE by the school district. Thus, in the FAPE context, the circumstances might support the argument that there is nothing for which to compensate, making any award of

---

[27] Plaintiffs argue that in fact *AS* supports their position because the district court awarded exactly the type of compensatory relief that the Does are seeking: establishment of a fund from which to pay the private provider of compensatory services. *A. S.*, 2016 U.S. Dist. LEXIS 57008 at *23; *see also A. S. v. Harrison Twp. Bd. of Educ.*, No. 14-147 (NLH/KMW), 2016 U.S. Dist. LEXIS 109822 at *5-*7 (D.N.J. Aug. 18, 2016) (on reconsideration, discussing and expressly approving "trust fund" mechanism).

compensatory education an impermissible award of damages. That is not the case here, however, where the services were never provided in any manner.[28]

The Court is unpersuaded that inherent in a single parenthetical from *Reid* was a requirement that this Court endeavor to travel back in time, correct the Board's wrong and provide John with the missing services, such that it could then determine what benefits he would likely have accrued from those services Defendant should have provided. A plaintiff cannot be asked to establish that which is impossible–how a child would have benefited from services he or she never received. This is especially impractical considering the fact that in the ordinary course pursuant to the IDEA, those precise services may not be kept in place during subsequent years, as the child matures and develops. Therefore, although the award of compensatory education in this case is specific to the Board's failure to continue providing John with the services in his Stay-Put IEP, the Court will not constrain its definition of what constitutes compensatory education so narrowly that its practicality is lost. Rather, the Court presumes that because the specified services were included in the Stay-Put IEP, John Doe would have gained at least some benefit had he been provided those services.

Moreover, as Plaintiffs remind the Court, compensatory education is an equitable remedy. The purpose of the Act "'to assure that all handicapped children have available to them . . . a free appropriate public education which emphasizes special education and related services designed to

_____

[28] Defendant's argument rests on the incorrect premise that where John Doe is on track academically, failure to show any educational deficiencies, i.e., "lost progress," is equivalent to establishing that John would not have benefited from the services in the Stay-Put IEP even if they had been provided. However, there is a clear distinction between regressing ("lost progress") and not obtaining any benefit from something. The fact that John Doe has been successful academically does not necessarily mean he would not have received any benefit from those services.

meet their unique needs [and] to assure that the rights of handicapped children and their parents or guardians are protected,'" is better served by holding schools accountable for failure to comply with their obligations where practical. *See Burlington*, 471 U.S. at 367 (quoting 20 U.S.C. § 1400(c)). Permitting a district to gamble based on the fact that a child may still make progress with the services the parents provides such that it will be excused from its obligations altogether surely does not align with the purposes of the Act.

Accordingly, this Court finds that the guiding question is the extent to which John Doe has current needs that will continue into the future such that he would benefit from services analogous to those which were appropriate at the time the 2008-2009 Stay-Put IEP was implemented. Because the phrase "analogous services" has not previously been defined the Court looks to the dictionary meaning of "analogous," defined as "susceptible of comparison either in general or in some specific detail: showing an analogy or a likeness that permits one to draw an analogy." *Webster's Third New International Dictionary* 77 (1993). The word "analogy" in turn is defined as "resemblance in some particulars between things otherwise unlike." *Id.*[29]

The Court concludes that analogous services should mean those services which benefit John based on his current disability and needs. The "analogy" is that the compensatory services may be "unlike" the services under the Stay-Put IEP in that they are not the exact same services listed, but there is still a "resemblance," in that like the stay-put services, the compensatory services are crafted to fit John's educational needs. *See id.*

---

[29] Garner's Modern American Usage states that the word analogous means "parallel in certain respects" but advises that "the word should be avoided where *similar* suffices [because] the two are not perfectly synonymous. What is *analogous* serves as an analogy for guidance, while *similar* carries no such connotation." Bryan A. Garner, *Modern American Usage* 44 (3rd ed. 2009).

### b. *John Doe has Current Needs That Will Likely Continue Through College*

The evidence establishes that although John has been successful academically, he continues to have deficiencies which necessitate the provision of services and which will likely persist through his college years. For instance, with respect to written work, it takes John several hours to write what a student adept at writing could write in a half-hour. (Tr. II at 337:8-16.) Dr. Kemper testified that although John Doe is improving in spelling and reading with the help of assistive technology, he continues to have oral motor issues such as pronunciation of multisyllabic words. (Tr. II at 273:14-23.) He opined that, overall, both oral and written language expression continue to be problematic areas for John.[30] (*Id.* at 273:25-274:1.) The contents of the IEP (the "2015 IEP") developed at an East Lyme planning and placement team meeting held June 11, 2015 confirmed this, among other current needs.[31]

The first page of the 2015 IEP states that John Doe is "evaluated as having a disability, and needs special education and related services." (Ex B. at 1.)[32] In the section titled "Present Levels of Academic Achievement and Functional Performance" the IEP lists as "concern[s]/need[s]"

---

[30] Ms. Doe confirmed these needs. (Tr. I at 65:5-68:19-20 (noting that: "he can't convey his thoughts concisely so that he gets a point across to the listener so that the task can be done. . . . [l]ike relating a relatively simple story, I have to actively work to figure out what the story is;" [w]riting clearly and concisely[] to get his . . . point across[] is also a significant area of deficit; and that "[h]e's not an efficient decoder, so that he could read fast.").)

[31] A team of individuals including Ms. Gittleman and Ms. Doe, as well as an East Lyme special education teacher, speech language provider and occupational therapy provider developed the IEP. (*See* Def.'s Ex. A at 1.1.)

[32] Ms. Gittleman testified that for a student to receive special education, he must have a disability that has a negative impact on his school performance and requires him to receive special instruction.

requiring specialized instruction: "[w]ritten language sample identifies areas of concern in spelling and organization of ideas [and l]etter formation is larger than typical for a grade 9 student," "social communication," "at/risk range for communication, adaptability and anxiety," and "disorganized, misinterprets or does not understand social cues." (*Id.* at 4-5.)[33] The IEP further notes that John's disability impedes his educational progress because in light of his spelling and organization difficulties he is only able to develop a well written essay with the assistance of graphic organizers and spell check and notes that "due to [his] deficits in social skills [John] may be unable to navigate interactions with peers and adults without explicit instruction." (*Id.*) Finally, the IEP lists eight different annual goals and related short term objectives for John Doe related to the identified areas of need, all of which Ms. Gittleman testified the district agreed were areas of need for John.[34]

Additionally, John Doe's handwriting is "very laborious [and] large" according to Ms. Doe (Tr. I at 167:3), and Ms. Gittleman testified that it was considered a concern at the June 2015 IEP meeting (Tr. II at 448:9-10).[35] Consequently, Dr. Kemper recommends John utilize a computer and assistive technology, including the voice to text software program called Dragon Naturally Speaking, which he can then edit on the computer. (*Id.* at 263:13-20; 270: 269:23-270:10.) This program is a tool often recommended by independent evaluators and school districts to give more

---

[33] Based upon a written language test (the "TOWL"), the IEP rated John Doe as "below average in spelling . . . [and his c]linical judgment and classroom performance indicate a deficit in written language." (Ex B. at 4.)

[34] She acknowledged that even though John is achieving at very high levels, there are still issues relating to his anxiety, organization, and social interaction.

[35] Ms. Doe claims that there is a "decline in the potential to remediate [John's handwriting] because . . . handwriting is more ingrained in muscle memory" and easier to remediate at a young age. (Tr. I at 192:23-193:5.)

independence to special education students with language issues. (*Id.* at 333:17-25.) Specifically, for John, this program enables him to "get a lot more output," when generally his oral and written expressive language is very sparse. (*Id.* at 334:21.)

Finally, the evidence demonstrates that John requires a "small, structured setting where he feels safe and secure." (Tr. I at 274:25-275:1.) According to Ms. Doe, "[i]f he doesn't feel comfortable and the anxiety kicks in . . . [h]e has a tendency to shut down." (Tr. I at 73:17-20.) She testified that in those circumstances John will not avail himself of the general education program and his functioning can become so disrupted that he becomes less available for learning even with regard to the services he receives outside of school. (Tr. I at 78:23-79:8.)

Thus, there is ample evidence that John Doe continues to be impacted by his disability such that services remain necessary and will continue to remain so throughout college. Specifically, at this time Dr. Kemper recommends that an education program for John include three to four hours a week of oral expression and about five or six hours a week of written expression, both of which must be provided one-on-one. (Tr. II at 266:4-13.) Dr. Kemper also specified that John will need assistance with whatever writing demands he encounters in college. (*Id.* at 277:4-11.)[36] Dr. Kemper concluded that John is "a very complex kid" and remarked that he has run across only several other students with similar disabilities to John. (Tr. II at 279:14-17.) The evidence taken as a whole establishes that John's disability will not subside before he has finished college and that he will therefore need at least some services through college in order to continue to succeed academically.

---

[36] John has been approved by the College Board for accommodations on College Board tests including the PSAT, SAT and Advance Placement Exams. (*See* Pl.'s Ex. 26 (Letter from College Board).) He was provided extra time for Reading, Writing, Mathematical Calculations, Listening and Speaking and granted permission to use a computer with word processing for essays. (*Id.*)

c.  *The Total Value of the Non-Provided Services Through Judgment is $330,781*

Defendant argues that in the event any compensatory education is awarded it should be in the form of hours provided by "qualified providers that the Board is able to obtain" based on John Doe's demonstrated ongoing analogous needs, and not in the form of monetary relief. (Def.'s Reply at 6-7.) Alternatively, Defendant urges that if the Court calculates the award in terms of monetary value, it should utilize "the rates that the board would be able to obtain for the student if he were still being educated within the school district, which the board . . . either offered to provide . . . and/or can provide." (Tr. I at 31:19-32:5.)[37]

Plaintiffs contend that the Second Circuit's decision requires this Court to determine, in monetary terms, the "just value" of the stay-put services that the Board should have provided to John but did not. (Pl.'s Post Trial Mem. at 14 (quoting *Streck v. Bd. of Educ. of E. Greenbush Cent. Sch. Dist*, 280 F. App'x 66, 68-69 (2d Cir. 2008)). They contend that the just value is the present value of the services–which Plaintiffs claim to have established through Ms. Doe's testimony and the substantial documentation of the costs of the services that she obtained, as well as the evidence that these rates constitute reasonable fair market rates. (*Id.* at 14-15 (citing *J.C. v. Vacaville Unified Sch. Dist.*, 2006 WL 2644897 at *7 (E.D. Cal. Sept. 14, 2006) (finding that where the plaintiff presented evidence of the regional fair market value of the services and that the rates of the

---

[37] The difference between these is a matter of semantics only: if the Court were to award the compensatory education in the form of hours for the Board to provide John Doe, those services would be at the rates the Board could obtain, rather than the higher market rates available to Ms. Doe, which is exactly the same as calculating the award using the rates available to the Board.

proposed service provider were within that fair market value, the appropriate value for compensatory education was determined using the rates of the proposed provider)).

The Court agrees with Plaintiffs that the total value of services should be calculated in dollars rather than hours. While an hour-for-hour remedy has been used by other courts in the past, based upon the facts of this case an award calculated in dollars is more appropriate.[38] First of all, the Second Circuit suggested that "the court may wish to consult remedies that [the Second Circuit has] endorsed in the past," citing as guidance *Streck v. Bd. of Educ. of the E. Greenbush Cent. Sch. Dist.*, 408 F. App'x 411, 415 (2d Cir. 2010), in which the compensatory award was calculated in dollars. Moreover, the Second Circuit appears to have envisioned a somewhat straightforward calculation when it directed this Court to "calculate the total value of the related services specified" in the Stay-Put IEP and, after the Board reimburses Ms. Doe for her out-of-pocket expenses, order "the Board to provide . . . the remainder of the total value as compensatory education." *E. Lyme Bd. of Educ.*, 790 F.3d at 457. The fact that this Court was directed to subtract the reimbursement expenses Ms. Doe monetarily incurred for Covered Services from the total

---

[38] In *Student X v. New York City Dep't of Educ.*, the court awarded the student the hours of services equal to the amount of time he was unlawfully deprived those services. Unlike here, the child was young enough that he continued to be eligible under IDEA, and thus remained the district's responsibility, for the duration of the compensatory education award. No. 07-CV-2316(NGG)RER, 2008 WL 4890440 (E.D.N.Y. Oct. 30, 2008). The Second Circuit in *Burr v. Sobol*, 888 F.2d 258 (2d Cir. 1989), affirmed its ruling in *Burr v. Ambach*, 863 F.2d 1071, 1078 (2d Cir. 1988), which allowed a student to remain in a state-supported school for one and a half years beyond age twenty-one as compensatory education equal to the amount of time that the student was improperly denied placement at this school. That case involved a fairly straightforward compensatory remedy where ordering the student's placement at the school for a particular length of time was essentially identical to providing the amount of money it would cost to attend the school for that length of time, which is not true here.

value in order to obtain the value of the compensatory services, suggests that the value should be calculated in terms of dollars and not hours.

Moreover, the Court finds it entirely impractical to have the Board provide the compensatory services considering John only has one year of high school remaining (which will not be at East Lyme) and will then matriculate into college at an undetermined location. The Court rejects the Board's claim that it could provide the services "remotely via electronic access (such as through Skype) given that services are currently being provided to the Student in this manner." (Def.'s Post Trial Mem. at 18-19 n.5.) The Court will not presume, and the Board did not offer any evidence, that simply because John receives limited services from Dr. Kemper via electronic means, all of his services can be effectively provided in this manner.

Furthermore, the Court will not limit the rates for services to those the Board would pay, but instead bases the value of the services on the market rates available to Plaintiffs. The purpose of compensatory education is to replace services Defendant failed to provide, and as discussed with regard to the reimbursement award, Ms. Doe is not privy to the same rates as the Board. It makes little sense to use rates for services which Ms. Doe cannot (and did not) obtain, for the result would be that the money paid to Plaintiffs would not be sufficient to actually obtain the services in the market.[39]

The evidence presented at trial was that the rates Ms. Doe paid for services were reasonable. Dr. Kemper testified based on his professional knowledge and experience that the market rates in southern New England for experienced speech-language therapists range from $150 to $250 per

---

[39] Using a monetary valuation also has the additional advantage of keeping the two parties from having to attempt to negotiate any further agreements regarding providers, rates or any other issues relating to the future services.

hour. (Tr. II at 279:17-20.) Ms. Doe testified, again based on her extensive experience in locating providers and arranging for services for John, that speech-language therapists in her area charge $95 to $200 per hour. (Tr. I. at 90:23-91:1.) The rates charged by John's current providers of speech services range from $117 to $200 per hour. (Tr. I at 40:11-21.) With respect to OT/PT, Dr. Kemper testified based on his professional knowledge and experience that the market rates in southern New England range from $90 to $300 per hour. (Tr. II at 343:13-15.) Ms. Doe testified, based on her experience in seeking OT/PT providers for John, that such a provider would charge $148 to $200 per hour. (Tr. I at 56:3-22.) Finally, Dr. Kemper testified that the going rate in southern New England for O/G instructors is $90 to $200 per hour. (Tr. II at 281:14-16.) Ms. Doe testified, based on her extensive experience in locating providers and arranging for services for John, that Orton-Gillingham instructors in her area charge $93 to $125 per hour. (Tr. I at 92:3-7.) As noted earlier, John's current Orton-Gillingham instructors, Ms. Stone and Janet Campbell, charge $93 and $125 per hour, respectively. (*Id.* at 45:12-17.)

Using the rates Plaintiffs propose, the full value of the services through January 11, 2017 is $294,181, and on an ongoing basis, the value of the services specified in the Stay-Put IEP amounts to $1,525 per week.[40] (*See* Pl.'s Post Trial Mem. at Table A2). Since January 11, 2017 twenty-four

---

[40] Defendant disputes the total value of the services, arguing that "Plaintiffs overinflated the 'full value' of services that were to be provided based on the Stay-Put IEP by utilizing the 'highest rate' for each service in each school year rather than the actual rate for each service." (Def.'s Status Report [Doc. # 205] at 3). Plaintiff specifically indicates that where John received services from multiple providers of the same classification during the same school year, Plaintiff's calculations for the full value of services utilized the highest rate. (Pl.'s Post Trial Mem. at Table A2). The Court is tasked with determining the total value of the services, not what Ms. Doe actually paid, although that may be a relevant factor. The Court does not agree that using the highest of the rates Ms. Doe actually paid within a particular school year amounts to overinflating the full value of the services,

weeks have passed, and accordingly the full value of Covered Services as of the date of this Judgment is $330,781.[41]

In accordance with the Second Circuit's instructions, the Court subtracts from this total the amount of Ms. Doe's reimbursement for services which as determined above was $127,302.90, (representing the sum to be ordered for reimbursement of services in this proceeding through January 11, 2017 ($36,555.94), as discussed above, plus the judgment amount the Board paid in June 2015 ($97,445).[42] *See Doe*, 790 F.3d at 457. This yields a total value of $203,478.10 which the Board must provide as compensatory education after conclusion of the case.[43]

### 2. *The Logistics of the Award*

Having determined that the compensatory services owed John will be provided in the form of dollars, the Court must now delineate the structure of the award, including the form the award will take, its duration, as well as outlining expenses which shall be reimbursable. Plaintiff urges that Defendant be ordered to place the amount owed in compensatory services into an escrow account for John's benefit, to be administered by a neutral third party and to be maintained for a period of

---

where the evidence established that these rates were within the range of the fair market value for those services.

[41] $1,525/week x 24 weeks = $36,000. This number is added to the full value through January 11, 2017 ($294,181) to give a total value of covered services through Judgment of $330,781.

[42] Reimbursement for stay-put transportation ($6,698.04 through January 11, 2017) is not subtracted from this amount, since transportation has not been included in calculating the total value of services.

[43] Again, to the extent Plaintiffs provide supplemental documentation of reimbursable expenses after January 11, 2017 to the date of this Judgment, the amount of compensatory education will be reduced to reflect any additional reimbursement paid to the Does.

six years from the date of judgment.[44] (Pl.'s Post Trial Mem. at 14.) Defendant maintains that Plaintiffs' proposal "is entirely without merit," (Def.'s Reply at 6) despite the Second Circuit's clear approval of such an account.

The Second Circuit referenced consideration of other remedies it has used, citing only one case—*Streck*, 408 F. App'x at 415. *East Lyme BOE*, 790 F.3d at 457. In *Streck*, the Second Circuit held that the school district must set aside the value of the prospective compensatory education in an escrow account seemingly identical to the one proposed by Plaintiff here. 408 F. App'x at 415. The Strecks were entitled to recover only the amount they actually spent on covered services and were required to present the bills or receipts to the escrow account manager who would then pay the appropriate party. *Id.* The court awarded the value of two years of compensatory reading education but permitted the escrow account to remain open for a period of three years, with any money remaining in the account upon its closing to be returned to the school district. *Id.*

This is precisely the remedy Plaintiffs request. Still, Defendant faults Plaintiffs for relying exclusively on *Streck*, which Defendant claims is not controlling because it occurred in the context of a FAPE. However, given the Second Circuit's endorsement of *Streck,* and consequently of the use of an escrow account for compensatory education, in conjunction with the practicality of such a remedy under the circumstances of this case, this Court concludes that John Doe is entitled to an escrow account, the details of which are described below.

---

[44] Plaintiff's proposal of six years stems from the fact that this is roughly equivalent to the period of time during which John was deprived of his stay-put rights.

*a. John Doe's Final Year of Eligibility Under the IDEA*

The Second Circuit ordered, and the parties assumed, that any compensatory education would "commence at the conclusion of litigation." *E. Lyme Bd. of Educ.*, 790 F.3d at 457. However, no one addressed the issue of how awarding compensatory education (addressing John's current needs) for a period during which John Doe continues to be covered by the IDEA (the 2017-2018 school year) interacts with the Board's continuing obligation under the Act to provide John Doe with a FAPE for that year. This would seem to excuse the Board in some respects, for the "compensatory education" it would be providing would essentially be what it remains otherwise obligated to provide John under the IDEA. By definition compensatory relief must be in addition to any existing rights under the IDEA, either compensating above and beyond that which is provided in the current IEP or extending the services beyond the child's eligibility. Otherwise, it would simply be awarding services to which the child is already entitled.

In other cases where the child remained eligible under IDEA for the time during which the compensatory award was granted, courts appear to have considered compensatory services to be *in addition to*, rather than in lieu of, those services covered by the IEP. In *Reid*, the D.C Circuit specifically noted that "[t]o make up for deficiencies in [the child's] prior education, [the parent] also sought extra instruction beyond his . . . IEP—in other words, 'compensatory education.'" 401 F.3d at 520. The compensatory education awarded in *P. v. Newington Board of Education* went beyond what was contained in the student's IEP. There, the court found appropriate the compensatory education granted by the hearing officer, who had concluded that

> for one school year . . . the school district had not properly addressed the student's behavior problems and had failed to give sufficient consideration to mainstreaming the student for more than 60% of the time. To remedy that situation, the hearing officer required the Board to provide P. with an inclusion consultant for one

calendar year. . . .This remedy addressed the areas in which the 2004–2005 IEP was deficient, and the period of time during which the additional support for P. was being provided was at least as long as the period during which P. had not been provided with a program that was appropriate.

*P. ex rel. Mr. P. v. Newington Bd. of Educ.*, 512 F. Supp. 2d 89, 112 (D. Conn. 2007), *aff'd sub nom.*

*P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111 (2d Cir. 2008).[45]

The question of what additional services might be required to compensate John runs into the issue, discussed earlier in this decision, of what John's current needs are. There was no evidence presented that John would benefit from double the amount of services in the latest IEP, nor was there any evidence presented regarding the likely contents of John's IEP for his final year of school. However, there is clear evidence that the providers Ms. Doe has obtained for John and the services he has received have been effective and that he continues to have certain needs requiring services.

As articulated above, the goal of compensatory education is not simply to provide "some benefit," as is the case with a FAPE, instead it is meant to actually compensate for the earlier deprivation. It would be inequitable to suddenly alter John's services as drastically as might occur if the Board were to provide the services based upon a new IEP developed for the 2017-2018 school year. Therefore, because John continues to have needs requiring services, and in light of the presumption that he would have benefited from the services he was not provided, this Court will not disrupt what has been shown to work. Although in some ways duplicative of what the Board

---

[45] In at least one case the court did not address the issue at all, but appears to have simply awarded duplicative services. The *Student X* court awarded "compensatory relief identical to the at-home services Student X, [who was still eligible under the IDEA,] should have received as his pendency entitlement. Defendant is ordered to fund and provide ten hours per week of at-home ABA and five hours per week of speech and language therapy, for fifty-seven weeks, the amount of time that Student X was unlawfully deprived of the services…" *Student X*, 2008 WL 4890440, at *26.

is required to provide John in his IEP, allowing John to continue working with those providers who have been effective (or similar replacements Ms. Doe is able to find), is compensatory in that it goes beyond the standard IEP.[46] Thus, the escrow account shall be opened as soon as practicable after all calculations have been finalized and in no circumstances more than fourteen days from the judgment date.

### b. The Board's Failure to Provide Services for a Period of Over six Years Constitutes a "Gross Procedural Violation"

After John graduates from high school he will no longer be eligible for services under the IDEA, however, compensatory education may extend beyond eligibility where there has been a "gross" violation. The Second Circuit in *East Lyme* wrote that it "need not decide whether the Board's failure to maintain a stay-put placement was a 'gross' procedural violation, because [John] . . . will not turn 21 for many years." *E. Lyme Bd. of Educ.*, 790 F.3d at 456 n.15. The panel thus apparently confirmed that a court need only find a gross violation of the student's IDEA rights in order to award compensatory education where the student is over twenty-one years old. *See A. v. Hartford Bd. of Educ.*, No. 3:11-CV-01381-GWC, 2016 WL 3950079, at *12 (D. Conn. July 19, 2016) (quoting *P. ex rel. Mr. & Mrs. P. v. Newington Bd. Of Educ.*, 512 F. Supp. 2d 89, 112 n.13 (D.

---

[46] Defendant argues

> [t]he law does not contemplate that the Parent should be permitted to dictate that services be provided only by the providers she has chosen at the rates those providers may charge her, and therefore, there is no basis to simply give her a pot of money so that she can choose to have whatever provider she wants perform whatever services she wants.

(Def.'s Post Trial Mem. at 6.) In this exceptional case where Ms. Doe has been forced to find providers and fund all services for John for over six years, the Court finds it appropriate to allow Plaintiffs the freedom to continue selecting the providers, as restricted by this opinion (see below).

Conn. 2007), *aff'd*, 546 F.3d 111 (2d Cir. 2008)) ("the 'gross violation' requirement for ordering

compensatory education 'has been applied only to cases involving claimants over the age of 21.'");

*S.A. ex rel. M.A.K. v. N.Y. City Dep't of Educ.*, No. 12-CV-435 RMM MDG, 2014 WL 1311761, at

*7 (E.D.N.Y. Mar. 30, 2014) ("before awarding compensatory education for a student older than

twenty-one, a court must find a gross violation of the student's [IDEA] right[s] . . . however,

whether the same prerequisite exists to awarding compensatory education for a younger student

is an open question."). Although all of the case law discusses the cut-off age of twenty-one, the

same logic and reasoning applies where a student has graduated high school, because similarly that

student is then no longer eligible for services under the IDEA.

Accordingly, finding this question necessary to answer, this Court holds that the Board's

failure to maintain a stay-put placement was a gross procedural violation of the IDEA entitling

John Doe to education extending beyond his eligibility—i.e., after he graduates from high school.

While there is little caselaw in the Second Circuit discussing what constitutes a gross violation,

several other courts have concluded that the deprivation of the benefit of the stay-put provision

rises to the level of a gross violation. *See Burr v. Ambach*, 863 F.2d 1071, 1075-76 (2d Cir. 1988),

*vacated sub nom. Sobol v. Burr,* 492 U.S. 902, *(1989), and aff'd on reconsideration sub nom. Burr by*

*Burr v. Sobol*, 888 F.2d 258 (2d Cir. 1989) (finding a gross violation in the undue delay in an agency

hearing and administrative review that resulted in the child being deprived of the benefit of the

statutory pendency provision and excluded from school, the court noted: the child was "denied an

appropriate education during pendency of the proceedings, the precise unfortunate result that the

'stay-put' provision was designed to prevent."); *Student X*, 2008 WL 4890440, at *24–25 (finding a

gross violation of the IDEA where student "was not completely deprived of all education, [but]

nonetheless experienced, for more than a year, the precise unfortunate result that the pendency

provision was designed to prevent . . . [because] Defendant . . . deprived Student X of services to which Student X was unequivocally entitled . . .”). Thus, having found that John's needs will continue through college, the escrow account shall remain open for a period of six years, beginning from the date of this judgment, or until John Doe completes college, whichever comes first.

The Board asserts that allowing the Parent to draw from the escrow account for up to six years is inappropriate “where, as here, Dr. Kemper testified only that the Student may need services through two years of college (if he attended a liberal arts school), and while the Parent, herself, indicated that it is unlikely the Student would use up the services owed to him by the Board.” (Def.'s Reply at 6.) The Court disagrees in several respects. Again, the Court has already found that John Doe's needs will persist through college.[47] Additionally, the fact that John may not be able to utilize the full value of the compensatory education services he is owed does not mean the Court should make this even more likely by limiting the period of time the account will remain open. Rather, the six year period makes practical sense because John was deprived of his stay-put rights for approximately six years and therefore logically he should be provided a similar amount of time in which to utilize the services owed to him. However, should he finish college before the six years expire, the account will close. There was no evidence that John would require services after college.

---

[47] Dr. Kemper testified that “[a]s far as [John's] writing is concerned, typically, knowing most college programs, the first two years are liberal arts. He would need the writing at least those first two years.” (Tr. II at 277:4-7.) However, he went on to add that “[d]epending on the area . . . that he goes into, whatever the writing demands are, he's going to need–he may continue to need those writing tutors helping him as well.” (*Id.* at 277:8-11.) Moreover, Ms. Doe confirmed John Doe would continue to have some use for services in college. (*Id.* at 402:4-12.) Moreover, common sense dictates that a child entering his senior year in high school who has had certain needs his entire academic life will continue to have some analogous if not identical needs during his final year of high school and through college.

Moreover, the Board is protected because whatever money John does not use prior to the escrow account's closing will be reimbursed to it.

### c. The Approved Expenditures

Plaintiffs ask that the reimbursable expenses include the following: "speech-language therapy; Orton-Gillingham reading instruction; oral and/or written language instruction; instruction in study skills, social skills, social behavior, and/or executive functioning skills; OT; PT; and transition-related skills; and services to address anxiety." (Def.'s Post Trial Mem. at 19-20.) As discussed above, the evidence shows that these are all areas in which John continues to have needs that would benefit from services and therefore these are appropriate "analogous services," which shall be reimbursed from the escrow account.[48] *See E. Lyme Bd. of Educ.*, 790 F.3d at 457. Similarly disability-related courses and/or support services in college that address John's special needs are appropriate expenditures. As requested, Plaintiffs shall be reimbursed for all such services, whether provided 1:1 or in a group setting.

Plaintiffs may also obtain reimbursement for assistive technology, including speech technology software such as Dragon Naturally Speaking, or applications geared towards organization, to allow John to benefit from his services. Moreover, evaluations by professionals in fields related to John's special needs shall be reimbursable to the extent they are required, as these

---

[48] Ms. Gittleman testified that "physical therapy as a related service is . . . different than physical therapy in the medical model [because i]t's required to enable the student to access their Special Education services," (Tr. II at 435:12-16), indicating John did not display the need for physical therapy at the time the 2015 IEP was drafted (*id.* at 435:16-22). Although John may not need physical therapy in order to access his special education services in the strict sense required for related services, to the extent physical therapy (or occupational therapy) would compensate for John's handwriting deficits the Court finds these are appropriate analogous services that shall be reimbursable.

are essentially an extension of the services themselves, and are necessary in order to ensure that the services being provided are those which will be most effective for John. Plaintiffs must provide copies of any such evaluations and all related documents to the escrow agent.[49]

John may obtain these services at any time, including summers. Reimbursement shall occur upon the Does' provision of appropriate documentation verifying the expense to the escrow agent, who will determine whether the expense is in fact reimbursable pursuant to the terms of this Judgment.[50] Plaintiffs shall be reimbursed for these expenses only to the extent that the services continue to be beneficial for John. Should any evaluation recommend or otherwise dictate that John no longer requires certain services, the escrow agent may consider this new information in determining whether the related expenses will continue to be reimbursed. The escrow agent holds the ultimate decision-making authority and may request additional information if he or she deems this would be helpful.

---

[49] The Court will not permit Plaintiffs to utilize the escrow account for tuition at Lyme Old Lyme high school "in order to provide an environment that reduces [John's] anxiety" as Plaintiffs request. (Pl.'s Post Trial Mem. at 19.) The Second Circuit decision specified that the compensatory education award could include analogous *services* but said nothing of any tuition reimbursement, which is not a "service" and was explicitly not provided in the Stay-Put IEP. (*See* Def.'s Ex. A at 2.1 (John "will remain at Solomon Schechter *at parent expense.*") (emphasis added.)

[50] Plaintiffs propose Attorney Deborah Tedford, who practices in Mystic, Connecticut, as the escrow agent, and who they represent has preliminarily agreed to serve in this capacity. Defendant did not object or make any alternative suggestion. Accordingly, the Court will appoint Attorney Tedford escrow agent assuming she remains willing to assume the role. In the case that Attorney Tedford is no longer available, the parties shall submit recommendations for an alternative escrow agent within fourteen days. The parties shall be equally responsible for paying the escrow agent and any associated costs with setting up, maintaining, or closing the escrow account. Funds from the escrow account may not be used to make such payments.

It is because of the Board's violation of the IDEA that the burden of finding and funding qualified, effective providers of services for a large portion of John's life has been entirely on Ms. Doe–and even the Board concedes that John has made tremendous progress because of Ms. Doe's efforts. It would be entirely inequitable to disrupt the system which has thus far been so effective. Accordingly, Ms. Doe will continue to be permitted to select the providers for reimbursable services. Still, the rates for all services must be within the range of fair market rates for the respective service based upon the time the service was provided.

Finally, at the end of the escrow period, any unused funds in the escrow account will revert back to the Board.

### III. Conclusion

For the foregoing reasons, the Board is ordered to reimburse Plaintiffs in the amount of 36,555.94 plus interest (the amount of which remains to be calculated) and to place $203,478.10 for compensatory education into an escrow account as soon as practicable after all calculations have been finalized, with the costs associated with the escrow account and agent's services divided equally between Defendant and Plaintiffs, as detailed above. Judgment shall enter in favor of Plaintiffs and against Defendant in accordance with this Memorandum of Decision.[51]

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of June 2017.

---

[51] As discussed above, upon submission reflecting supplemental reimbursement and transportation expenses incurred between January 12, 2017 and the date of Judgment, as well as the interest calculations, the Judgment will be amended appropriately. Plaintiffs shall submit within ten days any documentation of additional reimbursement and transportation expenses with any response by Defendant due seven days thereafter. The parties shall have twenty-one days from the date of Judgment to submit their interest calculations and methodology for the Court's consideration.